Nos. 25-4218, 25-3722, 25-3835, 25-4137, 25-4150, 25-4190

# United States Court of Appeals for the Ninth Circuit

———————

In re: College Athlete NIL Litigation

———————————————

DEWAYNE CARTER; NYA HARRISON; NICHOLAS SOLOMON; GRANT HOUSE; SEDONA PRINCE,

*Plaintiffs-Appellees,*

– v. –

K. BRAEDEN ANDERSON,

*Objector-Appellant,*

– v. –

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 4:20-CV-03919-CW, HON. CLAUDIA WILKEN, DISTRICT JUDGE

## APPELLANT'S OPENING BRIEF

PATRICK A. BRADFORD
BRADFORD EDWARDS, LLP
*Attorneys for Objector-Appellant*
575 Fifth Avenue, 14th Floor
New York, New York 10017
(917) 671-9470
pbradford@bradfordedwards.com

DENVER G. EDWARDS
BRADFORD EDWARDS LLP
1150 South Olive Street, 10th Floor
Los Angeles, California 90015
(213) 868-3310
dedwards@bradfordedwards.com

CP COUNSEL PRESS   (800) 4-APPEAL • (386048)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ............................................................ 1

JURISDICTION .................................................................................. 5

ISSUES PRESENTED ......................................................................... 6

STATEMENT OF THE CASE .............................................................. 8

    A.    Background Of The Division I Marketplace And
            Compensation Categories ....................................................... 8

    B.    Appellant .............................................................................. 10

    C.    Background Legal Landscape ............................................... 11

    D.    This Litigation And Its Original Class Certifications .......... 12

    E.    The Radical Expansion Of The Settlement Class To
            All D1 Athletes ................................................................... 14

    F.    The Settlement .................................................................... 16

    G.    Deficient Notice .................................................................. 20

    H.    Exorbitant Class Counsel Fees ............................................ 21

SUMMARY OF THE ARGUMENT ................................................... 21

    1.    Heightened Scrutiny And Structural Protections ................ 23

    2.    Material Conflicts Pervade Damages Valuations And
            Forward Looking Restraints (*Amchem, Ortiz*) ...................... 23

    3.    Obsolete Amateurism Premise And Distorted
            Valuation Undermine Adequacy ......................................... 24

    4.    The Settlement's Prospective NIL Regime Imposes A
            New Illegal Wage Cap And Confirms The Class
            Conflict ................................................................................ 25

    5.    Notice To Black Athletes Was Legally Inadequate ............. 26

6.    Heighted Scrutiny Required ................................... 27

ARGUMENT ....................................................................... 28

I.    THE DISTRICT COURT FAILED TO APPLY
NINTH CIRCUIT'S REQUIRED HEIGHTENED
SCRUTINY FOR SETTLEMENT-ONLY
CERTIFICATION AND IGNORED STRUCTURAL
CONFLICTS REQUIRING SEPARATE COUNSEL ........... 28

A.    Standard Of Review ..................................... 28

B.    Governing Framework .................................. 29

C.    Structural Conflicts Required Separate Counsel ........ 31

1.    Sequenced Bargaining Is Not A Structural
Assurance .............................................. 34

2.    The "No Evidence Of A Tradeoff" Finding
Applies The Wrong Analysis Under
*Amchem* And *Ortiz* ................................. 37

3.    The Order's Reliance On Counsel's
Consideration Of "Litigation Risk" For
Pay-For-Play Is Not An Adequacy Answer ........ 40

4.    Reliance On Dr. Rascher's Work Does Not
Cure The Structural Conflict .......................... 44

5.    "Single Team = More Leverage" Is Not
The Rule 23(A)(4) Test ................................ 47

D.    Dr. Rascher's Settlement Modeling For Pay-
For-Play Damages Artificially Depress Value
For Profit-Sport Athletes ............................. 49

1.    Treating In-Kind GIAs As Cash Salary At
Sticker Price ........................................... 50

2.    Loading All Division I Gias Into Offsets
Against "Salary" Depresses D1 Profit-
Athletes' (Like Mr. Anderson) Back Pay
Damages ............................................... 51

ii

3. Omitting Critical Athletic Performance Value ..................................................... 52

4. Ignoring The Post-Interim Policy Salary Substitute Payments Created By Nil Collectives ........................................... 54

5. The "50% Like The Pros" Framing Is Wrong ............................................ 56

E. The Settlement's Lobbying And "Court-Blessing" Provisions Confirm Structural Conflicts And Trigger Heightened Scrutiny ............... 57

F. The Decade-Long, No-Opt-Out Injunctive Regime "Locks In" Future Athletes With Only An Illusory Objection Window And Confirms Inadequate Representation ......................... 60

II. NOTICE TO BLACK ATHLETES WAS INADEQUATE ............................................... 63

A. Standard Of Review ................................... 63

B. Inadequacy Of Notice .............................. 63

III. THE SETTLEMENT'S CAP VIOLATES ANTITRUST LAW ................................................ 67

A. Standard Of Review ................................... 67

B. The Pool Cap Is Classic Horizontal Price Fixing ........ 68

C. Professional-League Salary-Cap Analogies Are Inapposite: There Is No Labor Exemption Here ......... 72

D. A Federal Court May Not "Bless" Ongoing Restraints ................................................. 74

CONCLUSION ................................................. 76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) ................................. 28, 31

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) .......................................... *passim*

*Arizona v. Maricopa Cty. Med. Soc'y,*
    457 U.S. 332 (1982) ............................................... 68

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) .................................... 28

*Brown v. Pro Football, Inc.,*
    518 U.S. 231 (1996) .............................................. 72

*Carter v. NCAA,*
    No. 3:23-cv-06325 (N.D. Cal.)................................. *passim*

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ................................. 28, 29

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002) ................................................ 11

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) .............................................. 72

*Fata v. Pizza Hut of Am.,*
    No. 6:14-cv-376-Orl-37DCI,
    2016 WL 7130932 (M.D. Fla. Oct. 31, 2016)................... 34, 35

*Fontenot v. NCAA,*
    23-cv-03076, ECF No. 103...................................... 14, 15

*Fraley v. Batman,*
    638 Fed. Appx. 594 (9th Cir. 2016) .......................... 67, 70

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986) .............................................. 69

iv

*Grunin v. Int'l House of Pancakes,*
  513 F.2d 114 (8th Cir. 1975) ................................................69-70, 74

*In re Blue Cross Blue Shield Antitrust Litig.,*
  85 F.4th 1070 (11th Cir. 2023) ..........................................69, 70, 71

*In re Bluetooth Headset Prods. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) ..................................................*passim*

*In re Cement & Concrete Antitrust Litig.,*
  817 F.2d 1435 (9th Cir. 1987) ........................................................63

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.,*
  795 F.3d 380 (3d Cir. 2015)............................................................35

*In re Literary Works in Elec. Databases Copyright Litig.,*
  654 F.3d 242 (2d Cir. 2011)....................................................*passim*

*In re Payment Card Interchange Fee &*
  *Merch. Disc. Antitrust Litig.,*
  827 F.3d 223 (2d Cir. 2016)....................................................*passim*

*Law v. NCAA,*
  134 F.3d 1010 (10th Cir. 1998) ....................................................68

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v.*
  *City of Cleveland,*
  478 U.S. 501 (1986) ..........................................................67, 74-75

*Low v. Trump Univ., LLC,*
  881 F.3d 1111 (9th Cir. 2018) ......................................................63

*McKinney-Drobnis v. Oreshack,*
  16 F.4th 594 (9th Cir. 2021)....................................................*passim*

*Nachshin v. AOL, LLC,*
  663 F.3d 1034 (9th Cir. 2011) ......................................................28

*Named Plaintiffs v. Feldman ("In re Apple"),*
  50 F.4th 769 (9th Cir. 2022)....................................................*passim*

*Nat'l Basketball Ass'n v. Williams,*
  45 F.3d 684 (2d Cir. 1995)............................................................72

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978) ...................................................................... 69

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,*
    468 U.S. 85 ................................................................................. 70

*NCAA v. Alston,*
    594 U.S. 69 (2021) ............................................................... *passim*

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,*
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ..................................... 3, 40, 50

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) .............................................................. *passim*

*Roes, 1–2 v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) .............................................. *passim*

*Saucillo v. Peck,*
    25 F.4th 1118 (9th Cir. 2022) ..................................... 29, 30, 31, 34

*Sierra Club, Inc. v. Elec. Controls Design, Inc.,*
    909 F.2d 1350 (9th Cir. 1990) .................................................. 67, 70

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................ 31

*United States v. Microsoft,*
    253 F.3d 34 (D.C. Cir. 2001) ........................................................ 75

*United States v. Philip Morris USA Inc.,*
    2014 U.S. Dist. LEXIS 75094 (D.D.C. June 2, 2014) ................... 66

*United States v. U.S. Gypsum Co.,*
    340 U.S. 76 (1950) ...................................................................... 75

*White v. NFL,*
    822 F. Supp. 1389 (D. Minn. 1993) .............................................. 72

*Wood v. NBA,*
    809 F.2d 954 (2d Cir. 1987) ......................................................... 72

## Statutes & Other Authorities:

28 U.S.C. § 1291 ................................................................5

28 U.S.C. § 1331 ................................................................5

28 U.S.C. § 1337 ................................................................5

NCAA Demographics Database ........................................64

Nielsen Diverse Intelligence Series, *Amplifying Black Voices in Media* (Oct. 2022) ..................................................64

Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023) ................................10

Pew Research Center, *Black Americans' News Habits* (Sept. 2023)......64

Rule 23.................................................................... *passim*

Rule 23(a)(4) .......................................... 6, 44, 47, 63

Rule 23(e)...................................................... 6, 74, 75

Rule 23(e)(1)(B) ........................................................ 64

Rule 23(e)(2) ........................................................ *passim*

Rule 23(f) ................................................................ 13

*Sportswise* Podcast, Episode 84 "*The Latest on the Twists and Turns in the House v. NCAA Settlement with Co-Lead Counsel, Steve Berman,*" (May 10, 2025)................................................73

*Sportswise* Podcast, Episode 89 "*The Final House v NCAA Podcast (for now) with… Grant House*" (July 2, 2025)......................73

## PRELIMINARY STATEMENT

On the eve of settlement, three class representatives—Grant House, Sedona Price and Nya Harrison—wrote directly to the district court noting the settlement's deficiencies. 4-ER-761. Yet the district court, though charged with serving as a fiduciary for absent class members, approved the settlement over the objections of those very class representatives. Their letter is prescient. The settlement attempts to do too much and ultimately betrays, once again, the athletes — predominantly African American — who have built the $19 billion per year Division I men's football and basketball business. The settlement involves four materially different classes — three past damages classes and one future injunctive relief class — including over 390,000 former Division I athletes, countless future athletes; and covers up to 30 years, 10 in the past, 10 in the near future, and a potential additional 10, subject to court approval. The settlement bears all the hallmarks of a collective bargaining agreement—but without a union, without consent of the workers, and without the protections that collective bargaining law provides. It among other things:

- anoints Class Counsel as unelected union representatives of hundreds of thousands of athletes for years to come without the consent of the workers;

- imposes a sports-wide wage cap that each school can pay its D1 athletes in the aggregate annually;

- **r**estricts permissible compensation within that cap to "NIL" and education-related categories, excluding payment for athletic labor performed on the field or court; limiting payments within that horizontal cap;

- regulates and chills third-party payments, requiring "fair market value" and "valid business purpose" review to ensure they do not function as pay-for-play compensation;

- positions the court as arbitrator of last resort, while authorizing Class Counsel to work with the NCAA and defendants to secure antitrust immunity for defendants. 6-ER-1290-1; and

- authorizes Class Counsel to collaborate with defendants and the NCAA to pursue federal antitrust immunity for the settlement's restraints; and

The DOJ's antitrust division rightly called the NIL cap simply exchanging one illegal salary cap with another, (DOJ Statement of Interest, 4-ER-740), and it should be rejected for that reason alone. But there is more.

The record in *NCAA v. Alston*, 594 U.S. 69, 90 (2021) established that NCAA sports began to gain significant media attention and value when Black athletes came to predominate in D1 football and men's basketball in the 1980s. The arc from *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 7 F.Supp. 3d 955, 963 (N.D. Cal. 2014), to *Alston* to the present legally flawed settlement represents the continuing history of racial exploitation in this country. And so, there is a simple truth at work here: It's easier to ignore the simple economic precepts in Justice Kavanaugh's concurrence in in *Alston*, *see* 594 U.S. at 109-11, than to pay young Black men — who comprise the majority of superstar players in money-making D1 sports — what they are worth.

This settlement must be reviewed very carefully, because it is unique, and will govern the compensation of all D-1 athletes for a decade or two. Hundreds of thousands of young athletes will lose the benefits

of a free market, although they were treated like an afterthought by Class Counsel, and with respect, by the trial court.

Unitary Class Counsel orchestrated this settlement of four highly divergent classes by first acquiescing to the NCAA's central demand that the NIL case (*House*) could not be settled without also settling pay-for-play claims that were not in the *House* case. 7-ER-1407 ¶9. This fatal and animating concession led Class Counsel to manipulate Rule 23 so that new classes were created, so as to give defendants what they wanted in forthcoming negotiations. Though discovery in *House* was completed, and the case was ready for trial, in order to give the NCAA what it most wanted, unitary Class Counsel quickly filed another case — *Carter,* so that it could settle additional (and massive) claims. *Carter* included approximately 16,000 D1 football and basketball players alleging violations of Section 1 for NCAA pay-for-play compensation caps. Then unitary Class Counsel sought expansion of this elite class of about 16,000 money-making D1 athletes to approximately 390,000 class member athletes, all D1 college athletes from all sports. The court did not certify this enormously expanded and internally divergent class until it was ready to approve the greatly expanded settlement (1-ER-125) and failed

4

to conduct the legally required heighted analysis called for by this massive settlement-only class. The court applied "heightened scrutiny" in name only, but not in substance, never installing the structural protections required by Supreme Court precedent for settlement-only classes with materially adverse interests.

As demonstrated below, the settlement approval order must be vacated and remanded because the record reflects legal errors and the absence of the rigorous, record-based findings that Rule 23 and this Court's heightened-scrutiny precedents demand. This failure to apply fiduciary rigor—especially in a market-shaping case—must be corrected.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337. It entered final judgment approving settlement and dismissing claims with prejudice on June 6, 2025, 1-ER-2-192.

Appellant K. Braeden Anderson, a member of the settlement class, objected below and filed a timely notice of appeal on July 7, 2025, 7-ER-1414.

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court erred by approving a settlement —
including a massively expanded settlement class and valuable,
unlitigated claims — certified in a settlement-only posture without
applying heightened scrutiny.

2.      Whether the court erred in finding Rule 23(a)(4) adequacy
based largely on unitary class counsel's experience, mediator reputation
and "sequencing," where defendants conditioned *any* deal on preserving
anticompetitive pay-for-play prohibitions and the newly filed *Carter* pay-
for-play claims were folded into a hugely expanded, not yet certified class
at the settlement stage.

3.      Whether the court erred in approving the settlement with its
"Associated Entity/Individual" restrictions that police, veto, or re-route
third-party NIL/collective payments, contrary to Rule 23(e) and *Alston's*
market realities directive.

4.      Whether the settlement's forward-looking provisions—
including a no-opt-out injunctive class binding future athletes, a brief
objection window timed to initial eligibility paperwork, exclusive-venue
and anti-suit covenants, and a potential doubling of the term of the

6

injunction to twenty years—are fair, reasonable, and adequate, and consistent with Rule 23(e)(2)'s equitable-treatment and adequacy requirements.

5. Whether settlement notice to Black class members was legally adequate under Rule 23 and due process where Black D1 athletes constitute a majority of the D1 money-making sports, are a readily identifiable subgroup central to the settlement, but notice included no Black media-targeted outreach and real-world experience showed substantial non-receipt.

6. Whether the court erred by approving a settlement that installs a one or two decade-long, maximum hard cap on athlete NIL only payments and seeks judicial approval of NCAA compensation rules.

## STATEMENT OF THE CASE

### A.    Background Of The Division I Marketplace And Compensation Categories.

Division I college sports operate as a large, revenue-generating enterprise. Conferences and schools negotiate substantial media contracts, sell tickets, concessions and sponsorships, and invest hundreds of millions of dollars in facilities and coaching staff. Alumni giving increases when their college teams win nationally broadcast games. These revenues are driven exclusively by the performances of student-athletes, who supply the labor that produces the product on the field and court. For decades Black athletes have dominated the revenue generating sports of D1 football and basketball. Historically, however, NCAA rules limited athlete payments primarily to athletic scholarships and certain education-related benefits.

Two categories of compensation matter here. The first, NIL refers to payments for licensing an athlete's publicity rights—endorsements, appearances, and similar deals—typically paid by third parties, and sometimes structured through institutions. Broadcast NIL (BNIL) is a category of NIL. The second, "pay-for-play" refers to compensation for an

8

athlete's labor, i.e., wages for athletic services and performance, distinct from NIL licensing.[1]

Beginning July 1, 2021, as the first state NIL laws went into effect, the NCAA adopted its Interim NIL Policy ("Interim Policy"). Under the Interim Policy, the NCAA stopped enforcing many of its NIL rules (while technically maintaining prohibitions on pay-for-play and recruiting inducements by schools/boosters). *See* 7-ER-1436-1440, 5-ER-1020. A functioning third-party NIL market—centered on school-affiliated "collectives"—rapidly emerged and, in practice, often operated as salary-substitute compensation.

The Interim Policy was a historic inflection point in college sports. For the first time ever, college athletes were paid market-defined compensation, putting to the test prior, amateurism-based judicial concerns over a salary-like professional pay market.

---

[1] The NCAA has long deployed "pay-for-play" as an amateurism-inflected pejorative, casting as suspect the straightforward concept of compensating labor in a revenue-generating enterprise and implying that direct compensation for athletic services is improper. We use the shorthand in this brief solely for clarity, including to track the settlement's "Additional Compensation" label and to distinguish the *Carter*-imported compensation claims from NIL claims; we do not adopt the NCAA's pejorative framing.

The results of this natural experiment proved that amateurism was not a revenue driver. Instead, the Interim Policy resulted in unprecedented revenues, increased consumer demand and product popularity, an expanded College Football Playoff, historic broadcast media deals, a new wave of conference realignment, ever-increasing coaching (and athletic director) salaries with "buy-outs" in the tens of millions of dollars for fired coaches,[2] and skyrocketing interest in "Olympic" and women's sports. As discussed below, the settlement gives defendants a way to prohibit, monitor and challenge all third-party payments to D1 athletes of $600 or more. 1-ER-22.

## B. Appellant

Appellant K. Braeden Anderson, Sr. is an African-American former D1 men's basketball player who competed for Fresno State, Kansas, and Seton Hall. 3-ER-491. He is one of many Black athletes who over the past thirty years have never been fairly compensated for their sports labor. An injury ended his pro hopes, placing him among the ~93% of Division

---

[2] Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023), https://www.espn.com/college-football/story/_/id/38880082/jimbo-fisher-expected-firedtexas-sources-confirm.

I basketball and football players who go undrafted by professional sports teams. Unlike most undrafted Black athletes—often left without degrees after their schools exploited their labor—Mr. Anderson had options. He graduated from law school, practiced at Sidley Austin LLP and Kirkland & Ellis LLP, and is now a partner at a Boston law firm. *Id*. Mr. Anderson is a member of the damages classes certified for settlement. Unlike many D1 basketball and football players who have been intimidated by their schools and coaches, he timely objected and appealed, and has standing to challenge adequacy, notice, and the legality of the Pool cap. 7-ER-1414; *Devlin v. Scardelletti,* 536 U.S. 1, 7 (2002).

## C. Background Legal Landscape

This case arises from the Supreme Court's ruling in *NCAA v. Alston*, 594 U.S. 69, 90 (2021). There, the Supreme Court unanimously affirmed injunctive relief against limits on certain education-related benefits and emphasized that the NCAA "accepts that its members collectively enjoy monopsony power in the market for student-athlete services." *Alston,* 594 U.S. at 90. The plaintiffs in *Alston* did not seek— and the Court did not adjudicate—an across-the-board injunction against

11

all NCAA compensation limits or pay-for-play restrictions by schools and conferences. It was limited to stipends paid for academic purposes.

Nevertheless, *Alston's* unanimity, Justice Kavanaugh's concurrence, and the Court's questioning at oral argument signaled that the NCAA's remaining pay-for-play restrictions were unlikely to survive the rule of reason analysis. The Supreme Court unanimously rejected the NCAA's quest for judicially created antitrust immunity and emphasized that college sports restraints must be judged by "market realities" under ordinary antitrust standards. *Id.* at 92-93

Just ten days after the Supreme Court decided *Alston*, on July 1, 2021, the "NIL era" began in college sports. This was among the most consequential changes in market realities that college sports had ever seen.

## D. This Litigation And Its Original Class Certifications

This case began in 2020 with the filing of *House v. NCAA* and *Oliver v. NCAA* in the Northern District of California. Plaintiffs in those actions challenged NCAA rules restricting payments to D1 athletes for use of their names, images, and likenesses ("NIL"). Thus, the first year of

12

litigation in *House* and *Oliver* occurred in a purely hypothetical NIL market modeled by experts without real market data.

The cases were consolidated under the caption *In re College Athlete NIL* Litigation in July 2021, though they have continued to be commonly referred to as *"House."* Merits discovery ended in October 2023. In the damages class certification process, plaintiffs' expert Dr. Daniel Rascher based his economic model of lost third party NIL compensation on only a single year of post-Interim Policy data. 5-ER-1134-1138. In his 2024 settlement report, Rascher further acknowledged that his Lost NIL analysis relied solely on third-party NIL data supplied by *schools*—not by collectives. 5-ER-925.

After discovery on NIL-related claims only, the court certified the *House* injunctive relief class (September 22, 2023) and three damages classes (November 3, 2023): (1) Football Bowl Subdivision football players, (2) D1 men's basketball players, and (3) D1 women's basketball players.[3] The court appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for all classes ("Class

---

[3] On January 18, 2024, this Court denied defendants' Rule 23(f) interlocutory petition challenging certification.

Counsel."). During settlement discussions in *House,* the parties discussed expanding the injunctive-relief settlement to include pay-for-play issues, with any damages for those claims to be addressed separately. But neither *House* nor *Oliver* asserted pay-for-play claims.

### E. The Radical Expansion Of The Settlement Class To All D1 Athletes

In November 2023, separate counsel filed *Fontenot v. NCAA* in the District of Colorado, asserting broader "pay-for-play" damages claims on behalf of athletes at schools in the five conferences with the strongest athletic programs, the "Power 5" or "P5." Case No. 23-cv-03076. The NCAA (aided by Class Counsel in this case) sought transfer and consolidation into this litigation, but the Colorado court rejected that in May 2024. *See Fontenot,* 23-cv-03076, ECF No. 103.

Seventeen days after *Fontenot* was filed, and while consolidated *House* was well into settlement negotiation, Class Counsel in this case filed *Carter v. NCAA*, No. 3:23-cv-06325 (N.D. Cal.) asserting pay-for-play damages claims for a targeted profit-athlete class limited to P5 football and D1 men's and women's basketball, approximately 16,000

athletes.[4] The next day, Class Counsel Mr. Kessler, publicly stated that *Carter* could be won on summary judgment because the NCAA could not offer a single procompetitive justification for its pay-for-play restrictions. 2-ER-416.

In fact, *Carter* might have been a ground-breaking case prohibiting limitations on pay-for-play and seeking pay-for-play damages that the NCAA long feared.

But no merits discovery or class-certification proceedings ever occurred in *Carter* and no responsive pleading was filed. It was simply a strategic vehicle to allow a much broader settlement, and to make an end run around the denial of a venue change in *Fontenot*, thereby giving the defendants what they most wanted— eliminating past compensation claims while retaining anticompetitive compensation prohibitions for the next decade.

---

[4] Exhibit A to Plaintiff's Motion for Preliminary Settlement Approval charts the number of athletes by class and claimed damages. 5-ER-910-11. In the "Additional Compensation" (pay-for-play) category, it lists approximately 14,000 men's football and men's basketball athletes and 2,000 women's basketball athletes. Those were the only cohorts at issue in Carter, meaning roughly 16,000 athletes comprised the *Carter* pay-for-play damages classes.

On July 26, 2024, while settlement negotiations were nearly complete, Class Counsel filed their Second Amended Complaint in which they quietly merged the *Carter* pay-for-play claims into *House's* NIL-only claims, and simultaneously expanded *Carter's* pay-for-play class from the original focus on 16,000 D1 football and basketball players to a Division I-wide settlement class of roughly 390,000 athletes, 5-ER-980—more than 23 times the original class size. The parties' motion for preliminary approval was filed later that day. 5-ER- 909.

## F. The Settlement

The settlement has three core components: (1) backward-looking damages for NIL claims; (2) an "Additional Compensation" fund for backward-looking pay-for-play claims; and (3) a decade-long prospective regime that annually caps total school payments to athletes, includes anti-circumvention and centralized oversight provisions, and allows a potential 10-year extension.

While the settlement does not *expressly* ban pay-for-play payments, it achieves that intended result in two ways. First, it provides that the NCAA's existing compensation limits "may remain in effect" except to the extent "required by the terms of" the Settlement." 1-ER-35, Art 4, §2.

16

Because nothing in the settlement requires the NCAA rules to *permit* pay for play compensation, the longstanding categorical ban remains intact.[5] Second, the settlement establishes an Associated-Entity/booster veto that polices and chills collective deals — the only functional market-defined proxy for pay-for-play compensation. 1-ER-35, Art 4, §3. In combination, these provisions preserve the NCAA's ossified ban on direct pay-for-play compensation, while imposing a chokehold on the salary-substitute revenue stream that emerged in the post-2021 NIL market.

At the hearing for preliminary approval, defendants stated that preserving future prohibitions on pay-for-play was a non-negotiable part of any settlement:

> THE COURT: But in this House settlement if it is approved, you will be explicitly paying for play or allowing schools to pay-for-play. So, this no play for pay thing isn't going to be there anymore, is it?

> MR. KILARU: It is, Your Honor. There is still going to be a prohibition on pay-for-play, and there is discretion for schools to make payments as they see fit under the new regime.

> THE COURT: And that won't be pay-for-play?

---

[5] Article 2, § 1 expressly states that payments "not contemplated" by the Settlement "remain prohibited." Because the Settlement does not contemplate pay-for-play compensation, the NCAA's existing rules banning such payments remain in force. 1-ER-21.

MR. KILARU: No, Your Honor. But, I mean, whatever -- I think that's correct, but I think setting that aside, the fact of the matter is bans on pay-for-play have been upheld time and time again. This is litigation challenging bans on pay-for-play. This is something that came out of the settlement process. I believe Plaintiffs believe it is an improvement for the status quo, and for us it is an essential part of the deal.

THE COURT: Wow.

7-ER-1441-42.

"Wow" indeed.

At that same hearing, an extended colloquy—7-ER-1436-1454—laid bare not only that the purpose and effect of the settlement's regulation of third-party NIL payments was to prohibit any proxy for pay-for-play compensation, but also that defendants treated this provision as a non-negotiable condition of settlement. In response to the district court's concerns that such provisions would "tak[e]… away" the "large sums of money in third party NIL" that athletes enjoyed under the status quo, 7-ER-1437, 1443, 1452.

Defendants made three key admissions:

(1) They described the booster prohibition as a "manifestation of a broad prohibition on pay-for-play," which in their view, "has been deemed pro-competitive," 7-ER-1450;

18

(2) They asserted that granting defendants regulatory authority over third party NIL payments to ensure they reflect only "real NIL" and not pay-for-play was an "improvement" over the status quo—because absent the settlement, the NCAA's categorical prohibition on third party payments could have been enforced at any time, 7-ER-1449-1450; and

(3) They further acknowledged that without the booster provision, defendants were "not sure there will be a settlement to submit." 7-ER-1451.

At the preliminary approval hearing, the court also questioned the expansion of the classes:

> THE COURT: Okay, so we had our litigation classes and three damage classes were certified; one injunctive relief class was certified. … if you can tell me briefly – what the difference is between the certified classes and the litigation classes. And to the extent there are difference, why are they?…who is in it – is it just P5 or is it all of D1 – are those factors different as between the litigation certified classes and the settlement classes?

5-ER-831-832.

That critical question went unanswered at the hearing and was not revisited in the final order.

19

Class Counsel explained that counsel for both parties shared the view that it was not possible to reach a settlement that resolved NIL payment claims only, and that an injunctive relief settlement would need to address *all* of the NCAA's compensation rules going forward (including continued restraints on pay-for-play). 7-ER-1407 ¶9. This approach was allegedly justified, including the use of unitary Class Counsel to negotiate on behalf of all four classes, because settlement negotiations were "sequenced" to temporarily resolve injunctive terms first and then turn to damages *Id.* ¶ 14.

## G. Deficient Notice

The court approved a notice plan consisting of direct email and mailed postcards, a press release, and digital outreach. The administrator estimated an 81.9% "reach" for current athletes and reported 73,115 unique claims and 28,816 payment updates out of an estimated 389,800 class members. The plan included no Black media-targeted outreach; declarations from class members and counsel reflected that many Black former athletes had not received notice until a brief, *pro bono* Black-media effort surfaced additional class members who were

previously unaware. 2-ER-298, 300, 304 ¶9, ¶21, ¶33; 3-ER-492; 2-ER-456-7.

## H.    Exorbitant Class Counsel Fees

Class Counsel sought fees of approximately $725 million including 20% of the NIL Settlement Fund ($395.2 million), 10% of the Additional Compensation Fund ($60 million), an upfront injunctive relief award of $20 million and an additional percentage of the Pool distribution amounting to approximately $250 million over the 10-year term. 7-ER-1359-60.

After minor modifications, and over many filed objections by class members, the court granted final approval on June 6, 2025.  1-ER-2-192. Appellant K. Braeden Anderson, a class member who objected below, filed a timely notice of appeal on July 7, 2025. 7-ER-1414.

## SUMMARY OF THE ARGUMENT

This case arrives amid breathless claims that the settlement is "seismic" and "industry-shaping." It may be big, but it is not fair. The settlement entrenches a market-wide wage cap and bundles disparate claims to foreclose future challenges. It also rests on an artificially pruned evidentiary record that omits the most probative evidence on

21

athlete value— collective salary-based payments—contrary to *Alston*'s directive to carefully analyze current market realities.

This appeal challenges a settlement that was negotiated and certified in a settlement-only posture and without separate, conflict-free class counsel. The parties and the district court tried to solve all the NCAA's labor problems in one fell swoop. And they failed miserably— trying to do too much in one case. In the end, plaintiff's unitary Class Counsel acted as arbitrator (or unelected and conflicted union representative negotiating a collective bargaining agreement) among competing interests, hurting all plaintiffs by pitting their interests against each other.

For Mr. Anderson—an African-American former D1 basketball player—and class member—the bargain understates pay-for-play value, relies on a notice procedure that failed to adequately reach Black athletes, including Mr. Anderson, and locks in a wage cap the DOJ has warned perpetuates an illegal restraint. Under Rule 23's heightened scrutiny for pre-certification settlements, the approval order cannot stand.

### 1. Heightened Scrutiny And Structural Protections

This settlement was negotiated and certified in a settlement-only posture. In that setting, this Court requires undiluted heightened scrutiny: a probing, record-based evaluation of Rule 23(e)(2), reasoned responses to non-frivolous objections, and structural assurances where materially adverse interests exist within the class. The court's approval order recites that standard but, as in *In re Apple,* applied a de facto presumption of fairness and adequacy of representation—leaning on counsel's experience, mediator credentials, and "sequencing"—rather than the rigorous analysis heightened scrutiny demands.

### 2. Material Conflicts Pervade Damages Valuations And Forward Looking Restraints (*Amchem, Ortiz*)

Material conflicts pervade this settlement. The core fault line is NIL versus pay-for-play, a divide that runs through the entire settlement. Additional conflicts exist between the damages classes and the no-opt-out injunctive class. Defendants conditioned any deal on preserving anticompetitive pay-for-play prohibitions, and negotiations were sequenced to address injunctive terms before damages. In that posture, structural protections—subclasses with separate, conflict-free counsel—were required.

23

The *Carter* pay-for-play claims underscore the problem. They were imported from a nascent, profit-athlete case — and, by unitary Class Counsel's own account (4-ER-756 ¶23), added midstream to supply the settlement architecture defendants demanded — into a vastly expanded, D1-wide settlement class without discovery, *Daubert* testing, or certification-stage vetting for the broadened class. At preliminary approval, the court questioned the expansion (4-ER-831-832) but the question went unanswered and was not revisited in the final order. That sequence amplified certification and valuation risks for pay-for-play interests and demanded heightened scrutiny grounded in record findings.

### 3. Obsolete Amateurism Premise And Distorted Valuation Undermine Adequacy.

The approval order's adequacy analysis relies on counsel's consideration of "litigation risk" for the pay-for-play claims, yet the risk narrative rests on pre-*Alston* "amateurism" premise that the Supreme Court rejected in light of changed market realities. Categorical discounting of pay-for-play claims cannot justify unitary representation where the record shows defendants *insisted* on preserving anticompetitive pay-for-play prohibitions as the price of any settlement.

24

The Rascher settlement economics (a) treat scholarships as salary proxies; (b) deploy Division-I-wide scholarship offsets that effectively tax profit-sport athletes' damages with non-revenue sports' scholarship costs; (c) narrow the denominator and pad the numerator to claim a "pro-league-like" 50% owners/players compensation split; and, importantly, (d) omit the salary-substitute market that emerged after July 1, 2021 through payments from NIL collectives. These structural valuation decisions depress the "but-for" wage for P5 football and D1 men's basketball and understate damages and forward-looking revenue; the opposite of what *Alston* requires.

### 4. The Settlement's Prospective NIL Regime Imposes A New Illegal Wage Cap And Confirms The Class Conflict

The settlement installs a decade-long cap on total annual school payments, with anti-circumvention rules and centralized oversight, and seeks prospective judicial "approval" of NCAA compensation rules. The DOJ cautioned that the settlement replaces one illegal wage cap with another. Thus, the settlement tied an  inadequate amount of cash with an illegal restraint going forward, and did not deserve approval. 4-ER-740-743. The forward-looking provisions bind future athletes, unless they object within a short window timed to initial eligibility paperwork, while

25

exclusive-venue and anti-suit provisions channel or suppress future challenges. Especially given the potential extension of the regime, these features underscore inadequacy of unitary class counsel and required scrutiny that the approval order does not provide. 6-ER-1235-1238, 1248, 1-ER-15.

### 5. Notice To Black Athletes Was Legally Inadequate.

Black D1 athletes constitute a majority of players in the money-making D1 sports and are a large, readily identifiable subgroup central to the settlement, yet the plan included no Black-media targeted outreach and real-world experience immediately surfaced non-receipt. De novo review governs notice adequacy; the remedy is supplemental, targeted notice through Black-owned and Black-focused media and extended deadlines. While D1 football and basketball class members were automatically eligible, they had to register and provide certain information to calculate awards. Those who never received notice could not register, and the window has now closed — leaving many players unable to claim past-damages payments.

### 6. Heighted Scrutiny Required

Heightened scrutiny requires more than confidence in the process and the participants; it requires findings grounded in the record that grapple with the specific conflicts and risks present in a case. This court vacated approval in *Named Plaintiffs v. Feldman ("In re Apple")*, 50 F.4th 769, 782–83 (9th Cir. 2022) even where the district court had "carefully considered and thoughtfully responded" to objections because the court's order referred to a presumption of fairness based on arm's-length negotiations and experienced counsel. *Id.* at 783. This case presents the mirror image: the order *recites* heightened scrutiny, but the analysis reads like the presumption that *In re Apple* rejects.

Reciting 'heightened scrutiny' is not applying it; by failing to apply that standard as Ninth Circuit precedent requires, the court abused its discretion.

A remand should require conflict-free subclassing, record-based Rule 23(e)(2) findings specific to pay-for-play, elimination or modification of the cap and "approval" provisions consistent with DOJ's concerns (4-ER-735), and supplemental, targeted notice to Black athletes.

27

# ARGUMENT

## I. THE DISTRICT COURT FAILED TO APPLY NINTH CIRCUIT'S REQUIRED HEIGHTENED SCRUTINY FOR SETTLEMENT-ONLY CERTIFICATION AND IGNORED STRUCTURAL CONFLICTS REQUIRING SEPARATE COUNSEL.

### A. Standard of Review

In reviewing approval of a class action settlement, legal issues are reviewed de novo, factual findings are only overturned for clear error, and other aspects of the decision are subject to an abuse of discretion standard. *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021); *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012). A district court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact. *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011).

Although appellate review of substantive fairness is limited, district courts are held to a higher procedural standard: "To survive appellate review, the district court must show it has explored comprehensively all factors and given a reasoned response to all non-frivolous objections." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606–07 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015).

28

When a settlement precedes class certification, the court must apply heightened scrutiny and conduct a more probing inquiry; reliance on any presumption of fairness is error. *Saucillo v. Peck*, 25 F.4th 1118, 1130–31 (9th Cir. 2022) (reaffirming *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048–50 (9th Cir. 2019)); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011); *In re Apple*, 50 F.4th at 782–83.

### B.  Governing Framework

Rule 23(e)(2) permits approval of a class settlement only if it is fair, reasonable, and adequate, including a determination that the proposal treats class members equitably relative to each other. The court must make a record-based determination and give a reasoned response to all non-frivolous objections. *See McKinney-Drobnis,* 16 F.4th at 606–07; *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).

When a settlement precedes class certification, the Ninth Circuit requires heightened scrutiny and a more probing inquiry than usual. Reliance on any presumption of fairness derived from arm's-length bargaining, mediator participation, or counsel's reputations is improper.

29

*See Saucillo* 25 F.4th 1118 at 1131 (reaffirming *Roes*, 944 F.3d at 1048–50.)

In this posture, consideration of the eight Churchill factors alone is not enough; the court must also probe for the *Bluetooth* "subtle signs" of counsel self-interest, including disproportionate fees, clear-sailing provisions, and kicker or reversion arrangements. *Bluetooth*, 654 F.3d at 946–47; *McKinney-Drobnis*, 16 F.4th at 607.

Settlement-only certification demands structural assurances of fair and adequate representation where materially adverse interests exist within the class—such as present versus future claimants, more valuable versus less valuable claims, or conflicts between damages relief and injunctive relief. The Supreme Court instructs that, in these circumstances, separate subclasses with independent counsel are typically required to prevent trading away one subgroup's interests to benefit another. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626–27 (1997); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 856–57 (1999). Persuasive authority from other appellate courts underscores the same point where allocation decisions and releases place distinct categories of claims at risk. *See In re Literary Works in Elec. Databases Copyright*

*Litig.*, 654 F.3d 242, 252–54 (2d Cir. 2011); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233–36 (2d Cir. 2016). The Ninth Circuit likewise polices conflicts that skew allocations or relief in the pre-certification context. *See Roes*, 944 F.3d at 1043–50; *Allen*, 787 F.3d at 1223–24; *Staton v. Boeing Co.*, 327 F.3d 938, 957–60 (9th Cir. 2003).

Application of an incorrect legal standard—such as employing a presumption of fairness in a pre-certification settlement—constitutes an abuse of discretion. *See Saucillo*, 25 F.4th at 1131 n.9, 1133; *In re Apple*, 50 F.4th at 783.

## C.     Structural Conflicts Required Separate Counsel

This settlement was negotiated and approved by one set of plaintiffs' Class Counsel in a settlement-only posture while the core fault line—NIL versus pay-for-play—was built into the architecture from the outset. Class Counsel acknowledged that,

> during injunctive relief settlement discussions in *House*, and prior to filing of the *Carter* complaint, the parties had discussed the concept of expanding the *House* injunctive relief settlement to include the pay-for-play claims that would eventually be alleged (and were ultimately alleged in *Carter*) to globally address Defendants' compensation and benefit rules on a going-forward basis. Plaintiffs made clear that any broadening of the *House* settlement to include pay-for-play damages would require a

31

> separate, independent, discussion of damages. Plaintiffs used Dr.
> Rascher to evaluate damages for those pay-for-play claims and to
> aid the pre-*Carter* settlement discussions and to prepare for the
> filing of the *Carter* complaint.

4-ER-756.

Shortly thereafter, the pay-for-play damages class expanded at the settlement stage from approximately 16,000 P5 football and D1 men's and women's basketball athletes (*Carter*) to roughly 390,000 D1 athletes. *See* 5-ER-910-911 and *infra,* n.4. *Carter* itself had no discovery, no *Daubert* testing, and no class-certification scrutiny for the expanded class. At preliminary approval hearing, the court briefly sought clarity on this expansion from elite D1 to all D1 sports and its implication. 7-ER-1387-1390. But that question was not answered and the dramatic expansion received no analysis by the court.

Defendants told the court that preserving pay-for-play prohibitions was "an essential part of the deal" and that without it "I'm not sure there will be a settlement to submit," while the parties sequenced negotiations to resolve injunctive terms first and damages later. 7-ER-1399-1401; *see also* 7-ER-1402-1403. Thus, the very prospective restraints that depress pay-for-play value were locked in before monetary terms were set, and the valuation of the newly imported *Carter* claims was reformed for

32

settlement, not through adversarial testing. But the inability to settle is not a license to compromise class interests.

Against that backdrop, the approval order overruled adequacy objections by relying on process labels—experienced counsel, a well-regarded mediator, and "sequencing"—and by finding "no indication" that one group's interests were traded for another. 1-ER-190-191. With respect, unless counsel recounted their various settlement postures throughout the settlement, there is no way for an indication of a trade-off would be in the record. The district court cited out-of-circuit decisions to suggest that separate counsel is not the "only acceptable" way to address conflicts, *id.* at 71-72, credited the parties' consideration of "litigation risk" to discount pay-for-play, *id.* at 74, treated reliance on Dr. Rascher's methodologies as a sufficiency finding, *id.* at 74-75, and reasoned that a single negotiating team "likely increased bargaining power." *Id.* at 75.

Under *Amchem* and *Ortiz*, heightened scrutiny requires structural safeguards where materially adverse interests converged on allocation; process formalities and conclusory "no tradeoff" assurances are not substitutes. The vastly expanded settlement-only class required

33

heightened scrutiny supported by specific findings responsive to the objectors' concerns. *See Saucillo*, 25 F.4th at 1130–31; *McKinney-Drobnis*, 16 F.4th at 606–07. Yet, though the order recited that standard, it did not apply it.

### 1. Sequenced Bargaining Is Not A Structural Assurance

In reasoning that arm's-length negotiation, the use of a respected mediator, and sequencing sufficed to protect all segments, the order relied on out-of-circuit decisions stating that separate counsel is not the "only acceptable" method of addressing conflicts. 1-ER-187-188.

Specifically, the order cites *Fata v. Pizza Hut of Am.*, No. 6:14-cv-376-Orl-37DCI, 2016 WL 7130932 (M.D. Fla. Oct. 31, 2016), to suggest that sequenced, arms-length negotiations can supply "structural assurance" without separate counsel. 1-ER-187. *Pizza Hut* is inapposite. There, both subclasses asserted the same injury from the same conduct (FLSA reimbursement shortfalls for delivery drivers); there were no different categories of claims, no split between retrospective damages and prospective injunctive relief, and no ten-year, no-opt-out regime binding future claimants. *Id.* at *4. The only distinction was arbitration agreements—yielding a clear litigation-risk discount for a subset of the

very same claim. *Id.* at *5–6. Nothing in *Pizza Hut* suggested an incentive or evidence to trade away one category of claim to benefit another. Here, by contrast, the core divide is NIL versus pay-for-play—a substantive conflict that pervades both damages allocation and the prospective rules, a divide born of defendant's insistence on anticompetitive prohibitions on pay-for-play as an "essential" precondition to any deal.

The approval order also relies on *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.,* 795 F.3d 380 (3d Cir. 2015), to suggest that separate counsel is not the "only acceptable" means of addressing conflicts. 1-ER-188. But *Community Bank* rests on the absence of any meaningful conflict — the subclasses there were "not competing for limited settlement funds," "all class members [could] assert all of their available claims," and "all class members [could], at least in theory, recover all of their damages without impacting the recovery of any other class members," because "they [were] all pursuing damages under the same statutes and the same theories of liability." *Id.* at 394. That is the opposite of this record. Here, fundamental conflicts do exist: NIL and pay-for-play claims pull in opposite directions on both allocation and prospective relief, and defendants conditioned any settlement on

35

preserving pay-for-play prohibitions. 7-ER-1399-1403. Even if the subclasses are not technically vying for a single damages pot (which they arguably were since only the NCAA is paying the $2.576 billion portion of the settlement over 10 years), the structure pits them against each other because the damages settlement would not proceed unless the injunctive regime preserved the very prohibitions that depress pay-for-play value. And the record confirms that "expanding" settlement talks to include pay-for-play occurred **before** *Carter* was filed and as part of the injunctive-relief discussions—underscoring that the key allocation fault line was baked in from the outset. 4-ER-756. In other words, unitary Class Counsel effectively agreed to the defendant's continued ban on pay-for-play compensation as a condition of any settlement at all. This fact baked in conflicts between classes that only separate class counsel could cure.

*Amchem* and *Ortiz* require structural protections when interests diverge; they do not turn on assurances that experienced counsel and a mediator negotiated "sequentially." *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. *Payment Card* and *Literary Works* confirm that serial negotiations by the same counsel do not eliminate the risk of trading

36

down disfavored claims to maximize others; independent advocacy is required where allocation decisions place distinct categories at risk. *Payment Card*, 827 F.3d at 233–36; *Literary Works*, 654 F.3d at 252–54. Here, sequencing operated exactly as those cases warn: forward-looking restrictions were agreed first—with defendants' "essential" condition preserved—before monetary terms were set. That is not a substitute for subclasses with separate counsel.

> ### 2. The "No Evidence Of A Tradeoff" Finding Applies The Wrong Analysis Under *Amchem* And *Ortiz*.

The approval order states there is "no indication" that one class's interests were traded away. 1-ER-190. But *Amchem* and *Ortiz* do not require proof of an actual trade; they require *structural assurances against trades* when subgroups' interests materially diverge. *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. The record reflects bargaining dynamics that made tradeoffs not only possible but predictable: defendants insisted that maintaining anticompetitive pay-for-play prohibitions was an essential condition, and counsel locked in forward-looking restrictions before turning to damages. Heightened

37

scrutiny required structural protection for pay-for-play claimants, not deference to process labels.

The Second Circuit was not blind to the elephant in the courtroom: "Class counsel stood to gain enormously." *Payment Card,* 827 F.3d at 234. The same is true here. The settlement provides for approximately $725 million in fees. 7-ER-1359-60, and *supra,* Statement of the Case, Section H. "[W]hen 'the potential for gigantic fees' is within counsel's grasp for representation of one group of plaintiffs, but only if counsel resolves another group of plaintiff's claims, a court cannot assume class counsel adequately represented the latter group's interests." *Payment Card,* 827 F.3d at 234, citing *Ortiz*, 527 U.S. at 853.

Without impugning class counsel's motives, the Second Circuit determined that "class counsel was charged with an inequitable task." *Id*. The same is true here. Class Counsel made passing mention of these two important Second Circuit cases in their joint declaration and described their attempts to impose "structural assurances" in their mediation to avoid the adequacy kibosh of *Amchem, Ortiz, Literary Works and Payment Card.* 7-ER-1409, ¶14. Specifically, Class counsel sought to quiet concerns of tradeoffs between damages and injunctive relief by

"first exclusively discuss[ing] and resolv[ing] injunctive relief issues" and by "refus[ing] to negotiate damages amounts before the terms of the injunctive relief settlement was agreed upon." *Id*. However, counsels' own statements belie the fairytale that injunctive relief and damages were not conflated:

> We were aware … that it was likely not possible to reach an injunctive relief settlement that resolved NIL compensation claims only and that an injunctive relief settlement would need to make structural changes to college athletics that would address all of the NCAA's compensation rules. Defendants indicated that they shared this view.

*Id*. ¶ 9 (emphasis added).

This admission, along with the NCAA's admission that it would not approve of damages relief without leaving prohibitions of pay-for-play intact, underscore that "the only unified interests served by herding these competing [damages and injunction] claims into one … are the interests served by settlement: (i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded … ." *Payment Card*, 827 F.3d at 236.

In this setting, a conclusory "no evidence of tradeoff" finding is not an acceptable answer under *Amchem* and *Ortiz*. It confirms the need for structural assurances—separate, conflict-free counsel for the materially

39

adverse NIL and pay-for-play subgroups—and a probing, record-based analysis of how value was allocated across them.

### 3. The Order's Reliance On Counsel's Consideration Of "Litigation Risk" For Pay-For-Play Is Not An Adequacy Answer.

The opinion credits Class Counsel's account that each "type" of damages and its litigation risk was negotiated separately and that agreed amounts reflected those risks "as informed by Class Counsel's experience in challenging NCAA compensation restraints." 1-ER-190-191.

The parties' and the court's litigation-risk rationale rests on pre-*Alston* premises. Class Counsel argued that that pay-for-play claims warranted substantial discounting because prior challenges to NCAA compensation restraints achieved only partial relief. 5-ER-930-933. The Opinion cited *O'Bannon* and *Alston* as examples of why compensation claims are not assured and concluded that "success at trial can mean that student-athlete compensation restrictions may be lessened but not eliminated," and reasoned that compromise was appropriate. 1-ER-119.

That framing relies on a pre-*Alston* understanding of "amateurism" that *Alston* itself undercuts, and it cannot carry the adequacy burden where the core conflict is NIL versus pay-for-play and

40

defendants conditioned any deal on preserving anticompetitive pay-for-play prohibitions.

*Alston* establishes that *Board of Regents* does not immunize compensation restraints "both in 1984 and forevermore," and emphasizes that antitrust analysis turns on "market realities," which have "changed significantly" since 1984. 594 U.S. at 92–93. One undeniable significant change just ten days after *Alston* was decided, was the emergence of a functioning pay-for-play market via collectives.  In the post-*Alston* NIL era, there has been no collapse of consumer demand for college sports merely because athletes received compensation, including salary-substitute payments. *Id.* Justice Kavanaugh's concurrence in *Alston* further explains why "amateurism" cannot serve as a talismanic procompetitive justification: price-fixing labor "is ordinarily a textbook antitrust problem," and the NCAA's "defining feature" argument is "circular and unpersuasive." *Id.* at 108–10 (Kavanaugh, J., concurring). Against that legal backdrop, a categorical discount of pay-for-play claims premised on pre-*Alston* obstacles does not withstand heightened scrutiny.

Plaintiffs leaned on those pre-*Alston* obstacles to explain the steep differential between the NIL fund and the "Additional Compensation" fund, and to defend preserving pay-for-play prohibitions in exchange for generous NIL relief. *See* 5-ER-930-933. But that rationale reflects, at best, less than zealous advocacy for pay-for-play claimants after *Alston*, where the governing law expressly invites courts to revisit compensation restraints as markets evolve. 594 U.S. at 92–93. Class Counsel themselves acknowledged the "amateurism myth" no longer had traction after *Alston* when they filed the *Carter* complaint. *See Carter v. NCAA,* No. 3:23-cv-06324, ECF. No. 1, ¶¶6-13.[6]

It is also in tension with the negotiation record: defendants told the court that maintaining the ban on pay-for-play was "an essential part of the deal" 7-ER-1399-1403. In that posture, the litigation-risk discounts for pay-for-play were both overstated (because they rested on outdated "amateurism" assumptions) and structurally suspect (because they

---

[6] Moreover, in a podcast interview on December 8, 2023 (the day after *Carter* was filed), lead unitary Class Counsel, Jeffrey L. Kessler, said because the NCAA could not offer any defensible procompetitive justifications of the pay-for-play restrictions, he expected to win *Carter* on summary judgment. (SportsWise podcast, Episode 56: Sports Law Legend Jeffrey Kessler on the Antitrust Threats Facing the NCAA December 8, 2023, at approx. 24:45 – 26:07).

predictably advantaged NIL over pay-for-play to satisfy defendants' non-negotiable condition).

Heightened scrutiny required more than accepting counsel's risk characterizations. *See McKinney-Drobnis*, 16 F.4th at 606–07; *Roes*, 944 F.3d at 1048–50; *Bluetooth*, 654 F.3d at 946–48. It required structural assurances when divergent interests met "essential allocation decisions." *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. The court's crediting generalized litigation-risk (1-ER-190) is not an adequacy answer where, as here, pay-for-play claimants were represented by the same Class Counsel simultaneously maximizing NIL recoveries and agreeing to a ten-year, no-opt-out regime that preserves pay-for-play prohibitions. *See In re Apple,* 50 F.4th at 782–83; *Payment Card*, 827 F.3d at 233–36; *Literary Works,* 654 F.3d at 252–54.

Finally, the settlement-stage expansion from approximately 16,000 elite D1 athletes in three sports (*Carter*) to roughly 390,000 Division I athletes amplified the very "litigation risk" invoked to discount pay-for-play. *See* 7-ER-1457-1458, where plaintiffs' Class Counsel argued class heterogeneity and certification difficulty were "litigation risks" that counseled for settlement. But that risk, orchestrated by Class Counsel,

43

was a consequence of how the case was postured for settlement rather than a merits barrier inherent to *Carter's* original class. A self-created certification obstacle cannot justify unitary representation across materially adverse interests under *Amchem* and *Ortiz*. Where the decisive "risk" flows from expanding an unlitigated class during settlement to make certification harder, structural protection of separate counsel—not deference—was required.

### 4. Reliance On Dr. Rascher's Work Does Not Cure The Structural Conflict.

The approval order reasons that Class Counsel's allocation judgments were "informed by the methodologies and economic analyses of Dr. Rascher," citing his prior work and multiple reports, and treats that expert input as support for adequacy. 1-ER-190-191. Respectfully, that does not answer the Rule 23(a)(4) problem presented here. Adequacy turns on representation structure when materially adverse interests are at stake; an economist's single, unified framework—however credentialed—cannot substitute for separate, conflict-free advocacy where "essential allocation decisions" risk favoring one subgroup over another. *See Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57; *Payment Card,* 827 F.3d at 233–36; *Literary Works*, 654 F.3d at 252–54.

44

First, the pay-for-play claims that most directly conflict with NIL were not litigated in *House*, were imported from *Carter* during settlement negotiations, and never underwent discovery, Daubert testing, or class-certification scrutiny for the vastly expanded class. On that record, reliance on expert "methodologies" becomes a process label, not a structural assurance.

Second, *by his own description*, Dr. Rascher did not provide a full damages analysis for pay-for-play compensation; he outlined a methodology with assumptions and then applied it to estimate potential damages, while acknowledging he had not previously provided such analyses. 5-ER-914 ¶3, 927 ¶35. By Class Counsel's account, his work was commissioned to "aid the pre-*Carter* settlement discussions"—further underscoring that these were settlement-sizing judgments made outside adversarial testing. 4-ER-756. Where the core dispute is how much value to assign to pay-for-play, a methodological sketch—untested in adversarial proceedings—cannot replace the independent advocacy *Amchem* and *Ortiz* require.

Third, key modeling choices described in detail in Section I.D, *infra,* have distributional consequences that only separate counsel could meaningfully contest.

Fourth, Racher's methodology contemplates that the forward looking injunctive relief payments to D1 athletes contain pay-for-play compensation. 7-ER-945 ¶82 ("It is my understanding that, in addition to the settlement amounts discussed above, the injunctive settlement includes a commitment going forward to rule changes that would allow NCAA schools to provide new forms of **direct athlete compensation, including** related to NIL and **athletic performance,** up to a certain amount each year.")(emphasis added). The district court relied on this paragraph of the Rascher declaration in finding adequacy of relief. 1-ER-146–147 (citing Rascher Decl. ¶¶ 82–87). This admission kills any reliance by defendants on amateurism. But it does explain why defendants' member schools are now requiring D1 players to sign agreements that say all payments are for NIL rights and expressly not as compensation for their sports training and on the court and field labor. Better to defend the defendants' decades-long held position that the players are not employees.

46

Finally, the approval order's acceptance of counsel's assurance that each "type" of damages and its "associated litigation risk" was negotiated separately, with expert input, does not grapple with the antecedent problem: defendants made preservation of pay-for-play prohibitions "an essential part of the deal," and the injunctive restrictions were locked in before damages. Expert-endorsed numbers cannot erase the incentive to trade down pay-for-play to maximize NIL, and heightened scrutiny required the court to install structural assurances.

### 5. "Single Team = More Leverage" Is Not The Rule 23(A)(4) Test.

The approval order reasons that one negotiating team "likely increased bargaining power" and produced a better outcome than separate counsel. 1-ER-191. The opposite is more likely true here. Adequacy turns on protection of divergent interests not the supposed leverage of a global negotiator. *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. It is obvious that the *Carter* classes designed as pay-for-play classes in money-making sports likely would have done better if their counsel had no interest in the outcome for the NIL *House* classes. The due-process problem arises precisely because a single team

empowered to resolve everything can prioritize some claims over others without independent advocates to say no.

Even if a bigger group increased bargaining power vis-à-vis plaintiffs against the NCAA as a whole, it decreased bargaining power insofar as each subgroup could not bargain fully for its own interests.

*Payment Card* and *Literary Works* underscore the point. A single team negotiating on behalf of divergent groups has both the opportunity and the incentive to diminish one subgroup's relief in exchange for gains to another, especially where prospective rules and money move in opposite directions. *Payment Card*, 827 F.3d at 233–36; *Literary Works*, 654 F.3d at 252–54. That dynamic is present here. Defendants made preservation of pay-for-play prohibitions an "essential" precondition to any deal, and injunctive terms were finalized before damages were set. In that posture, the "one team" rationale increases, rather than cures, the risk that pay-for-play claims would be traded down to maximize NIL recovery.

Reliance on a "more leverage" premise is a process label, not an adequacy finding under heightened scrutiny.

**D. Dr. Rascher's Settlement Modeling For Pay-For-Play Damages Artificially Depress Value For Profit-Sport Athletes.**

Heightened scrutiny cannot defer to a single economist's settlement model where core inputs predictably disadvantage one subgroup. *See Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. Here P5 football and D1 basketball players are greatly disadvantaged.

As discussed above, the posture of pay-for-play *Carter* claims being radically expanded and inserted into the *House* NIL claims for the express purpose of facilitating a global settlement severely biased the original classes in *Carter*. The expert opinion, commissioned "to aid the pre-*Carter* settlement discussions," 4-ER-756, bears the unmistakable imprint of that bias.

Five primary settlement-stage choices embedded in Dr. Rascher's 2024 settlement report drive down pay-for-play recovery for D1 football and basketball athletes: (1) counting grant-in-aid athletic scholarships ("GIA") as if they were cash salary; (2) loading **all Division I** GIAs into "compensation received," thereby offsetting profit-sport back pay with non-revenue sports' GIAs; (3) **omitting the athletic-performance value embedded in Broadcast NIL that Desser (and Dr. Rascher**

49

**himself in 2022) recognized**; (4) ignoring the post-Interim Policy salary substitute payments made by NIL collectives; and (5) presenting a "50% like the pros" owners/players compensation ratio built on a narrowed NCAA Membership Financial Reporting System (MFRS) denominator and a padded numerator, which is not comparable to a pro-style revenue split.

### 1. Treating In-Kind GIAs As Cash Salary At Sticker Price

First, Rascher treats the in-kind athletic scholarship ("GIA") as the functional salary equivalent of a *cash salary* for comparison to a professional sports compensation "yardstick," and values GIAs at "sticker" price" rather than market (net). 5-ER-930-932. That choice inflates "compensation" in a way that is not comparable to professional wages and is inconsistent with fair-market valuation of in-kind benefits. Tatos Decl., 4-ER-894-901.

This matters because the scholarship is the historically collusive baseline that antitrust challenges have chipped away at (*e.g.*, cost-of-attendance in *O'Bannon*; education-benefit relief in *Alston*), not a market wage for athletic labor. Using that capped baseline as a salary proxy depresses pay-for-play value for the very athletes who drive revenues.

50

Under heightened scrutiny, the court needed to grapple with that baseline choice and its distributive consequences. *See McKinney-Drobnis*, 16 F.4th at 606–07; *In re Apple*, 50 F.4th at 782–83.

> **2.** **Loading All Division I GIAs Into Offsets Against "Salary" Depresses D1 Profit-Athletes' (Like Mr. Anderson) Back Pay Damages**

Exhibit 7 aggregates *all Division I GIAs* as "Estimated Athletic Compensation Received," totaling $16.688 billion for 2019-2024. 5-ER-932, Ex. 7. That figure is the highest offset provision contained in Exhibit 7 to the Rascher report. Although Rascher does not specifically explain how he arrived at the $16.688 billion figure, it correlates with annual, total scholarship expenditures across all of Division I of approximately $3.2 billion per year over five years (the pay-for-play class period for *Carter* pay-for-play claims). The Tatos declaration explicitly identifies and explains Rascher's numbers using information from the Equity in Athletic Disclosure Act to arrive at a total five-year D-I GIA cost of $16,299 billion. 4-ER-901,¶ 77.

Rascher's structural valuation choice shrinks profit-athlete back- -pay-for-play damages **by "taxing" P5 football and D1 basketball athletes with non-revenue sports' GIAs**. *Carter* was a D1 elite profit

51

athlete-only case; if litigated as such, there is no defensible merit-based economic theory to offset profit-sport backpay with GIAs from the rest of Division I.

The magnitude is not trivial. Using a profit-sports-only offset materially lowers the GIA deduction (likely by billions). Applying heightened scrutiny, the court could have required an independent assessment of offsets keyed to the profit-sports cohorts certified in *Carter*. The failure of the damages analysis to differentiate between the various classes is both a product of unitary counsel, and another indication that unitary counsel was hopelessly conflicted.

### 3. Omitting Critical Athletic Performance Value

In the *House* damages certification process, Class Counsel relied upon expert reports from two experts to arrive at estimated damages for media-rights NIL value (BNIL). In his October 2022 report, Ed Desser explained that in every P5 major media deal, athletes collectively account for roughly 50 percent of total value. Of that athlete share, approximately 70 to 80 percent reflects on-field performance, and 20 to 30 percent derives from NIL. Applying those proportions, Desser conservatively assigned a 10 percent BNIL share of total media-rights value, and then

allocated that share among sports—75 percent to football, 15 percent to men's basketball, and 5 percent to women's basketball. 4-ER-724–732 (¶¶ 14, 17).

The second expert, Dr. Rascher issued a companion report in October 2022, expressly adopting Desser's valuation framework. 3-ER-611, ¶170. Because *House* was NIL-only, neither expert evaluated the separate 70-80% on-field performance component; there was no need to, as *Carter's* pay-for-play claims weren't filed until over a year later.

However, in his 2024 settlement analysis, Rascher was required to value both sets of claims—*House*'s BNIL component and *Carter*'s athletic-performance (pay-for-play) component—because both were being settled together. In his analysis of BNIL claims, Rascher explicitly adopts "the same methodology for estimating BNIL damages that I presented in my previous class certification and merits reports," cites Desser, and utilizes his 75/15/5 allocation model. 5-ER-922-924. Under the Desser framework, Rascher arrives at a $1.815 billion total valuation for **BNIL only** (5-ER -923, 927, Ex.4, 6).

However, while adopting Desser's methodology to arrive at his BNIL valuation, **Rascher did not revisit or reallocate the 70–80**

53

**percent on-field-performance value identified in 2022.** In assessing the separate "athletic services" (pay-for-play) damages, 5-ER-927–934, Rascher instead used a new "professional-sports yardstick," aiming to show a 50 percent revenue-to-compensation ratio. 5-ER-932. That approach did not reclassify the embedded performance component as pay-for-play damages.

The omission matters. Section 5 and Exhibit 7 of his 2024 report—while including media receipts in the $46.395 billion revenue total—do not attribute any portion of the previously recognized 70–80 percent performance component to pay-for-play damages. If the 2022 framework had been carried forward, one would expect a corresponding attribution; none appears. On that framework, the implied performance value associated with $1.815 billion in BNIL would range from roughly $4.24 billion (70/30 split) to $7.26 billion (80/20 split). 5-ER-927 (Ex. 6); 4-ER-724 (§ 14); 3-ER-527.

> ### 4. Ignoring The Post-Interim Policy Salary Substitute Payments Created By NIL Collectives

Salary-substitute payments made by NIL collectives after July 1, 2021, provide the most reliable benchmark for market wages. Yet at the

preliminary-approval hearing, Defendants acknowledged that those widely reported collective pay-for-play deals were not in the *House* record, 7-ER-1452-54, even as they described the settlement's regulatory framework as prohibiting those same payments as impermissible "pay-for-play" and recruiting inducements. *See* 7-ER-1437-1441;1444-1451.

Dr. Rascher's settlement report relied on *school*-reported NIL data "from schools that had previously produced at least one report of an NIL transaction identifying a dollar value," covering roughly July 2021–July 2022. 5-ER-924-925. That means the underlying dataset excluded most collective payments—precisely the market segment the new NIL screen targets.

The settlement itself implicitly recognizes that many collective transactions function as wages, requiring "valid business purpose" and "fair market value" screening. 1-ER-35 (Art. 2 § 3). In a pay-for-play valuation, those transactions are indispensable wage data. They define—not offset—the "but-for" compensation schools would have to meet in a functioning market.

Instead, the court treated the settlements *process* features (screens/arbitration) as improvements over the status quo *enforcement*

model and did not require a record that priced the very wage benchmark the free market created. 1-ER-162-165. Under *Amchem* and *Ortiz*, that analytical gap warrants vacatur and remand for development of a record that accounts for the wage benchmark the free market established, not approval of a model that ignores it.

### 5. The "50% Like The Pros" Framing Is Wrong

The record does not establish a professional-style 50% owners/players revenue split. To start, the ratio the parties champion uses a narrow denominator drawn from MFRS categories that omit substantial athlete-driven inflows—institutional/government support, athletics-restricted endowment, Contributions, and concessions/parking/camps/"Other." *See* Tatos Decl., 4-ER-887-890, ¶22-33. At the same time, the ratio's numerator is padded by treating in-kind athletic scholarships (GIA) as if they were cash wages at sticker price, even though pro-league splits are overwhelmingly cash and they value in-kind "compensation" at market, not list price. *See* Tatos Decl., 4-ER-895-896, ¶50-55 Rascher report, 5-ER-930-932.

Prospectively, the settlement's Pool is about 22% of "Average Shared Revenue," with anti-circumvention rules and centralized

oversight—not a 50% split. 1-ER-24-47, Art. 3 §1(a)–(h). Finally, pro-league "shares" arise from collective bargaining and are generally insulated by the non-statutory labor exemption; there is no union or collective bargaining agreement here. *See* DOJ Statement of Interest 4-ER-742-743. In short, the touted "50%" is an accounting mirage built on a narrowed denominator and a padded numerator; it is not comparable to a professional-sports revenue split.

### E. The Settlement's Lobbying And "Court-Blessing" Provisions Confirm Structural Conflicts And Trigger Heightened Scrutiny

The approval order overruled objections to provisions that align Class Counsel prospectively with defendants to preserve the settlement's anticompetitive restraints and to seek judicial endorsement of compensation limits not adjudicated. 1-ER-191. Respectfully, under the Ninth Circuit's heightened scrutiny for settlement-only approvals, these features are independent indicia of conflicted incentives that required structural protections and record-based findings.

First, the settlement obligates Class Counsel to "use reasonable efforts to support" legislation implementing or codifying the settlement, including "support[ing] antitrust immunity for conduct undertaken by

57

Defendants in compliance with or to implement" it and preemption of conflicting state law, and to seek the Court's "approval" of compensation limits not actually adjudicated. 1-ER-43, Art. 7, § 1. The order characterizes this as merely taking the position that the settlement and its implementation are lawful. 1-ER-191. But adequacy under *Amchem* and *Ortiz* turns on whether class counsel's duties and incentives remain aligned when "essential allocation decisions" are made—not on assurances. *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. Here, those commitments prospectively pit Class Counsel against their athlete clients in all classes—particularly athletes in the money-making sports who would seek to challenge or improve the settlement's preserved prohibitions. That is not hypothetical divergence; it is embedded in the bargain.

Second, these provisions function as *Bluetooth*-style red flags. The settlement includes a "clear-sailing" component for a $20 million upfront injunctive-relief fee to Class Counsel, paid by defendants and not opposed, plus a forward-looking percentage on annual Pool distributions over the ten-year term. *See* 6-ER-29, § F.27. That fee architecture ties Class Counsel's compensation to preserving and administering the

58

injunctive regime that entrenches pay-for-play prohibitions—precisely the structure defendants insisted upon as a condition of any deal. 7-ER-1399-1403. *Bluetooth* instructs courts to treat such arrangements as warning signs that class counsel's self-interest may have influenced outcomes, requiring "a more probing inquiry." 654 F.3d at 946–48; *see McKinney-Drobnis*, 16 F.4th at 606–07; *Roes*, 944 F.3d at 1048–50; *In re Apple*, 50 F.4th at 782–83. That concern is amplified by defendants' representation to DOJ that they may invoke the settlement as a defense to future antitrust liability. 4-ER-735. Taken together, these features are functional analogues to *Bluetooth's* warning signs and demanded heightened skepticism.

Third, the class itself perceived the conflict: named plaintiffs urged the court to reject the injunctive framework and requested "independent, formal representation," noting counsel's role in defining financial frameworks and lobbying for an antitrust exemption. 4-ER-761-2. Under *McKinney-Drobnis* and *In re Apple*, heightened scrutiny required a reasoned response to such non-frivolous objections beyond reliance on Class Counsel's experience and a mediator's declaration and Class

Counsel's representation that the settlement "is in the best interests of the class members." 1-ER-191.

### F. The Decade-Long, No-Opt-Out Injunctive Regime "Locks In" Future Athletes With Only An Illusory Objection Window And Confirms Inadequate Representation

The order overruled objections that the injunctive release is overbroad because it binds future Division I athletes whose claims are not yet ripe, reasoning that those claims "will become ripe when the future student-athletes become members of the Injunctive Relief Class," and pointing to a modification that future athletes will not release injunctive and declaratory claims until they receive notice and an opportunity to object to continuation of the IRS. 1-ER -181. Respectfully, that analysis never grappled with the practical realities that make this protection illusory and, under heightened scrutiny, it should have.

First, the structure provides no opt-out for the Injunctive Relief Settlement Class, and the only safeguard for future athletes is a 60-day objection window that begins when they first receive NCAA eligibility paperwork—typically as incoming freshmen amid a flood of forms, before they have counsel, leverage, or even a working understanding of antitrust rights. *See* 7-ER-1392-1393 (hearing colloquy referencing the

60

"six-year-old…playing kickball" who later enters college); 6-ER-1232, ¶14.

The court was obliged to provide a reasoned response to non-frivolous objections showing that, in practice, the opportunity to object is not meaningful for the very subgroup most affected by the ten-year regime. *McKinney-Drobnis*, 16 F.4th at 606–07; *In re Apple*, 50 F.4th at 782–83. The order did not do so.

Second, the settlement's enforcement provisions go far beyond a simple release. "Release of Injunctive Claims" (§§ 19–26) operates with a covenant not to sue; related provisions require that "any and all" future challenges—including antitrust or other legal claims about the structure or implementation of the new compensation regime—must "to the fullest extent legally permissible, be asserted exclusively in the Action" in this court, and, if filed elsewhere, Class Counsel will join defendants to enjoin them. 6-ER-1235-1239, 1248, ¶¶ 19–26, 45–46.

The practical effect is to channel and suppress future injunctive challenges by athletes who, at the point of entry, cannot opt out and are unlikely to mount a sophisticated objection within 60 days. Heightened scrutiny required the court to test whether these unusual forward-

looking restraints equitably treat materially different subgroups over a decade, not to accept assurances rooted in counsel's experience or the mediator's declaration.

Third, the no-opt-out lock-in intersects with the core fault line that this appeal identifies: pay-for-play versus NIL. Defendants told the court that preserving pay-for-play prohibitions was "an essential part of the deal." Binding future athletes to that regime, without independent counsel to negotiate on behalf of those whose interests are to challenge or raise the cap on compensation for athletic services, is exactly the problem *Amchem* and *Ortiz* warn against: present claimants and future claimants with divergent interests represented by unitary counsel in "essential allocation decisions." *Amchem*, 521 U.S. at 626–27; *Ortiz*, 527 U.S. at 856–57. *Payment Card* underscores that when a settlement bundles damages with forward-looking rules that constrain future claimants, separate, conflict-free representation is required. 827 F.3d at 233–36.

Fourth, the potential extension mechanism compounds the constraint. The regime can be extended beyond ten years upon the parties' agreement and court approval. For athletes who will join the

62

class years from now, the combination of a no-opt-out class, an impractical 60-day window, exclusive-venue and anti-suit provisions, and possible extension effectively deprives them of any meaningful avenue to test the legality of entrenched restraints—precisely the kind of forward-looking lock-in that demands rigorous, record-based justification under Rule 23(e)(2) and Rule 23(a)(4).

Accordingly, the approval should be vacated and remanded for subclassing with separate counsel.

## II.    NOTICE TO BLACK ATHLETES WAS INADEQUATE.

### A.    Standard Of Review

Whether settlement notice satisfies Rule 23 and due process is a question of law reviewed de novo. *Low v. Trump Univ., LLC*, 881 F.3d 1111 (9th Cir. 2018); *In re Cement & Concrete Antitrust Litig.,* 817 F.2d 1435 (9th Cir. 1987).

### B.    Inadequacy Of Notice

The notice program was legally inadequate because it failed to reasonably target a substantial, readily identifiable subgroup—Black Division I athletes—whose media habits and consumption patterns differ in ways material to effective notice.

63

First, Black athletes constitute a large, concentrated share of the settlement classes, especially in the elite D1 revenue generating sports most affected by the settlement. Over the past decade, Black players constitute roughly 54–58% of D1 men's basketball, 47–48% of D1 football players, and 42–51% of D1 women's basketball. 2-ER-194.[7] That makes Black athletes a readily identifiable subgroup whose inclusion is essential to any reasonable notice plan under Rule 23(e)(1)(B).

Second, the plan used no Black-specific media and did not attempt targeted outreach to Black audiences, despite widely reported differences in how Black audiences receive news. *See, e.g.,* Pew Research Center, Black Americans' News Habits (Sept. 2023) (noting distinct source preferences, including frequent use of Black-owned outlets); Nielsen Diverse Intelligence Series, Amplifying Black Voices in Media (Oct. 2022) (Black audiences are substantially more likely than the general population to seek diverse-owned media). The declaration submitted by the notice professional contains no Black-targeted component; indeed, searches of the terms "Black" and "African American" in that declaration

---

[7] Citing NCAA Demographics Database, available at ww.ncaa.org/sports/2018/12/13/ncaademographics- database.aspx.

yield no results. *See* 2-ER-299-300 ¶¶13, 40. The absence of any Black-targeted channels is particularly consequential where, as here, many affected athletes left school years ago and direct contact information is less reliable.

Third, real-world experience confirms the deficiency. Appellant Anderson did not learn of the settlement via the notice procedures. Rather, he learned of the settlement only after outreach by undersigned counsel through their Black media outreach; many of his former D1 classmates were likewise unaware. 3-ER-492. A short, *pro bono* outreach campaign to Black outlets promptly surfaced additional Black class members who had received no prior notice. 3-ER-458-458. That immediate response from targeted media is powerful evidence that the approved plan failed to reach a substantial portion of this subgroup.

Fourth, the program's aggregate metrics do not cure the problem. Plaintiffs cite an estimated 81.9% "reach" for current class members and a "high" claims response, but the record shows approximately 73,115 unique claims and 28,816 payment updates out of an estimated 389,800 class members—about a 26.15% response. ( 2-ER-298, 300, 304, ¶¶ 9, 21, 33,). That global figure says nothing about whether Black athletes—who

65

make up a large share of D1 football and basketball—actually received notice in meaningful numbers. The question under Rule 23 and due process is not whether notice reached someone; it is whether notice was reasonably calculated to reach all who would be bound, which here required tailored outreach to a large, readily identifiable subgroup central to the settlement.

Fifth, courts have required subgroup-targeted publication where the affected population is disproportionately Black and distinct media are necessary to provide meaningful notice. In the federal tobacco litigation, the court revised the decree to require corrective statements in Black-owned newspapers and broadcasters after the NNPA and NAOBB showed that smoking disproportionately harmed African Americans and Black audiences rely on distinct media channels. *See United States v. Philip Morris USA Inc.,* 2014 U.S. Dist. LEXIS 75094, at *19 (D.D.C. June 2, 2014) (granting amici's request to include Black media). The same principle applies here.

Under de novo review, the approval order should be vacated and remanded with instructions to implement a supplemental, targeted notice program directed to Black athletes through Black-owned and

Black-focused media (radio, digital, social, and print), and to extend the deadlines for claims, objections, and—where applicable—opt-outs for at least 90 days following completion of that supplemental notice.

## III. THE SETTLEMENT'S CAP VIOLATES ANTITRUST LAW

### A. Standard Of Review

The Court reviews a district court's approval with heightened scrutiny where (as here) settlement was negotiated before class certification. *McKinney-Drobnis*, 16 F.4th at 606–07; *In re Bluetooth*, 654 F.3d at 946–48.

As part of a district court's evaluation of the fairness, reasonableness and adequacy of a proposed settlement, the court also considers whether the settlement "furthers 'the objectives [of]' . . . and does not 'violate the statute upon which the complaint was based.'" *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) (quoting *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525-26 (1986)); *see also Fraley v. Batman*, 638 Fed. Appx. 594, 597 (9th Cir. 2016) (court is required to set aside a settlement if it involves "clearly illegal" conduct).

To survive appellate review, the district court must "explore[] comprehensively all [Rule 23(e)(2)] factors" and give a reasoned response to all non-frivolous objections. *McKinney-Drobnis*, 16 F.4th at 606–07.

### B. The Pool Cap Is Classic Horizontal Price Fixing.

The settlement replaces one industry-wide wage cap with another. Under the "Pool," each school's total payments to athletes are capped by a conference-wide formula—nominally about 22% of "Average Shared Revenue," with limited escalators, anti-circumvention rules, and centralized oversight. 1-ER-21, 24-27, 39. Article 4 §2 then asks the court to bless "all NCAA compensation rules" adopted to implement this architecture. 1-ER-34.

As the DOJ explained, the settlement "replac[es] one cap with another," fixing by agreement among competing buyers how much they may pay for athlete labor, and thereby "extinguish[ing] the free market that would otherwise determine how much college athletes get paid." 4-ER-740-743, citing *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring).

A horizontal maximum price is a paradigmatic restraint. *Arizona v. Maricopa Cty. Med. Soc'y,* 457 U.S. 332, 348–51 (1982); *Law v. NCAA,* 134 F.3d 1010, 1019–21 (10th Cir. 1998) (affirming judgment against

68

NCAA salary cap for assistant coaches as "obviously anticompetitive"). Agreements among competitors not to compete over a material term of trade require no "elaborate industry analysis" to show their anticompetitive character. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459 (1986) (*quoting Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)); *see also NCAA v. Alston*, 594 U.S. 69, 88–93 (2021) (recognizing wage-fixing restraints in the market for student-athlete labor). The NCAA's acknowledged monopsony power heightens the competitive concern. *Alston*, 594 U.S. at 90.

The district court invoked an Eleventh Circuit decision, *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1089–90 (11th Cir. 2023), to suggest approval is permissible so long as the perpetuated conduct is not per se unlawful. 1-ER-158. With respect, that cannot be correct. If an antitrust settlement creates an illegal arrangement, it ought not be approved. Conduct that violates the rule of reason is just as illegal as conduct that violates per se rules, the difference is merely in the quantum of proof required to prove the violation. Simply put, a court may not approve a class settlement that prospectively authorizes an ongoing restraint that conflicts with the Sherman Act. *Grunin v. Int'l*

69

*House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975); S*ierra Club, Inc. v. Elec. Controls Design, Inc.,* 909 F.2d 1350, 1355 (9th Cir. 1990) (settlement must further statutory objectives and not contravene substantive law); *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) (court must set aside a settlement that involves "clearly illegal" conduct).

Even if the *Blue Cross* were correct, it would not control here, and certainly not as applied to college athletics. *Board of Regents* continually placed college sports within rule-of-reason analysis because some horizontal coordination—on schedules, eligibility, and game rules—is inherent to intercollegiate competition, making a per se approach ill-suited. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,* 468 U.S. 85, at 101-103. But that limited recognition of necessary coordination does not confer a blanket exemption on restraints that are, in character, straightforward wage-fixing. As *Alston* explained, *Board of Regents* did not declare compensation limits "procompetitive both in 1984 and forevermore," and courts must test restraints against current "market realities," which have "changed significantly" since 1984. 594 U.S. at 92–

70

93. Those realities now include years of NIL payments without any collapse in consumer demand.[8]

Justice Kavanaugh's concurrence underscored the point: "Price-fixing labor is price-fixing labor," ordinarily a "textbook antitrust problem." *Alston,* 594 U.S. at 109–10. The necessity of coordinating schedules and rules does not convert a horizontal wage cap into a benign restraint, nor justify approving a settlement that entrenches one.

*Blue Cross* does not—and could not—stand for a rule which permits approval of a classic price fixing arrangement. At most, it reflects that where a restraint is *actually* susceptible to a rule-of-reason defense on a developed record, a court may proceed to consider and weigh that

---

[8] Plaintiffs' own *Carter* pleading collected evidence that relaxing NIL restraints did not diminish demand: after the NCAA suspended most NIL prohibitions on July 1, 2021, "the market for third-party NIL rights … exploded," benefitting tens of thousands of athletes "without hurting college sports or consumer demand"; a 2023 Playfly study reported television viewership up nearly 15% year-over-year in the first seven weeks of the 2023 football season, the highest overall attendance since 2016 with a 5% increase from 2021, and 42.3 million fans attending the 2022 regular season; and media-rights revenues continue to surge (e.g., Big Ten agreements exceeding $1 billion per year; CFP revenues projected to exceed $2 billion annually). Carter Compl, No. No. 3:23-cv-06325 ECF 1, ¶¶ 7–11.

defense, and approve a settlement; it does not license approval merely because a party labels a market-wide wage cap "rule-of-reason."

## C. Professional-League Salary-Cap Analogies Are Inapposite: There Is No Labor Exemption Here

The parties' comparisons to NFL/NBA "shares" ignore dispositive differences: those caps exist within collective bargaining, are approved by the athlete-workers and their elected representative, and are generally insulated from antitrust law by the non-statutory labor exemption. *See Brown v. Pro Football, Inc.,* 518 U.S. 231, 235–37, 250 (1996); *Wood v. NBA*, 809 F.2d 954, 959–63 (2d Cir. 1987); *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 688 (2d Cir. 1995); *White v. NFL*, 822 F. Supp. 1389, 1421–25 (D. Minn. 1993). Here, athletes had no union, no NLRA bargaining by elected representatives, no input into the settlement's terms and none of labor law's "offsetting tools." *See* 4-ER-742-743 *see also Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 515 (2018) (contrasting Rule 23 processes with NLRA bargaining rights).

The settlement nonetheless installs CBA-style features: a sport-wide wage cap, roster limits, anti-circumvention rules, and centralized enforcement/arbitration. *See* 1-ER-21-44. It is noteworthy that former NBA player union representative and attorney Michele Roberts, in an

72

amicus brief below observed that the settlement bore all the hallmarks of a collective-bargaining agreement—but without any of the player protections or a representative owing athletes undivided loyalty. 2-ER-392. Ms. Roberts' brief, among other filings, addressed many of the issues which warranted heightened scrutiny below.

That concern is borne in public statements made by Class Counsel and class representative, Grant House. In a post-approval podcast interview, co-lead Class Counsel Steve Berman described the settlement as a "functional collective-bargaining agreement."[9] In a later interview on the same podcast, Grant House stated that he was excluded from decision-making throughout the litigation, had no input into the settlement, and was unable to speak with co-lead counsel Jeffrey Kessler despite repeated attempts.[10] These admissions confirm that the Settlement was negotiated without the athlete representation that labor law presupposes and Rule 23 requires.

---

[9] *Sportswise* Podcast, Episode 84 "*The Latest on the Twists and Turns in the House v. NCAA Settlement with Co-Lead Counsel, Steve Berman,*" (May 10, 2025) (at 31:10 – 32:15.)

[10] *Sportswise* Podcast, Episode 89 "*The Final House v NCAA Podcast (for now) with… Grant House*" (July 2, 2025) (at 30:55 – 37:30).

73

The specific terms of this quasi-CBA were negotiated by unitary Class Counsel, whose loyalties were divided between high-revenue athletes and those in non-revenue sports. Putting aside Class Counsel's gross pecuniary interest in obtaining the settlement, unitary class counsel was not capable of representing D1 basketball and football players in a manner consistent with the union-rounded settlement terms. Class Counsel's sequencing of *Carter*, its expansion from a 16,000-member football and men's-basketball class to a 390,000-athlete Division I-wide class, and the linkage of the NIL and pay-for-play claims all demonstrate a trade-off designed to secure defendants' principal goal—comprehensive and continued anticompetitive restraints on future compensation. A class settlement cannot serve as a de facto CBA to launder a market-wide wage cap through judicial approval. Approving a decade-long cap negotiated without a union was an abuse of discretion under Rule 23(e)'s heightened scrutiny.

## D. A Federal Court May Not "Bless" Ongoing Restraints

Courts do not "lend [their] approval to any contract or agreement that violates the antitrust laws." *Grunin*, 513 F.2d at 123 (8th Cir. 1975); *see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478

74

U.S. 501, 525–26 (1986) (consent judgment cannot require unlawful conduct). Antitrust remedies must "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance," not institutionalize it. *United States v. U.S. Gypsum Co.,* 340 U.S. 76, 88 (1950); *see also United States v. Microsoft*, 253 F.3d 34, 103 (D.C. Cir. 2001). The DOJ warned that the Pool "enshrine[s]" a compensation cap for ten years and could be wielded as a litigation shield by an adjudicated monopsonist, raising "serious concerns" under Rule 23(e). 4-ER-740-743. The additional request in Article 4 §2 for global judicial approval of "all NCAA compensation rules" only compounds the problem.

The Court's role is to remedy antitrust violations—not to ratify them in perpetuity.

## CONCLUSION

The approval order cannot stand. The settlement was negotiated and certified in a settlement-only posture without the required structural protections and probing, record-based findings that Rule 23(e)(2) and this Court's heightened-scrutiny precedents require. Material conflicts went unremedied; pay-for-play value was discounted on outdated premises; and the settlement installs a decade-long wage cap while purporting to "bless" future NCAA compensation rules. Notice to Black athletes was also legally inadequate; and the settlement perpetuates the continued economic disenfranchisement of D1 football and basketball players, the majority of whom are Black, who will continue to make much less than the free market will pay. The lie of amateurism cannot be invoked to justify the patent wage theft that the settlement sanctions.

**Relief Requested.** Appellant respectfully asks this Court to:

1. **Vacate** the final-approval order and judgment;

2. **Remand with instructions** to apply heightened scrutiny and to implement **subclasses with separate, conflict-free counsel** for (a) pay-for-play interests and (b) the injunctive-relief class (including future athletes);

3. **Reconsider settlement-only certification** of the expanded *Carter* class on a developed record, with adversarial testing as needed (including Daubert) specific to pay-for-play valuation and offsets;

4. **Strike or modify** the prospective **Pool cap** and the settlement's request for judicial "approval" of NCAA compensation rules (and any lobbying/anti-suit provisions) so approval does not entrench ongoing restraints;

5. **Provide supplemental, targeted notice** to Black athletes through Black-owned and Black-focused media and **extend deadlines** accordingly; and

Grant such **other and further relief** as is just, including **costs on appeal**.

Dated: October 29, 2025

Respectfully submitted,


By:  s/ Patrick A. Bradford
     Patrick A. Bradford (*pro hac vice*)
     **BRADFORD EDWARDS LLP**
     575 Fifth Avenue, 14th Floor
     New York, New York 10017
     Telephone: (917) 671-9470
     *pbradford@bradfordedwards.com*

     Denver Edwards (SBN 268822)
     **BRADFORD EDWARDS LLP**
     1150 S. Olive St., 10th Floor
     Los Angeles, CA 90015
     Telephone: (213) 868-3310
     *dedwards@bradfordedwards.com*

     *Attorneys for Objector- Appellant*
     *K. Braeden Anderson*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 25-4218, 25-3722, 25-3835, 25-4137, 25-4150, 25-4190 |

I am the attorney or self-represented party.

**This brief contains** | 13,552 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Patrick A. Bradford |  **Date** | October 29, 2025 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                    *Rev. 12/01/22*