**Nos. 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, 25-4218**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

GRANT HOUSE, ET AL., *Plaintiffs-Appellees*,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., *Defendants-Appellees*,

v.

KACIE BREEDING, et al., *Objectors-Appellants*.

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
No. 4:20-cv-03919
Hon. Claudia Wilken

_____

## BREEDING OBJECTORS-APPELLANTS' OPENING BRIEF

_____

John Clune
Ashlyn L. Hare
HUTCHINSON BLACK AND COOK, LLC
921 Walnut St., Ste. 200
Boulder, CO 80302
Telephone: (303) 442-6514
Email: john.clune@hbcboulder.com
      ashlyn.hare@hbcboulder.com

Rebecca Peterson-Fisher
KATZ BANKS KUMIN LLP
235 Montgomery St., Ste. 665
San Francisco, CA 94104
Telephone: (415) 813-3271
Email: peterson-fisher@katzbanks.com

*Counsel for Breeding Objectors-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ................................................... 3

STATUTORY AND REGULATORY AUTHORITIES ....................... 3

ISSUES PRESENTED ....................................................................... 3

STATEMENT OF THE CASE ........................................................... 4

   I.     The Nature of the Case ......................................................... 4

   II.    The Settlement Agreement ................................................... 5

   III.   The Breeding Objection ........................................................ 9

   IV.  The District Court's Approval of the Settlement Agreement ..... 11

SUMMARY OF THE ARGUMENT ................................................. 13

STANDARD OF REVIEW ............................................................... 15

ARGUMENT ................................................................................... 16

   I.     Under Title IX, Institutions Receiving Federal Funds Must Provide Athletics-Based Financial Assistance to Male and Female Athletes Proportionately. .......................................... 16

   II.    The District Court's Finding That the Settlement's ASC and BNIL Damages Allocation was Fair and Reasonable is Clearly Erroneous and Legally Impossible ................................. 20

         A.    The District Court's Finding That the ASC Damages Allocation is Fair and Reasonable is Based on the Impermissible Assumption that Title IX Did Not Apply In the But-For World. ................................. 22

B.    The District Court's Finding That the BNIL Damages are Fair and Reasonable is Based On a Second Impermissible But-For World Assumption – That Athletic Conferences Would Have Paid BNIL Compensation ................................................................. 25

    1.    The But-for Assumption That Conferences Would Start Paying Money to Athletes is Not Tethered to Reality ......................... 25

    2.    Even In a World Where Athletic Conferences Made Such Payments, Title IX Would Still Apply Where They Are Exercising Authority Ceded by Member Schools ................... 27

III.    The District Court Abused Its Discretion by Failing to Consider the Breeding Objection. ................................................................... 30

    A.    The District Court Abused Its Discretion by Failing to Address the Breeding Objectors' Meritorious Objection to the Damages Calculation ................................................................. 30

    B.    The District Court Abused Its Discretion by Denying Breeding Objectors an Opportunity to be Heard at the Final Approval Hearing ................................................................. 33

CONCLUSION ................................................................................ 35

STATEMENT OF RELATED CASES ................................................ 36

CERTIFICATE OF COMPLIANCE ................................................... 37

CERTIFICATE OF SERVICE ........................................................... 38

ADDENDUM ................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

*A.B. By C.B. v. Haw. State Dep't Of Educ.*,
    386 F. Supp. 3D 1352, 1357-58 (D. Haw. 2019) .................................28

*Allen v. Bedolla*,
    787 F.3d 1218, 1223-24 (9th Cir. 2015)..........................................15, 30

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001)................................22, 26

*Barrs v. Se. Conf.*,
    734 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010) .....................................28

*B.K. ex rel. Tinsley v. Snyder*,
    *922 F.3d 957, 965-66 (9th Cir. 2019)* ....................................................16

*Briseño v. Henderson*,
    998 F.3d 1014, 1028-29 (9th Cir. 2021)................................................20

*Carter v. NCAA*,
    Case No. 3:23-cv-06325-CW (N.D. Cal. Dec. 7, 2023)............4, 5, 7, 10

*CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*,
    465 F. App'x 617, 619 (9th Cir. 2012)..................................................33

*Cohen v. Brown Univ.*,
    991 F.2d 888, 893-94 (1st Cir. 1993) ....................................................16

*Comcast Corp. v. Behrend*,
    569 U.S. 27, 36 (2013) .........................................................................22

*Dennis v. Kellogg Co.*,
    697 F.3d 858, 864 (9th Cir. 2012) ........................................................31

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
    773 F.2d 1506, 1511 (9th Cir. 1985) ....................................................27

*Epstein v. MCA, Inc.*,
    126 F.3d 1235 (9th Cir. 1997) ..............................................................34

iv

*Glass v. Ubs Fin. Servs., Inc.*,
    331 F. App'x 452, 455 (9th Cir. 2009)..............................................20, 31

*Hubbard v. NCAA*,
    Case No. 4:23-cv-01593-CW (N.D. Cal. Apr. 4, 2023).....................4, 5

*In re Apple Inc. Device Performance Litig.*,
    50 F.4th 769, 782 (9th Cir. 2022)......................................................16, 31

*In Re Baby Prods. Antitrust Litig.*,
    708 F.3d 163, 175 (3d Cir. 2013)........................................................20, 24

*In Re Blue Cross Shield Antitrust Litig. Mdl*
    *2406*, 85 F.4th 1070, 1094, 1100-01 (11th Cir. 2023) ..........................20

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935, 940 (9th Cir. 2011) ...........................................................15

*In Re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966, 974 (C.D. Cal. 2012)......................................22, 29

*In Re Mego Fin. Corp. Secs. Litig.*,
    213 F.3d 454, 460-61 (9th Cir. 2000).....................................................20

*In re: NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKX),
    2024 WL 3628118, at *7 (C.D. Cal. Aug. 1, 2024) ...............................27

*In re Pacific Enters. Secs. Litig.*,
    47 F.3d 373, 377 n. 3 (9th Cir. 1995) ......................................................34

*In re Roundup Prods. Liab. Litig.*,
    No. 23-15611, 2024 WL 2745210 (9th Cir. May 29, 2024) ................15

*In re Veritas Software Corp. Secs. Litig.*,
    496 F.3d 962, 968 (9th Cir. 2007) ...........................................................15

*Mandujano v. Basic Vegetable Prods., Inc.*,
    541 F.2d 832, 837 (9th Cir. 1976)......................................30, 31, 33, 34

*Marshall v. Holiday Magic, Inc.*,
    550 F.2d 1173, 1179 (9th Cir. 1977) ......................................................34

*Mccormick Ex Rel. Mccormick v. Sch. Dist. Of Mamaroneck*,
    370 F.3d 275, 287 (2d Cir. 2004) ...........................................................17

v

*McKinney-Drobnis v. Oreshack,*
16 F.4th 594, 606 (9th Cir. 2021) .........................................16

*NCAA v. Alston,*
594 U.S. 69 (2021).........................................................4

*Offs. for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d
615, 625 (9th Cir. 1982) ...............................................31

*Portz v. St. Cloud State Univ.,*
297 F.Supp.3d 929, 943-43 (D. Minn. 2018) ......................21

*Ray v. Ncaa,*
No. 1:23-Cv-00425, 2025 Wl 775753, At *2
(E.D. Cal. Mar. 11, 2025) ..............................................22

*Saunders v. Naval Air Rework Facility, Alameda, Cal.,*
608 F.2d 1308, 1312 (9th Cir. 1979) ...............................34

*Torrisi v. Tucson Elec. Power Co.,*
8 F.3d 1370, 1378-79 (9th Cir. 1993).............................34

*Union Asset Mgmt. Holding A.G.v. Dell, Inc.,*
669 F.3d 632, 641 (5th Cir. 2012) .................................34

*Williams v. Bd. Of Regents Of Univ. Sys. Of Georgia,*
477 F.3d 1282, 1294 (11th Cir. 2007) ............................28

## Statutes and Rules

20 U.S.C. § 1681(a) ...........................................................16

20 U.S.C. §1682 ...............................................................17

28 U.S.C. § 1291 .................................................................3

28 U.S.C. § 1331 .................................................................3

34 C.F.R. § 106.41 ............................................................17

34 C.F.R. § 106.37(c)........................................................17

Fed. R. App. P. 4(1)(A)......................................................3

44 Fed. Reg. 71, 413, 415 (Dec. 11, 1979)................. 18, 19, 24

Fed. R. Civ. P. 23(e)..................................................... passim

vi

**Other Authorties**

120 Cong. Rec. 15,322-15,323 (May 20, 1974) ...................................................... 17

Dear Colleague Letter: Cost-Of-Attendance Awards, U.S. Dep't Of Educ. Off. For Civ. Rights (Nov. 12, 2015) ....................................................................18

Jeff Todd Et Al., *Dubious Assumptions, Economic Models, And Expert Testimony*, 42 DEL. J. CORP. L. 279 (2018) ...................................................23

Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974).......................................................17

## INTRODUCTION

This appeal arises from the district court's approval of a more than $2.5 billion class action settlement that compensates college athletes for past name, image, and likeness ("NIL") and other restrictions on athlete earnings. Objectors-Appellants Kacie Breeding, Alexis Drumm, Emmie Wannemacher, Savannah Baron, Riley Hass, Emma Appleman, Kate Johnson, and Elizabeth Arnold (the "Breeding Objectors")—eight current and former Division I female athletes and class members—challenged the settlement's allocation of damages on their behalf and on behalf of all affected female athletes. The Breeding Objectors contend the settlement is not reasonable, fair or adequate as to female class members because its flawed damages model unlawfully deprives them of over $1.1 billion in compensation by ignoring Title IX's requirement that past earnings would have been made proportionately between male and female athletes.

The damages models underlying the settlement's Athletic Services Compensation ("ASC") and Broadcast Name, Image, and Likeness ("BNIL") payments were calculated as if schools could have lawfully provided unequal benefits to male and female athletes. Calculated solely through a sport-specific market value lens, more than 90% of these two categories of damages—both of which reflecting payments that schools would have made in a hypothetical "but-for world" from 2016 to the date of the settlement—are allocated to male athletes,

1

while female class members receive less than pennies on the dollar. Even though this was an issue of first impression, the district court approved these discriminatory damages without ever addressing whether Title IX's proportionality requirements would have applied in the "but-for world." Instead, the district court skipped this critical question which results in an analysis that is fundamentally flawed. Without making findings regarding Title IX's application to the ASC and BNIL payments at issue, it becomes difficult for this Court to now review whether the Settlement Agreement is fair, reasonable, and equitable. Put simply, if Title IX applies to the but-for damages, the District Court would have had to reject the settlement as plainly unfair and unreasonable—yet the district court made no finding on that critical question.

In statements made during that hearing, it was apparent that the district court did not understand the Breeding Objection. Moreover, in its final order, the district court failed to address it entirely. Compounding these fatal errors in the damages calculations, the Court denied the Breeding Objectors the opportunity to be heard at the final settlement approval hearing.

Consequently, the Settlement Agreement as approved remains grossly unreasonable, unfair, and inadequate to all female class members where it misallocates $1.1 billion to class members participating in men's sports. The judgment of the district court must be reversed and remanded either for trial or for

2

proper consideration of Title IX's application to the but-for damages model governing all monies that would have been provided, either directly by the schools or on their behalf.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted final approval of a class action settlement pursuant to Federal Rule of Civil Procedure 23(e) and entered final judgment on June 6, 2025. 1-BreedingER-3. The Breeding Objectors-Appellants timely filed their notice of appeal on June 11, 2025, pursuant to Federal Rule of Appellate Procedure 4(1)(A). 4-BreedingER-1345.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether the district court abused its discretion by approving a college sports antitrust settlement whose "but-for" damages allocation ignored Title IX's mandate of proportional financial treatment for male and female athletes.

2.     Whether the district court abused its discretion by approving the settlement without either hearing or addressing Objectors-Appellants' well-founded objection to the damages calculation, thereby requiring remand for further findings.

## STATEMENT OF THE CASE

### I.     THE NATURE OF THE CASE

This case arose from a series of class action antitrust cases against the National Collegiate Athletic Association ("NCAA") and the Pac-12 Conference, Big Ten Conference, Big 12 Conference, Southeastern Conference, and Atlantic Coast Conference (the "Power Five" or "Power Five Conferences") challenging restrictions on college athlete compensation. 1-BreedingER-117. The Plaintiffs challenged NCAA and conference rules that prohibited athletes from earning money for use of their name, image, and likeness ("NIL"). 1-BreedingER-117. The named Plaintiffs are current and former Division I college athletes. 1-BreedingER-117.

Separately, class counsel filed two additional putative class action antitrust lawsuits against the same parties. *Hubbard v. NCAA*, Case No. 4:23-cv-01593-CW (N.D. Cal. Apr. 4, 2023), sought past damages for academic achievement awards that were prohibited prior to the Supreme Court's ruling in *NCAA v. Alston*, 594 U.S. 69 (2021). *Carter v. NCAA*, Case No. 3:23-cv-06325-CW (N.D. Cal. Dec. 7,

4

2023), challenged NCAA rules that prohibit payments for athletic services, otherwise known as "pay-for-play." 1-BreedingER-121.

## II.   THE SETTLEMENT AGREEMENT

On July 26, 2024, Plaintiffs informed the court that the parties had reached a Settlement Agreement that would resolve claims in *House*, *Hubbard*, and *Carter*. 1-BreedingER-122. Generally, the operative Settlement Agreement is separated into two categories: damages addressing past anti-trust conduct and injunctive relief that will govern future conduct.[1] 1-BreedingER-123–24. The Settlement Agreement specifies three separate damages classes (collectively, the "Damages Settlement Classes"), defined as follows:

> **Football and Men's Basketball Class:** All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I men's basketball team or football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

> **Women's Basketball Class:** All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I women's basketball team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

---

[1] The Breeding Objectors' appeal focuses solely on the past damages portion of the Settlement Agreement and not the injunctive relief.

> **Additional Sports Class:** Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all student-athletes who compete on, competed on, or will compete on a Division I athletic team and who have or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

1-BreedingER-123–24.

The Settlement Agreement provides that Defendants will pay a total of $2.576 billion in past damages to compensate the Damages Settlement Classes, pursuant to an allocation plan developed by Plaintiffs' expert economist, Dr. Daniel A. Rascher. 1-ER-125. Dr. Rascher's allocation plan outlines four categories of damages for unlawfully restraining college athletes' right to earn money: (1) Video Games NIL; (2) Lost NIL Opportunity; (3) Broadcast NIL ("BNIL"); and (4) Athletic Services Compensation ("ASC"), which the district court referred to as "Additional Compensation." 1-BreedingER-125–26. The first two categories, Video Games NIL and Lost Opportunity NIL, compensate class members for lost NIL earnings that would have been paid by private third parties in the "but-for world" and are not challenged by the Breeding Objectors.

The third and fourth categories, however, are very different. The ASC category provides $600 million in past damages for "pay-for-play" payments which would have been made by schools directly to the athletes for their athletic participation and performance had the challenged restrictions on earning not been

6

in place.[2] 1-BreedingER-122; 1-BreedingER-126. Under the settlement, 75% of the ASC damages are allocated to Football, 15% are allocated to Men's Basketball, and 5% are allocated to Women's Basketball. 4-BreedingER-1201–02. These varying payments are subject to a formula where the school can account for each athlete's seniority, recruiting star rating, and performance metrics. 4-BreedingER-1202–15. The remaining 5% is allocated to the Additional Sports Class and will generally be paid pro rata, again by the schools. 4-BreedingER-1202–16.

The BNIL category represents payments to college athletes from their school's broadcast rights deals, in the amount of $1.815 billion of the total damages, and compensates only the Football and Men's Basketball Class and Women's Basketball Class for use of their name, image, and likeness. 1-BreedingER-125. Dr. Rascher proposed a pro rata distribution to all members of the class, with 75% of the damages allocated to Football, 15% allocated to Men's Basketball, and 5% allocated to Women's Basketball.[3] 4-BreedingER-1191.

Notably, Dr. Rascher and other expert witnesses did not consider Title IX in formulating their opinions and damages calculations. 4-BreedingER-1304 (Title IX was not "within what I was assigned to work on"); 4-BreedingER-1308 (Dr.

---

[2] The ASC damages derive from *Carter* and were therefore not discussed in Dr. Rascher's expert reports or disputed at class certification. 4-BreedingER-1183.
[3] Dr. Rascher does not explain which class will receive the remaining 5%. 3-BreedingER-873; 4-BreedingER-1191.

Rascher has not "tried to account for Title IX in any of [his] damages models in this case"). Using market value by sport instead, over 90% of the BNIL and ASC damages will go to class members competing in men's sports. 4-BreedingER-1201–02; 4-BreedingER-1191.

The district court held a preliminary approval hearing on September 5, 2024. 1-BreedingER-6. The court declined to grant preliminary approval at the hearing and requested the parties amend the Settlement Agreement to address concerns regarding the scope of the release and certain aspects of the injunctive relief. 4-BreedingER-1167–80. On September 26, 2024, the Plaintiffs filed an amended Settlement Agreement and a supplemental brief in support of the motion for preliminary settlement approval. (Dot. No. 535.) The amended Settlement Agreement expressly releases the parties—as well as all member institutions of the involved conferences, though they are not parties to the case—from any Title IX claims "arising out of or relating to the distribution of the Gross Settlement Fund. *See, e.g.*, 2-BreedingER-210. The district court granted preliminary settlement approval on October 7, 2024. 1-BreedingER-6. Seventy-three separate objections were timely filed on behalf of 446 class members. *See* 1-BreedingER-156; 2-BreedingER-374–79. Nine of those objections—on behalf of 248 class members—challenged the inequitable damages calculations under Title IX. 2-BreedingER-374–79.

### III.   THE BREEDING OBJECTION

The Breeding Objectors are eight current and former Division I college female athletes competing in women's track and field, soccer, and volleyball. 2-BreedingER-459–60.[4] The Breeding Objectors will earn between $188 and $456 each from the settlement, in stark contrast to the tens or hundreds of thousands of dollars that class members competing in men's sports will earn for ASC and BNIL. 2-BreedingER-459–60;    4-BreedingER-1193;    4-BreedingER-1205–06;    4-BreedingER-1208–09. Recognizing that the but-for damages calculation violated Title IX's mandate, the Breeding Objectors timely objected on January 31, 2025, and requested an opportunity to speak at the final approval hearing. 2-BreedingER-454. The Breeding Objectors objected on behalf of themselves and all other women class members. 2-BreedingER-474.

Specifically, the Breeding Objectors challenged the two damages categories that would have been paid by schools, or arguably by conferences, on behalf of the schools, in the but-for world: Athletic Services Compensation and Broadcast NIL. 2-BreedingER-461. The Breeding Objectors asserted that Dr. Rascher's proposed damages allocations for these two damages categories—which distributed over 90% of the damages to male athletes using nothing more than market value by

---

[4] Objectors Eden Hardy and Hannah Taylor objected to the settlement but are not participating in the appeal.

sport—erroneously ignored Title IX's stricture, which requires, and would have required in the but-for world, payments from schools to athletes be made proportionately to men and women. 2-BreedingER-464–67. As a result, the Settlement Agreement erroneously allocated over $1.1 of the $2.56 billion in ASC and BNIL damages that should have been allocated to female athletes. 2-BreedingER-480.

The Breeding Objection is founded upon the very same arguments asserted by the Defendants while opposing class certification earlier in this matter. 4-BreedingER-1277–78. There, the Defendants correctly stated that Title IX would have prevented the disproportionate BNIL payments suggested by Dr. Rascher, and that only schools, not conferences, pay benefits directly to athletes. 4-BreedingER-1278. In those earlier proceedings, the district court acknowledged that if Title IX applied, it would impact "the amount of the BNIL payments that would have been paid to the members of the Football and Men's Basketball and Women's Basketball proposed classes in the but-for world (i.e. Title IX would impact the question of damages)." 4-BreedingER-1278. (The district court never addressed Title IX's application to ASC payments made *by schools directly to athletes* at all, likely because those damages derive from *Carter*, which was not consolidated with *House* until settlement. 4-BreedingER-1183.)

10

### IV. THE DISTRICT COURT'S APPROVAL OF THE SETTLEMENT AGREEMENT

Plaintiffs filed a motion for final settlement approval on March 3, 2025,[5] and the district court held a final approval hearing on April 7, 2025. 1-BreedingER-122. Counsel for the Breeding Objectors, along with Objector Lexi Drumm, were present at the final approval hearing despite the district court's denial of their request to speak at the hearing. 2-BreedingER-336; 2-BreedingER-372; 2-BreedingER-454. During the hearing, the district court's comments reveal that it mistakenly believed that the Title IX objectors, collectively, were challenging only how the final settlement payments would be *distributed*, rather than whether the underlying damages had been miscalculated in the first place. 2-BreedingER-346–62. Based on this mischaracterization, the court directed its limited questions to the parties and other objectors from that limited premise and never reached the critical Title IX issue raised in the Breeding Objection. 2-BreedingER-346–62.

After the final approval hearing, the district court asked the parties and three objector groups to return to mediation to modify certain provisions of the

---

[5] The Breeding Objectors filed a response in opposition to Plaintiffs' motion for final settlement approval, reiterating the fatally flawed damages calculations and urging the district court to scrutinize the issue despite the parties' failure to address the Breeding Objection in their pleadings. 2-BreedingER-364–370.

injunctive relief.[6] 2-BreedingER-363. On May 7, 2025, the parties filed the fourth and final amended Settlement Agreement. 2-BreedingER-194–330. On June 6, 2025, the district court entered an order and opinion granting final settlement approval and entered final judgment. *See generally* 1-BreedingER2–192. In its opinion granting final settlement approval, the district court did not address the Breeding Objection challenging the damages allocation calculation and instead merely concluded that Title IX does not apply to the *distribution of damages by the claims administrator*, consistent with its previous statements made during the final approval hearing. 1-BreedingER-179. The district court reached the sweeping conclusion that Plaintiffs' damages allocations were adequately supported by Dr. Rascher's opinions and treated class members equitably without addressing whether Title IX would have prevented the disproportionate ASC and BNIL payments altogether. 1-BreedingER-153.

On June 11, 2025, the Breeding Objectors timely appealed the district court's June 6, 2025 rulings. 4-BreedingER-1345. Five additional groups of

---

[6] With permission from the district court 2-BreedingER-363, the Breeding Objectors also filed a one-page letter following the final approval hearing, which once again attempted to clarify the Settlement Agreement's glaring Title IX problem based on statements made by the district court during the hearing. 2-BreedingER-331.

objectors followed suit, and on August 6, 2025, this Court consolidated the appeals. Order at 4, No. 25-3722, Dkt. No. 27.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in granting final approval of the Settlement Agreement for two distinct, but related, reasons: 1) the court failed to consider Title IX's application to the but-for damages analysis and then 2) failed entirely to address the Title IX objections that raised this very issue.

I.     The district court abused its discretion in concluding that the Settlement Agreement was fair, reasonable, and adequate where it relied on a clearly flawed damages allocation that was not legally permissible in the but-for world given Title IX's requirement that athletics-based financial assistance and benefits must be made proportionately to men and women. The $600 million in ASC damages are payments made directly by schools to athletes and therefore subject to Title IX. A settlement that fails to allocate those payments proportionately between male and female athletes is plainly unfair and inadequate to female class members.

With regard to the BNIL damages, the parties and the court compounded their but-for calculation error by adopting two flawed assumptions that distorted the analysis and wrongly removed it from the required Title IX lens. First, the damages analysis offered by Plaintiffs' expert assumed athletic conferences would

13

have paid athletes directly in the but-for world, even though such entities have never had any role in the provision of financial aid and benefits to student athletes. Second, the damages analysis ignored precedent applying Title IX to conferences, as well as other third parties, where schools have ceded authority over some function of their programs and activities to such third-party entity. By adopting these impermissible and inaccurate assumptions, the parties effectively ignored Title IX's requirements in the but-for world, producing a skewed damages model that treated disproportionate payments as lawful. These foundational errors fatally undermine the allocation, and, accordingly, the Court should vacate the settlement approval order and remand for proper Title IX findings or trial.

II.     The district court abused its discretion by failing to respond in any fashion to the Breeding Objectors' non-frivolous Title IX objection that implicates $1.1 billion of the $2.576 billion damages award. While the governing Title IX principles are well established: federal funding recipients may not allocate athletics-based financial assistance or benefits disproportionately by sex, the precise question of Title IX's application to athlete earnings arises here for the first time.  As such, findings of fact, or mixed fact and law, resolving the question of Title IX's applicability are paramount to any evaluation of whether the Settlement Agreement is fair, reasonable, and equitable to female class members. Additionally, the district court abused its discretion by denying the Breeding

14

Objectors an opportunity to speak at the final approval hearing on this objection. The district court's refusal to hear from counsel for the Breeding Objectors contributed to its confounding of the issues and led it to overlook the core of the Breeding Title IX Objections in its order. These procedural defects denied the Breeding Objectors the due process required by Rule 23(e) and are independent bases that necessitate vacating the settlement approval and remanding for further proceedings.

## <u>STANDARD OF REVIEW</u>

This Court reviews a district court's approval of a class action settlement for a clear abuse of discretion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011). The district court's approval of an allocation plan is also reviewed for an abuse of discretion. *In re Veritas Software Corp. Secs. Litig.*, 496 F.3d 962, 968 (9th Cir. 2007). A court abuses its discretion when its factual findings are clearly erroneous. *In re Bluetooth*, 654 F.3d at 940; *see also Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015) ("A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact."). Factual findings are clearly erroneous if they are "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the record." *In re Roundup Prods. Liab. Litig.*, No. 23-15611, 2024 WL 2745210 (9th

15

Cir. May 29, 2024) (quoting *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 965-66 (9th Cir. 2019)).

Moreover, "[t]o survive appellate review, the district court must show it has explored comprehensively all [Rule 23(e)(2)] factors, and must give a reasoned response to all non-frivolous objections." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782 (9th Cir. 2022) (quoting *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021)).

## **ARGUMENT**

I.  **UNDER TITLE IX, INSTITUTIONS RECEIVING FEDERAL FUNDS MUST PROVIDE ATHLETICS-BASED FINANCIAL ASSISTANCE TO MALE AND FEMALE ATHLETES PROPORTIONATELY.**

If Title IX should have been applied to the settlement's but-for damages calculation, as the Breeding Objectors maintain, the settlement cannot stand as approved. Title IX provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Both the statute's legislative history and subsequent amendments and regulations make clear that the treatment of female athletes was of paramount concern to its sponsors. *See Cohen v. Brown Univ.*, 991 F.2d 888, 893-94 (1st Cir. 1993) (explaining Title IX's legislative history and intersection with athletics). Since its enactment, Title IX has substantially involved

16

women's participation and recognition in sports, leading to increased opportunities, broader public interest, and growing acknowledgement of the value of women's sport, both societally and financially.

Importantly, Title IX applies irrespective of the revenue a sport generates. In fact, Congress has expressly rejected attempts to carve-out football and basketball from Title IX. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (explaining Congress' rejection of the "Tower Amendment"). In 1974, Senator John Tower proposed an amendment to Title IX that would have allowed revenue-producing sports to keep revenue generated for their own use. 120 Cong. Rec. 15,322-15,323 (May 20, 1974). Congress rejected the Tower Amendment and instead passed the "Javits Amendment," which directed then Department of Health, Education, and Welfare (the "HEW") to promulgate regulations for athletics consistent with the statute's intent. *See* 20 U.S.C. §1682, as amended by Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974).

Pursuant to that directive, HEW enacted athletics-specific regulations at 34 C.F.R. § 106.37(c) and 34 C.F.R. § 106.41. Section 106.37(c) that require athletic scholarships and other financial aid be provided "in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics." Section 106.41 sets out guidelines for the two other predominant areas of Title IX athletics compliance: equal participation opportunities and equal treatment and

17

benefits. These regulations were further expanded upon in the HEW's 1979 Policy Interpretation. Policy Interpretation, 44 Fed. Reg. 71, 413 (Dec. 11, 1979).

With respect to athletics-based financial aid, the 1979 Policy Interpretation clarified that Title IX's proportionately requirement does not require a proportionate number of scholarships for men and women; rather, compliance is evaluated based on whether *the total amount of financial assistance* provided to men and women is substantially proportionate to their participation rates. Policy Interpretation, Section VII.A.3, 44 Fed. Reg. 71, 415 (Dec. 11, 1979).

The Breeding Objectors assert that the payment of money either for playing a sport at a school or for the use of a student's name, image, and likeness while playing a sport at the school is an unequivocal form of financial assistance or benefit. However, there is no question that the Settlement Agreement provides for a new form of athletics-related financial assistance—ASC and BNIL—that have never been considered by courts interpreting Title IX. These types of payments are certainly analogous to other direct financial assistance—such as scholarships, cost-of-attendance stipends, or work-related aid—that are subject to Title IX's proportionality requirements. *See, e.g.*, Dear Colleague Letter: Cost-of-Attendance Awards, U.S. Dep't of Educ. Off. for Civ. Rights (Nov. 12, 2015), https://www.ed.gov/media/document/20151112-cost-attendance-ath-scholarshipspdf-21182.pdf (defining athletic financial assistance as "any financial

18

assistance expenditures through the institution's athletics program and any other aid that is connected to a student's athletic participation," including cost-of-attendance stipends which are subject to the same rules under Title IX as athletic scholarships); Policy Interpretation, Section VII.A.3.b., 44 Fed. Reg. 71, 415 (Dec. 11, 1979) ("When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX.").

ASC and BNIL should be treated no differently from other forms of athletics-based financial aid—they are financial benefits provided to students contingent on their athletics participation. Thus, they should also be governed by Title IX and its implementing regulations and required to be paid proportionately to men and women. The notion that they should be distributed commensurate with revenue generation—as this settlement would do—is inconsistent with Title IX's purpose and legislative history, which make clear that revenue-producing sports are not exempted from Title IX's anti-discrimination mandate. To the extent that the parties believe that these payments are not analogous to such treatment for the purpose of Title IX, such assertion would require a fact-specific determination.

19

**II. THE DISTRICT COURT'S FINDING THAT THE SETTLEMENT'S ASC AND BNIL DAMAGES ALLOCATION WAS FAIR AND REASONABLE IS CLEARLY ERRONEOUS AND LEGALLY IMPOSSIBLE**

A district court abuses its discretion when its determination that an allocation plan is "fair, reasonable, and adequate" rests on clearly erroneous, unreasonable, or inadequate factual support. Center, *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (vacating settlement approval and the damages allocation plan because "it did not have the factual basis necessary to determine whether the settlement was fair to the entire class"). A district court's finding may be reversible if it relies on an erroneous analysis in an expert report. *See Briseño v. Henderson*, 998 F.3d 1014, 1028-29 (9th Cir. 2021) (finding that the district court erred in relying on a deficient expert report to quantify the value of injunctive relief for award of attorneys' fees in a class action settlement). Moreover, inequitable damages allocations between class members must be supported by a reasonable damages theory and reliable basis for treating class members differently. *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 460-61 (9th Cir. 2000); *Glass v. UBS Fin. Servs., Inc.*, 331 F. App'x 452, 455 (9th Cir. 2009); *In re Blue Cross Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1093-94, 1100-01 (11th Cir. 2023).

Here, in analyzing the factors set forth in Federal Rule of Civil Procedure 23(e), the district court broadly concluded that the Settlement Agreement treats

class members equitably to each other, notwithstanding the grossly inequitable damages allocation. 1-BreedingER-152. The district court's analysis demonstrates the error that the damages allocation plan fairly compensated class members based on what they "would most likely have received in the but-for world *in light of the revenues those sports achieve*." 1-BreedingER-152–53. However, as it pertains to ASC and BNIL damages, both the Rascher report and the district court failed to consider the requirements of Title IX in analyzing what those athletes "would have most likely received" from their federally funded institution.

Instead, the settlement relies on a hypothetical world in which Title IX does not exist. Title IX regulations expressly prohibit the allocation of athletics-based financial assistance according to revenue generation rather than proportionality. *See generally Portz v. St. Cloud State Univ.*, 297 F.Supp.3d 929, 943-43 (D. Minn. 2018). In the absence of the unlawful restraints on athletes' earnings, ASC and BNIL payments would have been paid proportionately between men and women, as required by Title IX. By ignoring that legal requirement of federal funding recipients, the Settlement Agreement treats female class members inequitably and results in a fundamentally unfair and unreasonable outcome, depriving women athletes of approximately $1.1 billion in compensation.

**A.** **The District Court's Finding That the ASC Damages Allocation is Fair and Reasonable is Based on the Impermissible Assumption that Title IX Did Not Apply in the But-For World.**

The district court erred by approving an allocation of ASC damages that failed to account for Title IX in the but-for world despite the ASC payments being athletics-based payments paid directly from federally funded schools to student athletes. Unlike with the settlement's BNIL damages allocation discussed below, there is no dispute that these amounts would have been paid by the federally funded schools at issue in the lawsuit directly to its athletes.

Damages in antitrust cases are determined "based on what class members' economic position would have been absent the alleged antitrust violations (i.e., in the world that would have existed 'but for' the alleged violation)." *Ray v. NCAA*, No. 1:23-cv-00425, 2025 WL 775753, at *2 (E.D. Cal. Mar. 11, 2025) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013)). Though this analysis may require assumptions about how the parties would have behaved absent the unlawful conduct, assumptions in the but-for world must be "supported by real-world evidence," and damages models that ignore or omit major factors that would impact the results of the analysis are generally excluded as unreliable. *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal.

22

2012); *see also generally* Jeff Todd et al., *Dubious Assumptions, Economic Models, and Expert Testimony*, 42 DEL. J. CORP. L. 279 (2018).

As set forth in the Breeding Objection, it is unreasonable to assume that schools would have violated Title IX in the but-for world in making such payments. Doing so would have led to endless lawsuits and administrative complaints and investigations. Therefore, presuming real world economics which necessarily include Title IX, these ASC payments would have been required by law to be allocated proportionately by gender.[7] The district court apparently recognized this at class certification, acknowledging that Title IX impacts the question of damages, 4-BreedingER-1278–79. And while being reassured by counsel for the NCAA that schools would not be making any past damages payments, the district court briefly remarked at the fairness hearing, "[i]f the schools are [paying the money], then we do have to worry about Title VII—I mean Title IX." 2-BreedingER-362.

It is undisputed that schools would pay the money for the but-for ASC damages, yet the district court failed to address its own concern about Title IX's application to those payments. Instead, the Court summarily accepted Dr.

---

[7] Objectors do not contest the total amount of the settlement damages. Though the total amount could change with the application of Title IX, for use as a settlement figure, Objectors do not challenge its reasonableness.

23

Rascher's damages calculation which assumed, following instruction from Plaintiffs' counsel, that Title IX did not apply. 1-BreedingER-153.

Adopting Dr. Rascher's mistaken report, the district court erroneously concluded that it is fair and reasonable to allocate over 90% of the ASC damages to class members participating in men's sports. 1-BreedingER-153. But Title IX does not allow such disparate treatment based on a sport's revenue generation. Regardless of the total amount of damages, the distribution to male and female athletes should have been proportionate to the gender percentages in the schools' athletic departments. Once that proportionate allocation is made between the genders, the schools are free to then allocate the money to particular sports based on revenue generation or another metric without violating Title IX. *See* Policy Interpretation, Section VII.A.3, 44 Fed. Reg. 71, 415 (Dec. 11, 1979).

Moreover, because Dr. Rascher's report failed to apply Title IX requirements to damages, the district court had no factual basis to determine whether the allocation of damages was fair to all class members. *See In re Baby Prods.*, 708 F.3d at 175 (vacating settlement approval and the damages allocation plan because "it did not have the factual basis necessary to determine whether the settlement was fair to the entire class"). In approving the settlement, the district court permitted a resolution that effectively circumvents federal anti-discrimination law and significantly harms female class members.

24

**B.** **The District Court's Finding That the BNIL Damages are Fair and Reasonable is Based On a Second Impermissible But-For World Assumption – That Athletic Conferences Would Have Paid BNIL Compensation**

The district court similarly found that the allocation of BNIL damages was "based on Dr. Rascher's opinions relating to the types of Division I student-athletes who were likely to receive each type of NIL compensation in the but-for world," and that the damages allocations were "adequately supported by Dr. Rascher's opinions and treat damages class members equitably." 1-BreedingER-153. For the very same reason as with the ASC damages, the district court's analysis of BNIL damages is flawed for not applying Title IX.

But a larger problems loom with BNIL's "but for" world as it makes a wholly unrealistic an illogical assumption that conferences, not schools, would have been the payor of the BNIL money.

*1. The But-for Assumption That Conferences Would Start Paying Money to Athletes is Not Tethered to Reality*

First, although the district court did not address Title IX's application to the BNIL damages calculation, it accepted Dr. Rascher's report that unreasonably assumed that conferences, not schools, would pay athletes BNIL money. 1-BreedingER-153. This assumption is unsupported by reality, as conferences have *never* directly paid or provided benefits to athletes. Defendant Conferences themselves dispelled this fallacy in addressing Plaintiff's Motion for Class

25

Certification. "Though Rascher posits that BNIL payments would be made directly by the conferences themselves, there is nothing to support such a payment model. Schools, not conferences, compete with each other in recruiting[,] and schools[,] not conferences[,] decide what amount of scholarship aid to give individual students." 4-BreedingER-1314; 4-BreedingER-1325; 4-BreedingER-1328; 4-BreedingER-1340. The settlement analysis makes the baseless assumption that conferences would make direct payments to a school's individual student-athletes for no reason other than the fact that the schools broadcast agreements are *negotiated* at the conference level. 3-BreedingER-1058.

In fact, the Court need look no further than the injunctive portion of the Settlement Agreement to determine who will provide the revenue-sharing payments from media deals for future BNIL compensation: it is the schools. 2-BreedingER-361. Never in the history of college athletics have conferences paid—nor, apparently, will conference pay—such BNIL compensation to athletes. That notion exists only within the Settlement Agreement's hypothetical but-for world as an assumption wholly untethered from reality. Again, assumptions made in the but for world must be based upon real world evidence. *See Am. Booksellers Ass'n, Inc.*, 135 F.Supp.2d at 1041.

26

This would not be the first time that speculative but-for assumptions have been questioned in the college sports world. See *In re: NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKX), 2024 WL 3628118, at *7 (C.D. Cal. Aug. 1, 2024) ("After review of Dr. Rascher's testimony, the Court finds that his college but-for world was not based on a reliable methodology but rather *ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world and must be excluded.") (emphasis in original). The same is true here (from the same expert.) The assertion that conferences would suddenly take over the most significant provision of benefits to athletes in the history of college sports is untethered to reality. The fact that this rogue assumption could arguably serve the benefit of avoiding Title IX's application is not lost on the Breeding Objectors. But economists serving in this capacity must present a but-for world grounded in reality. *Id.* ("Because Dr. Rascher's testimony relied on a college football model that was developed based on speculation and *ipse dixit* opinion, the Court excludes Dr. Rascher's testimony under FRE 702."). *Id.* citing to *Dolphin Tours, Inc. v. Pacifico Creative Serv*., Inc., 773 F.2d 1506, 1511 (9th Cir. 1985).

2.    *Even In a World Where Athletic Conferences Made Such Payments, Title IX Would Still Apply Where They Are Exercising Authority Ceded by Member Schools*

27

But-for BNIL payments made by the conferences would still be governed by Title IX where the conferences are only exercising controlling authority ceded by the schools. *Williams v. Bd. of Regents of Univ. Sys. of Georgia,* 477 F.3d 1282, 1294 (11th Cir. 2007) ("We are persuaded . . . by the analysis of the Western District of Michigan, noting that if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability."); *Barrs v. Se. Conf.*, 734 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010) (holding that plaintiffs plausibly stated a Title IX claim against the SEC where the conference was alleged to have ceded control over portions of the schools' athletic programs); *see also A.B. by C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357-58 (D. Haw. 2019) (collecting cases recognizing the controlling authority rule).

The record here clearly establishes that member schools have ceded authority over significant aspects of their athletic operations to the conferences, which are controlled, generally, by the Presidents of each of the member schools. 4-BreedingER-1313; 4-BreedingER-1324; 4-BreedingER-1338–39. That is even more so here in the proposed but-for world where conferences are doing the negotiation the schools' media rights deals and supposedly paying the school's athletes *for them.* The students are athletes of the school, not the conferences, and

28

the conference's but-for role here is clearly only at the behest of the member schools. Thus, regardless of whether the schools or conferences would have made the BNIL payments in the but-for world, Title IX still mandates that the damages payments be made proportionately to male and female athletes.

As a result, the damages allocation for ASC and BNIL is fundamentally unfair and unreasonable where it omits a critical factor in the damages analysis: a controlling federal anti-discrimination law that would have never permitted the disproportionate earnings set forth in the damages allocation.[8] *In re Live Concert*, 863 F. Supp. 2d at 974 (explaining that an expert report is unreliable if it omits "major factors" that would impact the damages analysis). Accordingly, the Settlement Agreement does not, and cannot, meet the standard for approval under Rule 23(e), and the judgment of the district court must be reversed.

---

[8] The Breeding Objectors do not dispute that lawsuits involving college athletes may result in damages that do not compensate male and female athletes equally or proportionately, and those damages are not always in error. For example, the Breeding Objectors do not contest the similarly disproportionate Lost NIL Opportunities or Videogames NIL allocations because third party payments are not subject to Title IX. The ASC and BNIL damages, however, are unique because the damages compensate athletes for earnings that necessarily would have been paid by federally funded schools (or their conferences) and would have been required to comply with Title IX.

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER THE BREEDING OBJECTION.

In addition to the requirements of Rule 23(e), district courts are held to a higher procedural standard when making a determination of substantive fairness and are required to hear and respond to non-frivolous objections. *Allen*, 787 F.3d at 1223-24 "To survive appellate review, the district court must show it has explored comprehensively all factors, *and must give a reasoned response* to all non-frivolous objections." *Id.* (emphasis added); *see also Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976). The district court failed to adhere to these procedural requirements with respect to the Breeding Objectors, and as a result, the district court's order should be vacated and remanded for rehearing and consideration of the objection. As set forth above, if the damages calculation had accounted for Title IX, the settlement could never have satisfied the fairness factor.

### A.   The District Court Abused Its Discretion by Failing to Address the Breeding Objectors' Meritorious Objection to the Damages Calculation

There can be no credible argument that the Breeding Objection was addressed by the district court. "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Allen*, 787 F.3d at 1223-24 (quoting

30

*Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)); *see also In re Apple Inc.*, 50 F.4th at 782. These procedural safeguards ensure the district court properly evaluates whether a class action settlement is "fair, reasonable, and adequate," and provide a record for this Court to review. *See Offs. for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982); *See Mandujano*, 541 F.2d at 837 ("These deficiencies of the record make it impossible to say that adequate protection was afforded the dissidents and that they are mere spoilers whose objections are without merit."). Appellate courts have recognized the importance of this process even where the settlement allocation itself was ultimately upheld. For example, in *Glass*, this Court found that the district court did not abuse its discretion in approving a settlement with disproportionate allocations *because* the district court addressed the objection and adequately set forth a reasoned basis for treating class members differently. 331 F. App'x at 455.

In this instance, however, the district court plainly did not address the Breeding Objectors' concerns. The district court issued a 76-page opinion with its order granting final settlement approval. 1-BreedingER-118–93. The sum total of language from the final order regarding the settlement's Title IX damages question addresses a distinctly separate issue and was likely in response to a different Title IX objection made by other class members:

31

> First, the objectors have cited no authority that Title IX applies to damages awards distributions or that damages distributions made by a claims administrator are subject to Title IX. Accordingly, the Court cannot conclude that Title IX violations will occur when the Gross Settlement Fund is distributed by the claims administrator pursuant to the damages allocations that Plaintiffs have proposed.[16]
>
>  . . .
>
> Plaintiffs' proposed damages allocations are based on Dr. Rascher's damages methodology, which allocates more funds to class members who played Division I football and men's basketball on the basis that schools and conferences received far more revenues from those sports than from other sports during the class period.

1-BreedingER-179–80.

The Breeding Objectors did not assert that Title IX applied to the *distribution* of damages by the claims administrator. Rather, the Breeding Objectors argued that Title IX must inform the calculation of ASC and BNIL damages in the but-for world, rather than concern itself with whether distributing the settlement proceeds might itself constitute a Title IX violation.

The record makes clear that the district court's analysis incorrectly assumed that the objections argued that Title IX governed the actual payout of the settlement damages, rather than inform the underlying calculation of damages in the but-for world. The Breeding Objectors made no such argument. The district court's focus on this distribution concern was apparent even at the fairness hearing, where it continually focused its questions on whether the settlement's distribution would be paid out by the NCAA, the conferences, or the schools. 2-BreedingER-

347; 2-BreedingER-349–50; 2-BreedingER-361–62. Thus, the Breeding Objection remains entirely unaddressed. As a result of its misunderstanding of the Breeding Objectors' argument, the district court adopted a grossly inaccurate damages calculation and wrongly determined that the allocation formula treated class members fairly.

The Breeding Objection called into question the allocation of $1.1. billion of the total settlement value, and the district court was required to substantively address it. The district court's passing reference to other Title IX issues does nothing to cure the deficiency. *See CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 F. App'x 617, 619 (9th Cir. 2012) ("More might be required of the district court [than a mere analysis of the fairness factors] in a case where an objector convincingly questions the settling plaintiffs' analysis or fairness of the settlement . . . ."). Consequently, the district court's failure to respond to the Breeding Objectors' significant objection is a reversible error, and the matter should be remanded for further findings or trial.

**B.  The District Court Abused Its Discretion by Denying Breeding Objectors an Opportunity to be Heard at the Final Approval Hearing**

In addition to its failure to consider or address their meritorious objection in its opinion, the district court abused its discretion by denying the Breeding Objectors an opportunity to be heard at the final approval hearing. In *Mandujano*,

33

this Court recognized the due process rights afforded to objectors. 541 F.2d at 835. It noted that substantial objections "cannot be rejected without an opportunity being afforded the objector to be heard," and that "the trial court should not hesitate to permit an attorney of the objector's choosing to appear at the hearing to represent the objector." *Id*.; *see also Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012) ("Objectors have a right to be heard…"). "Objections found to be without substance and frivolous require no hearing, but the trial court should set forth on the record its reasons for so considering the objection." *Mandujano*, 541 F.2d at 836.[9]

Here, although counsel for the Breeding Objectors specifically requested an opportunity to speak at the final approval hearing, they were excluded from the

_____

[9] This Court has, at times, declined to apply *Mandujano*'s procedural requirements where it has determined the objector's arguments are without merit and the objectors have an opportunity to opt out. *See In re Pacific Enters. Secs. Litig.*, 47 F.3d 373, 377 n. 3 (9th Cir. 1995) (collecting cases). There is good reason to heed *Mandujano* here. First, the Breeding Objectors asserted a meritorious objection on behalf of *all* female athletes that will have a determinative effect on the damages allocation for the entire class. This is distinct from asserting an individual grievance and "playing spoilers." *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1179 (9th Cir. 1977), *abrogated on other grounds by Epstein v. MCA, Inc.*, 126 F.3d 1235 (9th Cir. 1997); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378-79 (9th Cir. 1993). Second, opting out is similarly not appropriate where, as here, the objection has class-wide repercussions, and the objectors do not seek relief "separate and apart from that awarded to the class." *Saunders v. Naval Air Rework Facility, Alameda, Cal.*, 608 F.2d 1308, 1312 (9th Cir. 1979).

34

Court's list of permitted speakers due to "limited time." 2-BreedingER-372; 2-BreedingER-454.

Because the district court erred both in denying the Breeding Objectors an opportunity to be heard on their non-frivolous objection *and* failing to consider that objection, errors that appear to have materially affected its decision to grant final approval, the judgment should be reversed and remanded back to the district court for appropriate consideration and findings.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the case remanded to the district court.

Date: October 29, 2025

*/s/ John Clune*
John Clune
Ashlyn L. Hare
HUTCHINSON BLACK AND COOK, LLC
921 Walnut St., Ste. 200
Boulder, CO 80302
Telephone: (303) 442-6514
Email: john.clune@hbcboulder.com
ashlyn.hare@hbcboulder.com

Rebecca Peterson-Fisher
KATZ BANKS KUMIN LLP
235 Montgomery St., Ste. 665
San Francisco, CA 94104
Telephone: (415) 813-3271
Email: peterson-fisher@katzbanks.com

*Attorneys for Breeding Objectors-Appellants*

35

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s) 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, 25-4218**

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** */s John Clune*_____ **Date:** October 29, 2025

36

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, 25-4218**

I am the attorney or self-represented party.

**This brief contains 7734 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ John Clune* _____ **Date** October 29, 2025

37

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s) 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, 25-4218**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**
Breeding Objectors-Appellants' Opening Brief
Excerpts of Record – Index Volume, Volumes I-V

**Signature** *s/ John Clune*       **Date** October 29, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

38

# ADDENDUM

# INDEX TO ADDENDUM

### PERTINENT STATUTORY AND CONSTITUTIONAL AUTHORITIES

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 23 ...............................................................................2-3

**Statutes**

20 U.S.C. § 1681 ................................................................................4-7

20 U.S.C. § 1682 ..................................................................................8

20 U.S.C. § 1687 ..................................................................................9

**Code of Federal Regulations**

34 C.F.R. § 106.1 ...............................................................................10

34 C.F.R. § 106.42 .........................................................................11-12

34 C.F.R. § 106.31 .........................................................................13-14

34 C.F.R. § 106.37 .........................................................................15-16

34 C.F.R § 106.41 ..........................................................................17-18

**Federal Register**

44 Fed. Reg. 71, 415 (1979) ...........................................................19-28

**Federal Rule of Civil Procedure 23(e). Class Actions.**

(e)    Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class--or a class proposed to be certified for purposes of settlement--may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

    (1) *Notice to the Class.*

        (A)  *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

        (B)  *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

            (i)    approve the proposal under Rule 23(e)(2); and

            (ii)   certify the class for purposes of judgment on the proposal.

    (2) *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

        (A)  the class representatives and class counsel have adequately represented the class;

        (B)  the proposal was negotiated at arm's length;

        (C)  the relief provided for the class is adequate, taking into account:

            (i)    the costs, risks, and delay of trial and appeal;

            (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

            (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

            (iv)  any agreement required to be identified under Rule 23(e)(3); and

        (D)  the proposal treats class members equitably relative to each other.

2

(3) *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections.*

(1) *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(2) *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

  (i) forgoing or withdrawing an objection, or

  (ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(3) *Procedure for Approval After an Appeal.* If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

**Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681** *et seq.*

**20 U.S.C. § 1681. Sex.**

### a. Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) **Classes of educational institutions subject to prohibition**

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) **Educational institutions commencing planned change in admissions**

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) **Educational institutions of religious organizations with contrary religious tenets**

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this

4

subsection would not be consistent with the religious tenets of such organization;

**(4) Educational institutions training individuals for military services or merchant marine**

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

**(5) Public educational institutions with traditional and continuing admissions policy**

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices—

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

**(7) Boy or Girl conferences**

this section shall not apply to—

5

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for—

   (i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

   (ii) the selection of students to attend any such conference;

**(8) Father-son or mother-daughter activities at educational institutions**

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

**(9) Institution of higher education scholarship awards in "beauty" pageants**

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

**b. Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance**

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with

6

respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

### c. "Educational institution" defined

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

## 20 U.S.C. § 1682. Federal Administrative Enforcement; Report to Congressional Committees.

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## 20 U.S.C. § 1687. Interpretation of "program or activity."

For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of—

    (1)    (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

    (2)    (A) a college, university, or other postsecondary institution, or a public system of higher education; or
(B) a local educational agency (as defined in section section[1] 7801 of this title), system of vocational education, or other school system;

    (3)    (A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

        1. if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

        2. which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

    (4)    any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

    (5)    any part of which is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.

**34 C.F.R. § 106 *et seq*. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.**

**34 C.F.R. § 106.1. Purpose.**

The purpose of this part is to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part. This part is also intended to effectuate section 844 of the Education Amendments of 1974, Public Law 93–380, 88 Stat. 484.

10

**34 C.F.R. § 106.2. Definitions.**

As used in this part, the term:

. . .

Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:
    (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
    (ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
(3) Provision of the services of Federal personnel.
(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

. . .

Institution of undergraduate higher education means:

(1) An institution offering at least two but less than four years of college level study beyond the high school level, leading to a diploma or an associate degree, or wholly or principally creditable toward a baccalaureate degree; or

11

(2) An institution offering academic study leading to a baccalaureate degree; or

(3) An agency or body which certifies credentials or offers degrees, but which may or may not offer academic study.

. . .

Postsecondary institution means an institution of graduate higher education, an institution of undergraduate higher education, an institution of professional education, or an institution of vocational education that serves postsecondary school students.

. . .

Recipient means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

**34 C.F.R. § 106.31. Education Programs or Activities.**

(a)  General.

    (1)  Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient that receives Federal financial assistance.

    (2)  In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

    (3)  This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of:

        (i)  A recipient to which subpart C does not apply; or

        (ii)  An entity, not a recipient, to which subpart C would not apply if the entity were a recipient.

(b)  Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

    (1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

    (2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

    (3) Deny any person any such aid, benefit, or service;

    (4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

    (5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

13

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

(c) Assistance administered by a recipient educational institution to study at a foreign institution. A recipient educational institution may administer or assist in the administration of scholarships, fellowships, or other awards established by foreign or domestic wills, trusts, or similar legal instruments, or by acts of foreign governments and restricted to members of one sex, which are designed to provide opportunities to study abroad, and which are awarded to students who are already matriculating at or who are graduates of the recipient institution; *Provided*, a recipient educational institution which administers or assists in the administration of such scholarships, fellowships, or other awards which are restricted to members of one sex provides, or otherwise makes available reasonable opportunities for similar studies for members of the other sex. Such opportunities may be derived from either domestic or foreign sources.

(d) Aid, benefits or services not provided by recipient.

(1) This paragraph applies to any recipient which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational consortia and cooperative employment and student-teaching assignments.

(2) Such recipient:

(i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and

(ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

14

**34 C.F.R. § 106.37. Financial Assistance.**

(a)    General. Except as provided in paragraphs (b) and (c) of this section, in providing financial assistance to any of its students, a recipient shall not:

    (1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;

    (2) Through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or

    (3) Apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

(b)    Financial aid established by certain legal instruments.

    (1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein; *Provided*, That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex.

    (2) To ensure nondiscriminatory awards of assistance as required in paragraph (b)(1) of this section, recipients shall develop and use procedures under which:

        (i)   Students are selected for award of financial assistance on the basis of nondiscriminatory criteria and not on the basis of availability of funds restricted to members of a particular sex;

        (ii)  An appropriate sex-restricted scholarship, fellowship, or other form of financial assistance is allocated to each student selected under paragraph (b)(2)(i) of this section; and

        (iii) No student is denied the award for which he or she was selected under paragraph (b)(2)(i) of this section because

15

of the absence of a scholarship, fellowship, or other form of financial assistance designated for a member of that student's sex.

(c)    Athletic scholarships.

    (1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

    (2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

**34 C.F.R. § 106.41. Athletics.**

(a)     General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b)     Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c)     Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

   (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
   (2) The provision of equipment and supplies;
   (3) Scheduling of games and practice time;
   (4) Travel and per diem allowance;
   (5) Opportunity to receive coaching and academic tutoring;
   (6) Assignment and compensation of coaches and tutors;
   (7) Provision of locker rooms, practice and competitive facilities;
   (8) Provision of medical and training facilities and services;
   (9) Provision of housing and dining facilities and services;
   (10)    Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may

consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

    d.  [Reserved by 89 FR 33888]

**Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, Policy Interpretation, Section VII., 44 Fed. Reg. 71, 415 (Dec. 11, 1979).**

This Policy Interpretation clarifies the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at 45 CFR 86.37(c) and 86.41(c).

    *A. Athletic Financial Assistance (Scholarships)*
        *1. The Regulation*—Section 86.37(c) of the regulation provides: [Institutions] must provide reasonable opportunities for such award [of financial assistance] for member of each sex in proportion to the number of students of each sex participating in inter-collegiate athletics.[2]
        *2. The Policy*—The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors. Two such factors are:
            a. At public institutions, the higher costs of tuition for students from out-of-state may in some years be unevenly distributed between men's and women's programs. These differences will be considered nondiscriminatory if they are not the result of policies or practices which disproportionately limit the availability of out-of-state scholarships to either men or women.

---

[2] See also § 86.37(a) of the regulation.

19

b. An institution may make reasonable professional decisions concerning the awards most appropriate for program development. For example, team development initially may require spreading scholarships over as much as a full generation (four years) of student athletes. This may result in the award of fewer scholarships in the first few years than would be necessary to create proportionality between male and female athletes.

3. *Application of the Policy*—

   a. This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates.

   b. When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX.

4. *Definition*—For purposes of examining compliance with this Section, the participants will be defined as those athletes:

   a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

   b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season: and

   c. Who are listed on the eligibility or squad lists maintained for each sport, or

   d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

B. *Equivalence in Other Athletic Benefits and Opportunities*

1. *The Regulation*—The Regulation requires that recipients that operate or sponsor interscholastic, intercollegiate, club or intramural athletics.

20

"provide equal athletic opportunities for members of both sexes." In determining whether an institution is providing equal opportunity in intercollegiate athletics the regulation requires the Department to consider, among others, the following factors:

a. [3]
b. Provision and maintenance of equipment and supplies;
c. Scheduling of games and practice times;
d. Travel and per diem expenses;
e. Opportunity to receive coaching and academic tutoring;
f. Assignment and compensation of coaches and tutors;
g. Provision of locker rooms, practice and competitive facilities;
h. Provision of medical and training services and facilities;
i. Provision of housing and dining services and facilities; and
j. Publicity

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this Section also addresses recruitment of student athletes and provision of support services.

This list is not exhaustive. Under the regulation, it may be expanded as necessary at the discretion of the Director of the Office for Civil Rights.[4]

2. *The Policy*—The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effects of any differences is negligible.

---

[3] 86.41(c)(1) on the accommodation of student interests and abilities, is covered in detail in the following Section C of this policy interpretation.
[4] See also § 86.41(a) and (b) of the regulation.

If comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors. Some of the factors that may justify these differences are as follows:

a. Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities. This type of distinction was called for by the "Javits' Amendment"[5] to Title IX which instructed HEW to make "reasonable (regulatory) provisions considering the nature of particular sports" in intercollegiate athletics.

   Generally, these differences will be the result of factors that are inherent to the basic operation of specific sports. Such factors may include rules of play, nature/replacement of equipment, rates of injury resulting from participation, nature of facilities required for competition, and the maintenance/ upkeep requirements of those facilities. For the most part, differences involving such factors will occur in programs offering football, and consequently these differences will favor men. If sport-specific needs are met equivalently in both men's and women's programs, however, differences in particular program components will be found to be justifiable.

b. Some aspects of athletic programs may not be equivalent for men and women because of legitimately sex-neutral factors related to special circumstances of a temporary nature. For example, large disparities in recruitment activity for any particular year may be the result of annual fluctuations in team needs for first-year athletes. Such differences are justifiable to the extent that they do not reduce overall equality of opportunity.

c. The activities directly associated with the operation of a competitive event in a single-sex sport may, under some circumstances, create unique demands or imbalances in particular program components. Provided any special demands

---

[5] Section 844 of the Education Amendments of 1974, Pub. L. 93-380, Title VIII (August 21, 1974) 88 Stat. 612.

associated with the activities of sports involving participants of the other sex are met to an equivalent degree, the resulting differences may be found nondiscriminatory. At many schools, for example, certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind. These differences would not violate Title IX if the recipient does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of event management support available to both programs are based on sex-neutral criteria (e.g., facilities used, projected attendance, and staffing needs).

d. Some aspects of athletic programs may not be equivalent for men and women because institutions are undertaking voluntary affirmative actions to overcome effects of historical conditions that have limited participation in athletics by the members of one sex. This is authorized at § 86.3(b) of the regulation.

3. *Application of the Policy—General Athletic Program Components—*

a. *Equipment and Supplies (§ 86.41(c)(2)).* Equipment and supplies include but are not limited to uniforms, other apparel, sport-specific equipment and supplies, general equipment and supplies, instructional devices, and conditioning and weight training equipment.

Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The quality of equipment and supplies;
(2) The amount of equipment and supplies;
(3) The suitability of equipment and supplies;
(4) The maintenance and replacement of the equipment and supplies; and
(5) The availability of equipment and supplies.

b. *Scheduling of Games and Practice Times (§ 86.41(c)(3)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The number of competitive events per sport;
(2) The number and length of practice opportunities;
(3) The time of day competitive events are scheduled;

23

(4) The time of day practice opportunities are scheduled; and

(5) The opportunities to engage in available pre-season and post-season competition.

c. *Travel and Per Diem Allowances (§ 86.41(c)(4)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Modes of transportation;

(2) Housing furnished during travel;

(3) Length of stay before and after competitive events;

(4) Per diem allowances; and

(5) Dining arrangements.

d. *Opportunity to Receive Coaching and Academic Tutoring (§ 86.41(c)(5)).*

(1) Coaching—Compliance will be assessed by examining, among other factors:

(a)  Relative availability of full-time coaches;

(b)  Relative availability of part-time and assistant coaches; and

(c)  Relative availability of graduate assistants.

(2) Academic tutoring—Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(a)  The availability of tutoring; and

(b)  Procedures and criteria for obtaining tutorial assistance.

e. *Assignment and Compensation of Coaches and Tutors (§ 86.41(c)(6)).*[6] In general, a violation of Section 86.41(c)(6) will be found only where compensation or assignment policies or

---

[6] The Department's jurisdiction over the employment practices of recipients under Subpart E, §§ 86.51–86.61 of the Title IX regulation has been successfully challenged in several court cases. Accordingly, the Department has suspended enforcement of Subpart E. Section 86.41(c)(6) of the regulation, however, authorizes the Department to consider the compensation of coaches of men and women in the determination of the equality of athletic opportunity provided to male and female athletes. It is on this section of the regulation that this Policy Interpretation is based.

practices deny male and female athletes coaching of equivalent quality, nature, or availability.

Nondiscriminatory factors can affect the compensation of coaches. In determining whether differences are caused by permissible factors, the range and nature of duties, the experience of individual coaches, the number of participants for particular sports, the number of assistant coaches supervised, and the level of competition will be considered.

Where these or similar factors represent valid differences in skill, effort, responsibility or working conditions they may, in specific circumstances, justify differences in compensation. Similarly, there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary.

(1) Assignment of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:
  (a) Training, experience, and other professional qualifications;
  (b) Professional standing.
(2) Assignment of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:
  (a) Tutor qualifications;
  (b) Training, experience, and other qualifications.
(3) Compensation of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:
  (a) Rate of compensation (per sport, per season);
  (b) Duration of contracts;
  (c) Conditions relating to contract renewal;
  (d) Experience;
  (e) Nature of coaching duties performed;
  (f) Working conditions; and
  (g) Other terms and conditions of employment.
(4) Compensation of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

25

      (a)    Hourly rate of payment by nature subjects tutored;

      (b)    Pupil loads per tutoring season;

      (c)    Tutor qualifications;

      (d)    Experience;

      (e)    Other terms and conditions of employment.

f.  *Provision of Locker Rooms, Practice and Competitive Facilities (§ 86.41(c)(7)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

    (1) Quality and availability of the facilities provided for practice and competitive events;

    (2) Exclusivity of use of facilities provided for practice and competitive events;

    (3) Availability of locker rooms;

    (4) Quality of locker rooms;

    (5) Maintenance of practice and competitive facilities; and

    (6) Preparation of facilities for practice and competitive events.

g.  *Provision of Medical and Training Facilities and Services (§ 86.41(c)(8)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

    (1) Availability of medical personnel and assistance;

    (2) Health, accident and injury insurance coverage;

    (3) Availability and quality of weight and training facilities;

    (4) Availability and quality of conditioning facilities; and

    (5) Availability and qualifications of athletic trainers.

h.  *Provision of Housing and Dining Facilities and Services (§ 86.41(c)(9)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

    (1) Housing provided;

    (2) Special services as part of housing arrangements (e.g., laundry facilities, parking space, maid service).

i.  *Publicity (§ 86.41(c)(10)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

    (1) Availability and quality of sports information personnel;

    (2) Access to other publicity resources for men's and women's programs; and

26

(3) Quantity and quality of publications and other promotional devices featuring men's and women's programs.

4. *Application of the Policy—Other Factors (§ 86.41(c))*. a. *Recruitment of Student Athletes*.[7] The athletic recruitment practices of institutions often affect the overall provision of opportunity to male and female athletes. Accordingly, where equal athletic opportunities are not present for male and female students, compliance will be assessed by examining the recruitment practices of the athletic programs for both sexes to determine whether the provision of equal opportunity will require modification of those practices.

Such examinations will review the following factors:

(1) Whether coaches or other professional athletic personnel in the programs serving male and female athletes are provided with substantially equal opportunities to recruit;

(2) Whether the financial and other resources made available for recruitment in male and female athletic programs are equivalently adequate to meet the needs of each program; and

(3) Whether the differences in benefits, opportunities, and treatment afforded prospective student athletes of each sex have a disproportionately limiting effect upon the recruitment of students of either sex.

b. *Provision of Support Services.* The administrative and clerical support provided to an athletic program can affect the overall

---

[7] Public undergraduate institutions are also subject to the general anti-discrimination provision at § 86.23 of the regulation, which reads in part:

''A recipient * * * shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action * * * and may choose to undertake such efforts as affirmative action * * *''

Accordingly, institutions subject to § 86.23 are required in all cases to maintain equivalently effective recruitment programs for both sexes and, under § 86.41(c), to provide equivalent benefits, opportunities, and treatment to student athletes of both sexes.

27

provision of opportunity to male and female athletes, particularly to the extent that the provided services enable coaches to perform better their coaching functions.

In the provision of support services, compliance will be assessed by examining, among other factors, the equivalence of:

(1) The amount of administrative assistance provided to men's and women's programs;

(2) The amount of secretarial and clerical assistance provided to men's and women's programs.

5. *Overall Determination of Compliance.* The Department will base its compliance determination under ' 86.41(c) of the regulation upon an examination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole; or

c. Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.

. . .