**Nos. 25-4190, 25-3722, 25-3835, 25-4137, 25-4150, 25-4218**

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

IN RE COLLEGE ATHLETE NIL

LITIGATION GRANT HOUSE; et al.,

*Plaintiffs-Appellees*,

v.

TYLER PHILLIPS,

*Appellant*,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; et al.,

*Defendants-Appellees*.

On Appeal from the United States
District Court for the Northern
District of California
No. 4:20-cv-03919-CW, Hon. Claudia A. Wilken

**OPENING BRIEF OF TYLER PHILLIPS**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................2

REQUEST FOR ORAL ARGUMENT ..................................... 3

JURISDICTIONAL STATEMENT ...........................................3

STATEMENT OF THE CASE ....................................................3

SUMMARY OF ARGUMENT....................................................9

ARGUMENT .............................................................................14

I.      Plain Error – First Amendment ...............................14

II.     Abuse of Discretion – Inquiry and Objections ................32

III.    Abuse of Discretion – Clear Error ...............................36

IV.     Abuse of Discretion – Erroneous View (Fundamental Conflicts)..42

        A.     Excluded Walk On BNIL Claims ...........................45

        B.     Excluded Walk On CAS Claims ...........................52

        C.     Older CAS Claims ................................................. 55

        D.     Older 3rd Party Claims .......................................... 58

V.      Abuse of Discretion – Erroneous View (Inequitable Use of Uncertainty) ................................................................. 62

        A.     Excluded Walk On BNIL Claims ...........................63

        B.     Older 3rd Party Claims .......................................... 65

VI.     Abuse of Discretion – Erroneous View (*Alston's* Impact) ............ 67

VII.    Abuse of Discretion – Erroneous View (Scholarship Restrictions) ................................................................. 70

CONCLUSION ................................................................ 77

OBJECTOR TABLE ........................................................ 80

CERTIFICATE OF COMPLIANCE ................................. 81

ADDENDUM .................................................................. 84

    I.  United States Constitution (Amendments) ................... 84

    II.  Federal Rule of Civil Procedure – 23 ......................... 85

    III. Old NIL Rules ........................................................... 93

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337. This Court has jurisdiction under 28 U.S.C. § 1291. On June 6, 2025, the district court entered final judgment. ECF No. 980. Tyler Phillips timely noticed his appeal on July 2, 2025. ECF 991; *see* Fed. R. App. P. 4(a)(1).

## STATEMENT OF THE CASE

A. FACTUAL HISTORY

For many years the NCAA and its member institutions adopted and enforced rules that restricted student athletes ability to utilize their name, image, and likeness ("**NIL**") and to otherwise be compensated – whether from third-parties, member institutions, or any entity – for (i) utilizing their NIL for expressive or associational purposes and (ii) playing, participating athletically, or otherwise providing athletic services. ECF 533-1 (the "**Complaint**"), p. 31-39.

4

B. Procedural History

This consolidated litigation began as two separate actions in 2020 in the United States District Court for the Northern District of California (the "**Court**"): (1) House v. National Collegiate Athletic Association, 4:20-cv-03919 (*House*); and (2) Oliver v. National Collegiate Athletic Association, 4:20-cv-04527 (*Oliver*).

In each of the two actions, Plaintiffs asserted claims against Defendants arising out of injuries they allegedly suffered as a result of certain NCAA rules that restrict the compensation that student-athletes can receive in exchange for the commercial use of their NIL. ECF 978 (the "**Opinion**"), p. 4.

In 2021, the Court adopted a stipulation to consolidate *House* and *Oliver*. ECF 164.

On September 22, 2023, the Court granted Plaintiffs' motion for certification of an injunctive relief class and appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel (the "**Class Counsel**"). ECF 323.

Merits discovery closed in October 2023. Opinion, p. 5.

On December 7, 2023, a proposed class action was filed in the

Court captioned Carter v. National Collegiate Athletic Association (*Carter*), Case No. 3:23-cv-06325 (N.D. Cal.), which alleged that the NCAA's rules prohibiting compensation for athletic services (i.e., pay-for-play, which shall be known in this brief as "**CAS**") violate the antitrust laws. *Id.*

In the operative complaint, which is the Third Consolidated Amended Complaint (ECF 533-1) (the "**Complaint**"), the claims asserted in *Carter* added to the previously consolidated *House* and *Oliver* claims, and DeWayne Carter and Nya Harrison became named Plaintiffs in this action.

On July 26, 2024, Plaintiffs moved for preliminary approval of the Settlement. ECF 450. The Court held a hearing on that motion and granted preliminary approval of the Settlement. ECF 544.

On March 3, 2025, Plaintiffs filed a motion for final approval of the Settlement. ECF 717. On April 7, 2025, the Court held a final approval hearing. Opinion, p. 6.

The district court then approved the Settlement on June 6, 2025, and the approval of the Settlement is the ruling presented for review. ECF 978.

6

C. T̲h̲e̲ ̲S̲e̲t̲t̲l̲e̲m̲e̲n̲t̲

"The negotiations [for the Settlement] included discussions of NIL and compensation for athletic services as of August 2023," which was before (i) *Carter* had been filed, (ii) CAS claims were consolidated with the claims from the *House* action, and (iii) there was a class representative who was a walk on. Opinion p. 5-7.

The negotiations for the Settlement were structured so that each type of damages claim was negotiated separately. Opinion, p. 74.

The Injunctive Relief Settlement allows the Defendants and their member institutions to "continue, and pass new rules further clarifying and implementing, their existing prohibitions related to NIL transactions involving Associated Entities and Individuals." ECF 958-1, Appendix A (the "**Injunctive Relief Settlement**"), Article 4, Section 3. Section B of the Settlement further states that the members of the Injunctive Relief Settlement Class and the member institutions of the Defendants must comply by enforcing such rules. ECF 958-1 (the "**Settlement**"), p. 15.

The Settlement's damages classes were divided so that there was a subclass for (a) football and men's basketball players on scholarship at

7

a member institution of a power 5 conference from June 15, 2016 through September 15, 2024, (b) women's basketball players on scholarship at a member institution of a power 5 conference during those same years, and (c) all other students on Division I athletic teams at a member institution of the NCAA.

Damages for BNIL and lost 3rd party NIL opportunity claims were the largest out of the damages for NIL claims. Opinion, p. 9-10.

95% of the damages for CAS claims were allocated for football and basketball. Opinion, p. 10.

Damages arising from the BNIL and CAS claims of non-scholarship football and basketball players were not pursued, and those claims were released with no compensation. Opinion, p. 9-15.

Damages arising from the Older CAS Claims and Older 3rd Party Claims were not pursued, and those claims were released with no compensation. *Id.* Such failure to pursue those claims of older class members resulted in an average injunctive relief / damages allocation per year as follows:

| School Years | Avg. Damages or Additional Spending from Injunctive Relief / Year | Claims Pursued |
|---|---|---|

8

| | | |
|---|---|---|
| Fall 2025 – Spring 2035 | $1,940,000,000.00 | Injunctive Relief |
| Summer 2021- Spring 2025 | $331,990,000.00 | Video Game NIL ($7.94 million / year)<br>BNIL ($201.67 million / year)<br>3rd Party ($22.38 million / year)<br>CAS ($100 million / year) |
| Fall 2019 – Summer 2021 | $309,610,000.00 | Video Game NIL<br>BNIL<br>CAS |
| Fall 2016 – Spring 2019 | $209,610,000.00 | Video Game NIL<br>BNIL |

*Id.*

It is important to note that the $1.94 billion in additional spending is merely the average direct additional spending permitted for only Power 5 schools, while years concerning damages payments includes all of Division I. Opinion, p. 11.

## SUMMARY OF ARGUMENT

A class action settlement must be fair, reasonable, and adequate. This settlement is not.

A court's approval of a settlement is reviewed under the abuse of discretion standard, except that issues appealed without a corresponding objection are reviewed for a plain error.

I. The district court committed a plain error by approving the Settlement without looking out for the interests of absent class members via analysis of the government's participation in the alleged conspiracy and in the Settlement during its fairness assessment of the Settlement because (i) the jurisprudence arising from the First Amendment of the United States Constitution provides that public universities cannot discriminate against student athletes as a class of speaker or otherwise burden students' expression or associations unless such restriction has an educational purpose and protects the rights of faculty to provide, and the rights of other students to receive, educational instruction free from disruptive activities within the school's learning

environment and (ii) Damages Settlement Class members' First Amendment liberties were unconstitutionally restricted in such ways via the alleged conspiracy and Injunctive Relief Settlement Class members are similarly being unconstitutionally restricted via the Settlement.

II. The district court abused its discretion by failing to apply the correct legal standard when approving the Settlement in regard to the objections raised by the Excluded Objectors by failing to comprehensively explore all necessary factors, provide a reasoned response to all non-frivolous objections, adequately develop the record to support its final approval decision when reviewing a settlement that has been submitted for approval before its classes have been formally certified.

III. The district court abused its discretion via a clearly erroneous assessment of evidence by approving the Settlement based upon a determination, founded upon an admitted assumption that is disputed by the Excluded Objectors' testimonial evidence or contradicted by other

11

assertions in the record, that the uncompensated release of the Excluded Walk Ons' BNIL claims was reasonable because Excluded Walk Ons do not have BNIL claims.

IV. The district court abused its discretion by approving the Settlement based upon its erroneous view of the law as its relates to the district court's overruling of objections regarding inadequate representation by the class representatives – particularly concerning the failure to pursue, and the uncompensated extinguishment of, (a) Excluded Walk Ons' BNIL claims, (b) Excluded Walk Ons' CAS claims, (c) Older CAS Claims, and (d) the third-party NIL claims of class members who participated in their athletic programs before July 1, 2021 (the "**Older 3rd Party Claims**") – where there are differing interests in the pursuit, calculation, and allocation of the damages for such claims between subclasses.

V. The district court abused its discretion by approving the Settlement based upon an erroneous view of the law when it determined that the uncompensated extinguishment of the

12

(a) Excluded Walk Ons' BNIL claims and (b) Older 3rd Party Claims was reasonable because it is inequitable to use the uncertainty arising from the respective class members' injury (lack of scholarship or lack of third-party NIL compensation), which was affected by restrictions imposed by the Defendants that are alleged in the Complaint to have violated the Sherman Act, as the basis for determining that such claims should not be pursued.

VI.  The district court abused its discretion by approving the Settlement based upon its erroneous view of the law as it relates to *Alston*'s completely negative impact upon the value of CAS claims because the district court determined that much of the compensation that was already permissible is reasonably considered "pay for play" and ruled in favor of the *Alston* plaintiffs' education related CAS claims.

VII.  The district court abused its discretion by approving the Settlement based upon its erroneous view of the law in regard to (1) the impact of Class Counsel's past litigation concerning athletic scholarship restrictions upon the

valuation of class members' scholarship restriction claims because Class Counsel corrected the mistakes that caused those previous lawsuits to fail for the CAS claims but merely did not apply the objective athletic participation and recruitment measurement of damages to the scholarship restriction claims and (2) the applicability of *Alston*'s ruling concerning education-related benefits to the scholarship restriction claims.

## **ARGUMENT**

I. DID THE DISTRICT COURT COMMIT A PLAIN ERROR BY APPROVING THE SETTLEMENT WHILE FAILING TO LOOK OUT FOR THE INTERESTS OF ABSENT CLASS MEMBERS VIA ANALYSIS OF THE GOVERNMENT'S PARTICIPATION IN THE ALLEGED CONSPIRACY AND IN THE SETTLEMENT, CONSIDERING THE DAMAGES SETTLEMENT CLASS MEMBERS' FIRST AMENDMENT LIBERTIES WERE UNCONSTITUTIONALLY RESTRICTED VIA THE ALLEGED CONSPIRACY AND THE INJUNCTIVE RELIEF SETTLEMENT CLASS MEMBERS ARE BEING UNCONSTITUTIONALLY RESTRICTED VIA THE SETTLEMENT?

A reviewing court will review for a plain error absent a contemporaneous objection where the integrity and fundamental fairness of the proceedings in the district court are called into serious question. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002). "Plain error review requires: (1) an error, (2) the error is plain or obvious, (3) the error was prejudicial or [a]ffects substantial rights, and (4) review is necessary to prevent a miscarriage of justice." *Id.*

(1) The district court committed an error by approving the Settlement without looking out for the interests of absent class members by analyzing the government's participation in the alleged conspiracy and in the Settlement during its fairness assessment of the Settlement.

Fed.R.Civ.P. 23(e) requires the district court to determine whether a proposed class action settlement is fundamentally fair, adequate, and reasonable, which involves a "fairness assessment" that "is not a casual one; the uncommon risks posed by class action settlements demand serious review by the district court" and "impose upon district courts a fiduciary duty to look after the interests of … absent class members." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,

15

895 F.3d 597, 610 (9th Cir. 2018) (citations omitted) (internal quotations marks omitted).

When conducting such fairness assessment, "district courts examine the eight '*Churchill* factors' and the 'specific factors' identified in Federal Rule of Civil Procedure 23(e)(2)." *Chalian v. Ghassemian*, No. 21-55904, 2023 WL 12071922, at 2 (9th Cir. Apr. 17, 2025).

For a district court's assessment "to survive appellate review" in instances where the settlement agreement is negotiated prior to formal certification of the settlement's classes, the district courts' fairness assessment "must show … that it has explored the *Churchill* factors comprehensively." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 946-947 (9th Cir. 2011) (cleaned up). That comprehensive assessment must involve a more probing inquiry than is normally required. *Dennis v. Kellogg Co.*, 697 F. 3d 858, 864 (9th Cir. 2012).

The presence of government participation in the conspiracy and/or the settlement is one of the *Churchill* factors. *Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004). The strength of class members' claims is another *Churchill* factor. *Id.*

In this case, the Complaint made clear that public universities

16

were co-conspirators in the alleged restrictive conduct by: (A) claiming that member institutions of the Defendants "have participated as unnamed co-conspirators in the violations alleged herein," (B) explicitly identifying many public universities that are member institutions of the Defendants, and (C) providing that four of the plaintiff class representatives (including Grant House, Tymir Oliver, Nicholas Solomon, and Sedona Prince) were student athletes at public universities and that such plaintiff class representatives' connection to the Defendants was through such public universities' adoption and enforcement of the rules at issue in this lawsuit. Complaint, p. 6-26.

Further, the Complaint includes the text of four NCAA rules at issue in this lawsuit (the "Old NCAA Rules," as set forth in the Addendum and discussed more thoroughly in the following subsection) that plainly restricted the Damages Settlement Class members' expression and expressive associations, particularly as it relates to the freedom to be compensated for entering into associations for the promotions of various causes and the freedom to otherwise utilize their names, images, or likenesses ("NIL") for promotional or advocational purposes. Complaint, p. 27-29.

17

However, the Injunctive Relief Settlement permits the public universities that are members of the Defendants to "continue, and pass new rules further clarifying and implementing, their existing prohibitions related to NIL transactions involving Associated Entities and Individuals." Injunctive Relief Settlement, Article 4, Section 3. Section B of the Settlement Agreement further states that the members of the Injunctive Relief Settlement Class and the member institutions of the Defendants, which include public universities, must comply by enforcing such rules. Settlement, p. 15.

Lastly, the classes of this Settlement were not formally certified prior to its negotiation. Opinion, p. 9.

Instead of looking out for the interests of the absent class members by conducting a probing inquiry and analyzing all of the *Churchill* factors while conducting its fairness assessment of this pre-certification Settlement, the district court did not provide any analysis (certainly not a comprehensive and more probing inquiry and assessment than is normal) of government participation in the alleged conspiracy and the Settlement despite (i) public universities' alleged participation in the conspiracy and the Settlement and (ii) the district

18

court's fiduciary duties and heightened standards regarding comprehensive inquiry and assessment of a settlement's fairness where the proposed settlement was reached prior to formal certification of its classes.

Therefore, the district court committed an error by failing to perform its duty as required by the binding 9th Circuit precedent set forth above.

(2) This error was an obvious error. An error is plain and obvious where it is clear under the current law that the district court's act was impermissible. *Loggervale v. Cnty. of Alameda*, No. 23-15483, 2024 WL 4234878, at 4 (9th Cir. Sept. 19, 2024).

When approving the Settlement, the district court cites *Dennis v. Kellogg,* as mentioned above, as it relates to the district court's duty to comprehensively explore all factors while assessing a proposed settlement in an effort to look after the interests of the absent class members. Opinion, p. 40. In the paragraph that includes the quote cited by the district court in the Opinion, that decision affirms the higher standards and more probing inquiry that is required where the settlement agreement is negotiated before the district court has

19

certified the classes. *Dennis* at 864.

Additionally, the judge presiding over this Settlement in the district court, Judge Claudia Wilken, has proven in her past decisions that the law is clear and that she understands the district court's duty as it relates to analysis of government participation during its fairness assessment of a class action settlement, even considering the interests and participation of governmental actors in instances where no governmental entities are participating as a party in the action or have been identified as co-conspirators. See *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at 14 (N.D. Cal. Apr. 22, 2010); see also, *Representatives of Naiman v. Total Merch. Servs., Inc.*, No. 17-CV-03806, 2019 WL 13194603, at 7 (N.D. Cal. Apr. 16, 2019) ("[T]he Court must evaluate several factors, including … the presence of a governmental participant.")

Therefore, the law, allegations, and past course of dealing of this district court set forth above prove that it is clear under the current law that the district court had a duty to look after the interests of the absent class members by analyzing government participation in the alleged conspiracy and the Settlement during its fairness assessment of

20

the Settlement, which was reached prior to certification of its classes.

(3) This error affected substantial rights and was prejudicial because a probing inquiry into (and a comprehensive assessment of) government participation in the alleged conspiracy and the Settlement would have informed the district court that the public universities' restrictions upon students' expression and expressive associations are unconstitutional and required judicial intervention to protect the class members' First Amendment rights and would have informed the district court to otherwise apply the proper legal standards so that the district court could not possibly find that the third-party NIL provisions of the Settlement were a "product of reasonable compromise" and were not automatically illegal. Opinion at 49 and 61.

An error is prejudicial and affects substantial rights when the error affects the outcome of the district court proceedings. *Claiborne v. Blauser*, 934 F. 3d 885, 899 (9th Cir. 2019).

Public universities engage in state action when they adopt NCAA rules and subject people to such rules. *NCAA v. Tarkanian*, 488 U.S. 179, 194-198 (1988).

State-operated programs and the compensation arising therefrom

amount to state-action and government benefits, and any restrictions imposed by such programs must be "consistent with the Federal Constitution." *Locke v. Davey*, 540 U.S. 712, 719-721 (2004); see also, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his **constitutionally protected speech or associations**, his exercise of those freedoms would in effect be penalized and inhibited … Such interference with constitutional rights is **impermissible**.") (emphasis added).

The Supreme Court has acknowledged that "our cases long have protected speech even though it is in the form of a paid advertisement … [or] in a form that is sold for profit." *Bates v. State Bar of Arizona*, 433 U.S. 350, 363 (1977)) (citations omitted). Any prohibition against

22

compensation in connection with expression and expressive association amounts to "an outright ban [of such] speech." *Citizens United v. FEC*, 558 U.S. 310, 312 (2010).

"[T]he First Amendment safeguards an individual's right to participate in the public debate" by contributing money to another entity, which compensation (i) "serves as a general expression of support" for the entity receiving such compensation and for the things for which such entity stands and (ii) "serves to affiliate" the entities that provide and receive such compensation. *McCutcheon v. FEC*, 572 U.S. ____, No. 12–536, slip op., at 14 (2014).

The financial protections connected with expression and association that are guaranteed by the First Amendment also extend to (i) the speakers, performers, or subjects of the expression and (ii) the general public. See *Citizens United* at 340-341 (By restricting the speech of a particular person or class of speaker, "the Government deprives the disadvantaged person or class of the right to use speech to strive to **establish worth**, standing, and respect for the speaker's voice. The Government may not by [discriminating against a class of speaker] deprive the public of the right and privilege to determine for

23

itself what speech and speakers are worthy of consideration.") (emphasis added).

The government's ability to adopt and enforce discriminatory speech policies is limited. "Premised on mistrust of governmental power, the First Amendment stands against ... restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.* at 340. The Supreme Court has only upheld a narrow class of speech restrictions that discriminate against certain persons, but these exceptions arose from the necessity of such restrictions in relation to the government's performance of essential governmental functions such as the operation of schools, prisons, or the military. *Id.* at 341. "These precedents stand only for the proposition that there are certain **governmental functions** that **cannot operate** without some restrictions on particular kinds of speech." *Id.* (emphasis added).

Therefore, the States' obligation to perform the governmental function of providing public education necessitates "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Independent Community School*

24

*District*, 393 U.S. 503, 507 (1969).

However, the Supreme Court has been clear that "in our system, state-operated schools may not be enclaves of totalitarianism" and that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 511 and 506, respectively. Whether within the classroom or "**on the playing field**," students retain their right to express themselves freely so long as the student's conduct does not "materially disrupt classwork" or invade "the rights of others." *Id.* at 512-513 (emphasis added).

Similar to its protection of students' expression, restrictions upon students' associational activities may only be justified by interests related to "the need for orderly and effective instruction and student protection." *Healy v. James*, 408 U.S. 169, 189 (1972).

Our Supreme Court has also acknowledged that such freedom of association protects "forms of 'association' that are not [only] political in the customary sense but pertain the social, legal, and economic benefit" of the associated parties. *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) Additionally, the Court appreciated that "the right of association, like the right of belief, is more than the right to attend a meeting; it

25

includes the right to express one's attitudes or philosophies by membership in a group or **by affiliation with it** or **by other lawful means**." *Id.* (internal citations omitted) (emphasis added).

Lastly, where a restriction of students' First Amendment liberties "has **no valid educational purpose** … the First Amendment is so directly and sharply implicate[d]" that it "**require[s] judicial intervention to protect students' constitutional rights**." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (emphasis added) (citations omitted) (internal quotation marks omitted).

In regard to this Settlement, the public universities that are member institutions of the Defendants engaged in state action when they adopted NCAA rules and subjected the members of the Damages Settlement Classes to such rules, as determined in *Tarkanian*.

Some Old NIL Rules were NCAA rules that discriminated against the members of the Damages Settlement Classes as a class of speaker and restricted their expression by prohibiting their use of their "name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind." *NCAA Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming a Student-Athlete");*

26

see also *NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales")* and *NCAA Bylaw 12.4.4 ("Self-Employment")* ("A student-athlete may establish a business, provided the student-athlete's name, photograph, appearance or athletics reputation is not used to promote the business.").

Similarly, other Old NIL Rules burdened the Damages Settlement Class members' freedom to join in expressive associations by requiring that compensation could not be paid to the members of the Damages Settlement Classes in relation with the value that the Damages Settlement Class members contributed to the expressive association via the student athlete's "publicity, reputation, fame, or personal following obtained because of athletic ability" and that compensation only be paid to the members of the Damages Settlement Classes "for work actually performed" rather than for entering into an expressive association that may be political, commercial, religious, charitable, social, or in any way promotional or advocational. See *NCAA Bylaw 12.4.1-12.4.1.1 ("Criteria Governing Compensation to Student-Athletes" and "Athletics Reputation")*.

Concerning the Injunctive Relief Settlement Class, the Injunctive Relief Settlement permits the public universities that are members of

27

the Defendants have to "continue, and pass new rules further clarifying and implementing, their existing prohibitions related to NIL transactions involving Associated Entities and Individuals." Injunctive Relief Settlement, Article 4, Section 3.

A student athlete's association of its name, image, or likeness with any cause (whether commercial, religious, educational, social, political, or otherwise) is expression.

The forementioned NIL rules restrict and otherwise burden the student athlete class members' freedom to express and associate themselves and do not serve an educational purpose, so they are unconstitutional pursuant to the binding First Amendment case law set forth above.

In its decision approving the Settlement, the district court determined that the NIL provision of the Injunctive Relief Settlement and the uncompensated release of third-party NIL damages claims owned by some members of the Damages Settlement Classes' were "fair and reasonable" compromises without determining whether government participation and the unconstitutionality of such restrictions arising therefrom rendered the third-party NIL rules at issue automatically

28

illegal under the Sherman Act. Opinion p. 49 and 65, respectively.

Further, the district court decided that the restrictions related to NIL were to be analyzed under the rule of reason and were not automatically unlawful restrictions without performing the forementioned inquiry and assessment. Opinion p. 46.

The district court has a fiduciary duty to protect the interests of the absent class members; including the duty analyze government participation in the alleged conspiracy and Settlement. The district court breached its duty by failing to conduct a comprehensive and probing inquiry and assessment that considers the government's unconstitutional involvement in the alleged conspiracy and the Settlement, which involvement renders the Old NIL Rules and the compromises of the Settlement that relate to NIL unconstitutional and impermissible violations of the class members' First Amendment rights rather than fair and reasonable. The uncompensated extinguishment of claims related thereto and continued violation of such rights show that class members' substantial rights were harmed by the district court's failures.

"The very enumeration of [a constitutional] right takes out of the

hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *D.C. v. Heller*, 554 U.S. 570, 634 (2008). "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* at 636.

Therefore, the district court's error involved substantial rights and was prejudicial (affecting the outcome of the proceedings) because the district court approved the Settlement despite judicial intervention being required for the purpose of (i) preventing the Settlement's provisions that violate class members' First Amendment rights (pursuant to *In re Volkswagen* at 610, *Heller* at 634, and *Hazelwood* at 273) and (ii) otherwise looking out for the interests of class members, pursuant to *Volkswagen*.

(4) A miscarriage of justice occurs when an error seriously impaired the fairness, integrity, or public reputation of judicial proceedings. *C.B. v. City of Sonora*, 769 F.3d 1005, 1019 (9th Cir. 2014). For the reasons set forth above regarding the unconstitutional restrictions upon First Amendment rights and duty of the court to look out for the interests of absent class members, the fairness and integrity of the proceedings

were impaired and judicial intervention is required (pursuant *In re Volkswagen* at 610, *Heller* at 634, and *Hazelwood* at 273) to remedy the court's failure to consider government participation in the alleged conspiracy and the Settlement, which resulted in the approval of a settlement that permitted the government to continue violating the Injunctive Relief Settlement Class members' First Amendment rights and failure to account for the unconstitutionality of the Old NIL Rules in relation to the Damages Settlement Class' claims.

The district court's failure to adhere to the extensive and binding 9th Circuit and Supreme Court precedent cited above, concerning both procedure and substantive law, without providing its reasoning for doing so has also seriously impaired the integrity of the judicial proceedings.

Ultimately, all four elements of a plain error have been met to prove that the court obviously erred by approving the Settlement while failing to analyze government participation in the alleged conspiracy and the Settlement and that such obvious error affected the outcome of the judicial proceedings in a way that impaired the fairness and integrity thereof due to the Settlement's restrictions of the First

Amendment rights of the Injunctive Relief Settlement Class and the Settlement's failure to account for the unconstitutionality of the Old NIL Rules in relation to the Damages Settlement Class' claims.

II.  DID THE DISTRICT COURT ABUSE ITS DISCRETION WHEN APPROVING THE SETTLEMENT BY FAILING TO APPLY THE LEGAL STANDARDS CONCERNING INQUIRY AND OBJECTIONS THAT ARE REQUIRED WHEN REVIEWING A SETTLEMENT THAT HAS BEEN SUBMITTED FOR APPROVAL BEFORE ITS CLASSES HAVE BEEN FORMALLY CERTIFIED?

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc).

A district court abuses its discretion when approving a class action settlement by failing to apply the correct legal standard. *Roes, 1-2 v. SFBSC Management, LLC*, 944 F. 3d 1035, 1043 (9th Cir. 2019).

Due to the unique due process concerns of absent class members such as the Excluded Walk Ons in the pre-certification-settlement context, a higher standard of fairness and a more probing inquiry than normal are both required for the district court's fairness assessment. *Id.*

32

1048-1049. These obligations in the pre-certification-settlement context also necessitate the court's application of the following legal standards: comprehensively exploring of all factors (including the strength of the class members' claims), providing a reasoned response to all non-frivolous objections, and adequately developing the record to support its final approval decision. *Roes* at 1043.

A district court fails to apply the correct legal standard when it does not perform the heightened inquiry that is required while reviewing a settlement for approval where the settlement's classes have not been certified before the negotiation of the settlement. *Id.* at 1060.

Here, the Settlement was submitted for approval before formal certification of the settlement classes. Opinion, p. 9.

Upon the submission of the Settlement for approval, the district court approved notice that informed class members that they could submit objections and ask the district court for permission to speak at the fairness hearing. *See* ECF 544 and Long Form Notice, p. 5.

Twenty-five (25) class members (approximately 1/3 of all objectors to this Settlement), who were walk ons for their respective collegiate football or men's basketball programs, submitted timely and valid

objections regarding the Settlement's uncompensated release of their BNIL claims (such objectors shall be known as the "**Excluded Objectors**"). *See* "Objector Table," which is attached below for reference. For clarification, I am one of the Excluded Objectors. *See* ECF 678. All but one of the Excluded Objectors requested to speak at the fairness hearing.

Collectively, the Excluded Objectors raised a variety of issues that warranted rejection of the Settlement, mostly related to BNIL claims but also relating to the claims for CAS and scholarship restrictions. *E.g.*, ECFs 593, 601, 612, 675, 679, 685, and 710. The Excluded Objectors also raised disputes of facts that concern assumptions that served as the basis for the district court's decision, as cited and discussed thoroughly in Section III of this argument.

The district court prohibited the Excluded Objectors' attendance and participation at the final settlement fairness hearing after receiving the Excluded Objectors' timely and valid objections and only permitted the attendance and participation of objectors who did not raise the same issues or disputes of fact that the Excluded Objectors raised. *See* ECF 723. The court did not provide any reasoning for why it may have

determined that the Excluded Objectors' issues or disputes of fact were frivolous and were, therefore, permissibly excluded from being further investigated at the hearing.

As set forth in more detail in the following sections that further identify many ways that the district court abused its discretion, the district court, in the Opinion approving the Settlement, (a) failed to address multiple objection issues raised by the Excluded Objectors, such as whether using scholarship status as a dispositive element for determining if such class members' BNIL claims should be pursued was equitable considering the Complaint alleged that the Excluded Walk Ons were also harmed by scholarship restrictions that violated the Sherman Act, and (b) relied on assumptions that were contradicted by Excluded Objectors' testimonial evidence, such as the assumption that no schools competed for any Excluded Walk Ons' athletic services by offering them scholarships. *See* Opinion, p. 62; along with the following objections by Excluded Objectors: ECFs 593, p. 1; 612, p. 2; 632, p. 2; 675 p. 2; 678 p. 2; and 684 p. 1.

During its approval of this pre-certification Settlement, the district court did not (i) perform a more probing inquiry than normal in

35

regard to the objections and disputes of fact raised by the Excluded Objectors; (ii) permit the Excluded Objectors' participation at the hearing; (iii) explain why it believed the Excluded Objectors' objections and disputes of fact were frivolous and undeserving of being investigated at the hearing; and (iv) adequately develop a record to support its findings on the objection issues and disputes of fact that were raised by the Excluded Objectors.

Therefore, the district court abused its discretion by failing to apply the legal standards that are required when reviewing a settlement for approval where a settlement has been submitted for approval before its classes have been formally certified.

III. DID THE DISTRICT COURT ABUSE ITS DISCRETION VIA A CLEARLY ERRONEOUS ASSESSMENT OF EVIDENCE BY APPROVING THE SETTLEMENT BASED ON ASSUMPTIONS THAT WERE DISPUTED AND CONTRADICTED IN THE RECORD?

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion. *In re Hyundai* at 556.

A district court abuses its discretion "if it based its ruling on … a

36

clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405 (1990).

Questions of fact will survive the clearly erroneous standard in instances where there is evidence to support a district court's factual findings or the district court makes "factual inferences from undisputed basic facts." *Duberstein* at 291.

The district court's decision must be supported by sufficient findings to be entitled to the traditional deference arising from the abuse of discretion standard. *Narouz v. Charter Communications, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010). Also, factors that warrant an extensive review of the district court's findings include the short length or nonexistence of a trial and a district court's primary reliance upon expert testimony. See *Easley v. Cromartie*, 532 U.S. 234, 243 (2001).

Here, the Excluded Walk Ons BNIL claims were not pursued, and Excluded Walk Ons were provided no remedy for their BNIL claims. Opinion, p. 7-11.

When approving this Settlement, the district court overruled the objections of the Excluded Objectors concerning the Excluded Walk Ons' uncompensated release of BNIL claims because the expert witness for

Class Counsel, Dr. Rascher, alleged that "schools have not competed to offer scholarships" to the Excluded Walk Ons and claimed that it should be assumed that schools would not have competed to provide BNIL payments to those same athletes in the absence of the NCAA rules challenged in the Complaint. Opinion, p. 62. The court also acknowledged that such theoretical conclusion by the expert witness was an "assumption" based upon economic analysis and did not provide any findings of the court on this issue. *Id.*

Contrary to the claim provided by such expert witness that schools did not compete to offer scholarships to the Excluded Walk Ons, seven (7) of the Excluded Objectors provided testimonial evidence that expressly provided that schools did in fact compete for some of the Excluded Walk Ons' athletic services (providing themselves as an example) by offering scholarships for their athletic services. See ECFs 593, p. 1; 612, p. 2; 632, p. 2; 675 p. 2; 678 p. 2; 684 p. 1; and 692 p. 2.

Additionally, Excluded Objectors provided testimonial evidence that their schools competed for their athletic services and the athletic services of some other Excluded Walk Ons' using money and other benefits for compensation that was (A) equal with scholarship athletes

38

to the extent permitted by the restrictions at-issue and (B) similar to offering BNIL compensation, conflicting with Dr. Rascher's reasoning behind his allegation that Excluded Walk Ons have no claims due to his assumption that (i) schools did not compete for any of the Excluded Walk Ons athletic services and (ii) Excluded Walk Ons "provide[d] their services and NIL for **no money** (as they played on teams without receiving any scholarship or **other benefits**)." ECF 598-5, p. 23 (emphasis added). Excluded Walk Ons reported receiving at least some benefits, including financial compensation, for their athletic services despite not being on scholarship – with some of that money coming directly from commercial productions, such as bowl games and the events related thereto, that are similar to the broadcast of games. *E.g.* ECFs 675, p. 2; 678, p. 2; 692, p. 2; and 693, p. 2. Some Excluded Walk Ons were recruited with "preferred walk on" status and the benefits arising therefrom. *E.g.*, 593 p. 1; 619 p. 1; 632 p. 2; 633 p. 1; and 678, p. 2. Some Excluded Walk Ons were recruited via the benefit of preferential treatment for admission to their university. ECF 685, p. 1. Some Excluded Walk Ons were recruited and retained using unenforceable oral representations that they would be awarded a

39

scholarship once they actually contributed in competition despite the school never honoring that promise. ECF 632, p. 1 and 2.

Further, Dr. Rascher contradicted his assertion that Excluded Walk Ons have no BNIL claims with various other assertions throughout his testimonies. He argues that the economics related to BNIL compensation evens the BNIL value for all class members, going so far as to use a Power 5 football walk on (Hunter Renfrow) as one of his three detailed examples that illustrate why "broadcast partners would want to have the certainty that they could use the NILs of all player-participants." Rascher Report, p. 79-81. He also confessed that some of the Excluded Walk Ons "would have received Broadcast NIL payments in the but-for world in which such payments were permitted." Rascher Decl., p. 73, paragraph 150. This conflicts with his position, which the court accepted in the Opinion, that "it is reasonable to assume that schools would not have competed to provide BNIL payments" to Excluded Walk Ons in the absence of the NCAA rules challenged in the Complaint. Opinion, p. 62.

Lastly, Class Counsel confessed to the district court at the final approval fairness hearing, when asked about class members settling

their claims for nothing at all, that "[e]veryone [in this class action] theoretically has a claim for individual NIL because they were subject to the restrictions. Every single member does. Partial scholarship or not." Transcript, p. 224.

The nonexistence of a trial and the district court's primary reliance upon expert testimony warrant an extensive review of the district court's findings, pursuant to *Easley* at 243.

Pursuant to *Narouz* at 1266, the district court is not entitled to the traditional deference arising from the abuse of discretion standard due to the lack of the court's findings of fact regarding the issues of (i) whether any Excluded Walk Ons actually received scholarship offers from other member institutions of the Defendants or (ii) whether schools competed for some of the Excluded Walk Ons' athletic services within compliance of the restrictions imposed at the time by the NCAA.

The district court relied upon the assumptions of Dr. Rascher (Opinion, p. 62) without conducting an evidentiary hearing, considering evidence regarding these issues at the fairness hearing, or otherwise setting forth its findings of fact on this matter despite the objections of the twenty-five (25) Excluded Objectors in connection with the issue of

41

the uncompensated release of BNIL claims, which objections included the genuine disputes of the assumptions provided by Dr. Rascher.

Therefore, the district court abused its discretion via a clearly erroneous assessment of evidence by approving the Settlement and finding that the uncompensated release of the Excluded Walk Ons' BNIL claims was reasonable based upon assumptions that were contradicted by assertions in the record and disputed by objectors because such determination is not supported by (i) the district court's factual findings or (ii) "factual inferences from undisputed basic facts."

IV.  DID THE DISTRICT COURT ABUSE ITS DISCRETION VIA AN ERRONEOUS VIEW OF THE LAW CONCERNING ADEQUACY OF REPRESENTATION WHERE FUNDAMENTAL CONFLICTS OF INTEREST RESULT IN THE UNCOMPENSATED EXTINGUISHMENT OF CLAIMS OF SUBGROUPS OF CLASS MEMBERS WHOSE INTERESTS IN THE SUCH CLAIMS DIVERGE FROM OTHER CLASS MEMBERS?

A district court's determination regarding adequacy of representation is reviewed for an abuse of discretion. *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003).

A district court abuses its discretion "if it based its ruling on an

42

erroneous view of the law." *Cooter* at 405.

The requirement of adequate representation necessitates a showing that the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether the representatives (i) have any conflicts of interest with class members and (ii) will prosecute the action vigorously on behalf of the class. See *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

There is a conflict within a class where there are "differing, even adversarial, interests" between subclasses regarding whether damages should be calculated and allocated for particular types of claims. *In re Volkswagen* at 607-608; *see also*, *Moore v. PetSmart, Inc.*, 728 Fed.Appx. 671, 674 (9th Cir. 2018) ("When class members disagree over the type or form of relief sought … there may be a fundamental conflict… sufficient to defeat adequacy.")

A district court abuses its discretion when it approves settlement classes that have a fundamental conflict of interest, meaning such conflict concerns "the specific issues in controversy." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015).

43

"[S]ettlement terms that differentially affect" subgroups of class members who objectors contend have diverging interests are "indicative" that such conflicting interests "are in fact pertinent to the issues in the lawsuit." *Staton* at 956-957.

"Due process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court." *Epstein* at 648.

"[T]he terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability," which indicates inadequate structural assurances of fair and adequate representation for the diverse groups and individuals affected where particular types of claims "are extinguished with no compensation." *Amchem* at 627.

Due to the unique due process concerns of absent class members in the pre-certification-settlement context, a higher standard of fairness and a more probing inquiry than normal are both required. *Roes* at 1048-1049.

The certification requirements "designed to protect absentees by blocking unwarranted or overbroad class definitions" demand

"undiluted, even heightened, attention in the settlement context."
*Amchem Prod. v. Windsor*, 521 U.S. 591, 620 (1997).

(a) EXCLUDED WALK ONS' BNIL CLAIMS

The Complaint alleged that all class members were harmed by the NCAA's restrictions upon CAS and the use of an athlete's name, image, and likeness, which restrictions prevented class members' receipt of BNIL compensation. Complaint, p. 107.

In this Settlement, the two damages classes that pursue BNIL claims for Power 5 football and basketball class members are limited to class members that were scholarship athletes. Opinion, p. 8.

The Complaint alleged that the Excluded Walk Ons were harmed by the Defendants' scholarship restrictions and that such restrictions violated the Sherman Act. Complaint, p. 36-37.

The Excluded Walk Ons were the only class members removed from damages classes that pursued the BNIL claims of their teammates and placed into a damages class that did not seek also seek the same type of claims. Complaint, p. 96-99. Further, the Excluded Walk Ons' BNIL claims were released without compensation. Settlement, p. 10-11.

Excluded Walk Ons objected, informing the district court that "the

45

class representatives have failed to [adequately represent walk-ons] by overlooking [walk-ons] in the Football and Men's Basketball and Women's Basketball classes. [Walk ons] share the same legal defenses, claims, and injuries as full GIA athletes, and their exclusion [from those damages classes] creates a conflict that undermines the adequacy of representation." ECF 612, p. 9-10. "The exclusion of [walk ons], specifically on Football and Men's Basketball, and Women's Basektball teams, unjustly narrows the scope of the class eligible for BNIL recovery in a manner that violates Rule 23." *Id.* at 1. A majority of the Excluded Objectors raised the issue of conflicts within the damages classes or otherwise objected to the inadequacy of the class definitions or the representation by the class representatives.

As it generally relates to the conflicts of interests between class members arising from the pursuit of particular types of claims for some class members but not for others whose interests in those claims diverge from the class representatives', the district court overruled the objections and approved the Settlement without determining if such conflicts were present. Opinion, p. 74-75. Instead of establishing in the record whether or not the forementioned circumstances created a

conflict, the district court merely claimed (i) there was no evidence suggesting the interests of class members had been traded away and (ii) sequencing negotiations so that each type of damages claim was negotiated separately "served as a structural protection that ensured fair and adequate representation for all class members," while citing *Fata v. Pizza Hut of Am., Inc.*, No. 614CV376ORL37DCI, 2016 WL 7130932, at 3 (M.D. Fla. Oct. 31, 2016) as its legal basis for such conclusion. Opinion p. 74.

In *Fata*, that settlement had two subclasses that pursued the same claims, provided that the claims of one subclass were subject to an arbitration agreement and the other subclass' claims were not. *Fata* at 2. When unitary counsel negotiated that settlement, the negotiations were held separately for each subclass, and the subclass with the weaker claims was allocated 30.9% of the net settlement amount. *Id.* To justify the discrepancy in the allocation of the damages between the subclasses, it was asserted that the defendant's defense was stronger against one subclass, "which warrant[ed] the steep discount." *Id.*

*Fata* cannot be used as a legal basis to establish that negotiating each type of claim separately provides a structural assurance of fair and

47

adequate representation where different types of claims are pursued between subclasses because *Fata* involved negotiations that were separated by subclasses that pursued the exact same types of claims. Contrarily, the negotiations for this Settlement were separated by type of claim in a circumstance where the subclasses did not pursue the same types of claims. Opinion p. 74. The negotiations for this Settlement were not separated by subclasses. *See* ECF 494-2. Further, the claims that are asserted as being "weaker" in this Settlement were alleged but not pursued in the Complaint, and such claims were released without compensation. That is distinguishable from *Fata* where the weaker claims were still pursued and damages were allocated to members with weaker claims but were merely discounted pursuant to the different conditions that warranted the separation into those subclasses.

Pursuant to *Amchem* at 627 (as quoted above), the uncompensated extinguishment of Excluded Walk Ons' BNIL claims indicates that those class members' interests have been traded away and that there are inadequate structural assurances of fair and adequate representation.

Regarding the specific conflict of interest between class members with athletic scholarships and those without them, the district court determined that there was "no evidence of a conflict between class members on athletic scholarships and class members who are not on athletic scholarships, whether in the context of the roster limits provisions or otherwise" and that the class members' "common interest" in securing a more competitive market for the labor of student athletes "is sufficient to conclude that non-scholarship student-athletes had adequate representation from the named Plaintiffs in the context of the roster limits provisions, as well as the remainder of the [Settlement]," while citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945–46, 953 (1st Cir. 2021) as its legal basis for such conclusion. Opinion, p. 52-53.

In *Cohen*, objectors raised the issue that the class representatives were inadequate because the class representatives had already graduated and did not currently have "skin in the game," but the 1st Circuit ultimately affirmed the overruling of that objection due to the fact that the class representatives were seeking the same type of relief as these objectors. *Cohen* at 949-950. There, the "common interest" was the pursuit of a single type of relief that was uniformly applicable to the

49

class members' interests. *Id.* at 950 (The "significant interest common to all student-athletes was the imposition of some meaningful limit on Brown's discretion to strip teams of varsity status.")

Contrary to *Cohen*, there are multiple types of relief being sought via this lawsuit and the pursuit of those claims is not uniform amongst the class members. The claims arising from Defendants' BNIL restrictions are pursued, or not pursued and released without compensation, for class members who played Power 5 football and basketball on the sole basis of scholarship status, despite the fact that the scholarship restrictions that harmed the Excluded Walk Ons were at-issue in this lawsuit. Dr. Rascher's efforts arguing why damages should only be allocated to scholarship athletes provides further evidence that the scholarship football and basketball players' interests were truly adversarial in the negotiations of this Settlement in the context of using scholarship status as the method for determining the validity and value of BNIL claims. There is no singular, uniformly-applicable type of relief for the damages claims in this Settlement that would support the conclusion that *Cohen*, which the district court relied on in its Opinion rather than taking guidance from the clear 9th Circuit

case law cited above, should be applied to damages claims

Due to the facts that (i) the Excluded Walk Ons' lack of athletic scholarship due to NCAA restrictions is a specific issue in controversy; (ii) the validity and value of BNIL claims are specific issues in controversy; (iii) scholarship status was the sole basis used to determine that Excluded Walk Ons' BNIL damages should not be pursued while BNIL damages were pursued for Excluded Walk Ons' teammates in the other damages settlement classes; and (iv) Excluded Walk Ons' BNIL claims were extinguished without compensation while others were allocated damages for such claims, there is a fundamental intraclass conflict that is sufficient to defeat adequacy of representation.

The district court's determination that no intraclass conflict exists or is otherwise sufficient to defeat adequacy of representation in regard to the conflict, arising from the use of scholarship status to determine whether BNIL damages claims should be pursued, between Excluded Walk Ons and their teammate-class members (who had athletic scholarships) in the other subclasses is an erroneous view of the law. As discussed above, the district court's reliance on *Cohen* and *Fata* under these circumstances were also erroneous views of the law. Additionally,

51

the conclusion that the uncompensated extinguishment of Excluded Walk Ons' BNIL claims provided no indication of inadequate structural assurances of adequate representation is also an erroneous view of the law. Therefore, the district court abused its discretion when approving the Settlement and overruling the Excluded Objectors' objections regarding this issue.

(b)    EXCLUDED WALK ONS' CAS CLAIMS

The Complaint alleged that all class members were harmed by the NCAA's restrictions upon CAS. Complaint, p. 107.

The Settlement only pursued, calculated, and allocated damages arising from CAS claims for scholarship football and basketball players. Opinion, p. 10. Yet, the Settlement provided for the release of all class members' claims for CAS. Settlement, p. 10-11.

Excluded Objectors objected regarding the unfairness of the Settlement's damages classes and the fundamental conflict arising from the failure to pursue Excluded Walk Ons' CAS claims. *See* ECF 679, p. 1-2 ("The arbitrary nature of the scholarship/non-scholarship distinction is also readily apparent in the calculation of 'compensation for athletic services' award. The distribution plan provides that 75% of the allotted

52

$600 million settlement for athletic services compensation is earmarked for power five football, recognizing that the vast majority of collegiate sport revenue is generated by power five football. However, non-scholarship football players such as myself are incorrectly placed in the "Additional Sports" category of recovery, which is completely barred from the 75% allocation … In essence, this categorization erroneously implies that non-scholarship players such as myself were not power five football participants at all.")

When overruling the Excluded Objectors' objections and approving the Settlement, the district court found the CAS allocation to be fair and reasonable. Opinion, p. 60. It relied upon *Cohen* to conclude that there was adequate representation due to the non-existence of conflicts between scholarship and non-scholarship class members. Opinion, p. 52-53.

Due to the facts that (i) the Excluded Walk Ons' lack of scholarship due to NCAA restrictions is a specific issue in controversy; (ii) the validity and value of CAS claims are a specific issue in controversy; (iii) scholarship status was the sole basis used to determine that Excluded Walk Ons' CAS claims should not be pursued while CAS

53

claims were pursued for Excluded Walk Ons' teammates (who were on scholarship) in the other damages settlement classes; and (iv) Excluded Walk Ons' CAS claims were extinguished without compensation while other class members were allocated damages for such claims, the district court also abused its discretion when approving the Settlement due to an erroneous view of the law because such facts prove there is a fundamental intraclass conflict that is sufficient to defeat adequacy of representation, pursuant to the binding case law set forth above.

Pursuant to *Amchem* at 627 (as quoted above), the uncompensated extinguishment of Excluded Walk Ons CAS claims indicates that those class members' interests have been traded away and that there are inadequate structural assurances of fair and adequate representation.

The district court's determination that no intraclass conflict exists or is otherwise sufficient to defeat adequacy of representation in regard to the conflict, arising from the use of scholarship status to determine whether CAS damages claims should be pursued, between Excluded Walk Ons and their teammate-class members (who had athletic scholarships) in the other subclasses is an erroneous view of the law. The district court's reliance on *Cohen* (regarding a conflict between

54

scholarship class members and non-scholarship class members) and *Fata* (regarding the separation of negotiations) under these circumstances were also erroneous views of the law, as discussed above. Therefore, the district court abused its discretion when approving the Settlement and overruling the Excluded Objectors' objections regarding this issue.

(c) OLDER CAS CLAIMS

The Complaint alleged that all class members were harmed by the NCAA's restrictions upon CAS. Complaint, p. 107.

However, Class Counsel only pursued class members' CAS claims for some academic years, beginning in the 2019-2020 academic year. Complaint, p. 97-99.

In this Settlement, class members who participated in their respective programs as of or after the 2019-2020 academic year were calculated and allocated damages arising from their CAS claims for each academic year that they participated, beginning with the 2019-2020 academic year, but no compensation was calculated or allocated for Older CAS Claims. Rascher Decl., p. 21-22.

Class members objected to the failure to pursue Older CAS

55

Claims, informing the district court that "[t]he claims regarding CAS should be available to those class members such as myself who were participating athletes prior to the 2019-2020 academic year … The relation back doctrine is applicable to [those] claims…" ECF 710, p. 5. Another objector who played before 2019-2020 raised this objection at the Settlement's fairness hearing, stating: "My estimated payout … [provides] zero compensation for athletic services while teammates are receiving significant payouts in that category. When I raised this with the plaintiffs' attorneys, they offered no clear explanation." Transcript, p. 99-100. That objector, while later discussing the discrepancy in the types of claims pursued for different subgroups of class members, declared: "As I understand it, this is a violation of Rule 23."

The district court only responded to that second objection at the fairness hearing by saying, "Okay. Well, again if the settlement is not approved, then it won't matter what the calculation was… because no one will get anything." Transcript Page 102. The district court did not address the first-mentioned objection on the record.

The district court overruled those objections and approved the Settlement without determining if such conflict was present. Opinion, p.

56

74-75. Instead of establishing in the record whether or not the forementioned circumstances created a conflict, the district court merely claimed (i) there was no evidence suggesting the interests of class members had been traded away and (ii) sequencing negotiations so that each type of damages claim was negotiated separately "served as a structural protection that ensured fair and adequate representation for all class members," while citing *Fata* at 3 as its legal basis for such determination. Opinion p. 74.

Pursuant to *Amchem* at 627 (as quoted above), the uncompensated extinguishment of Older CAS Claims indicates that those class members' interests have been traded away and that there are inadequate structural assurances of fair and adequate representation.

Also, *Fata* is not applicable to this case because the subclasses here do not pursue the exact same types of claims and the negotiations of this Settlement were separated by type of claim rather than being separated so that each subclass was negotiated separately.

The difference in the pursuit of the same type of claim between class members is a fundamental conflict that sufficiently defeats adequacy of representation because the validity and value of the CAS

57

claims are "specific issues in controversy" in this class action.

Therefore, the district court abused its discretion via an erroneous view of the law when it approved this Settlement over objections regarding the fundamental conflicts between class members as it concerns the failure to pursue Older CAS Claims because (x) the failure to pursue Older CAS Claims created a fundamental conflict of interest between class members, (y) *Fata* does not provide that separating settlement negotiations by type of claim provides structural assurances of fair and adequate representation that sufficiently overcomes such a fundamental conflict of interest, and (z) the uncompensated extinguishment of the Older CAS Claims indicates the utilization of inadequate structural assurances to satisfy the due process requirement of adequate representation.

(d) OLDER 3ʳᵈ PARTY CLAIMS

The Complaint alleged that all class members were harmed by the NCAA's restrictions upon compensation for the use of an athlete's name, image, and likeness, including third-party NIL restrictions. Complaint, p. 107.

However, Class Counsel only pursued third-party NIL claims for

those class members who received third-party NIL compensation after July 1, 2021. Complaint, p. 96-99. Those class members were able to receive third-party compensation because the NCAA adopted an interim policy in 2021 that suspended enforcement of restrictions upon third-party NIL compensation. Complaint, p. 36. The damages model used to determine third-party NIL damages claim liability excluded class members who did not receive third-party NIL compensation after July, 2021 under the basis that such lack of third-party NIL compensation after the imposition of that interim NIL policy indicates that such class members "might not have received third-party payments" for their NIL after the enforcement of those restrictions was suspended. ECF 387, p. 40.

In this Settlement, class members who participated in their respective programs after July 1, 2021 and received third-party NIL compensation were allocated damages for their third-party NIL claims and no third-party NIL damages were calculated or allocated for Older 3rd Party Claims. Opinion, p. 10.

Class members objected to the failure to seek Older 3rd Party Claims, informing the district court:

> "[A]s an NCAA athlete before the NIL era, the unfairness to me and those like me is stark compared to those players who were lucky enough to receive third-party NIL payments while they were in school … The logic is circular. You can only get compensated for lost third-party NIL [claims] if you actually got third-party NIL [compensation]. This model is discriminatory against me and other athletes who simply had no access to third-party NIL but still incurred the [injuries]. As I understand it, this is a violation of Rule 23."

Transcript, p. 100-101.

The district court only responded to this objection at the fairness hearing by saying, "Okay. Well, again if the settlement is not approved, then it won't matter what the calculation was… because no one will get anything." Transcript Page 102.

The district court overruled those objections and approved the Settlement without determining if such conflict was present. Opinion, p. 74-75. Instead of establishing in the record whether or not the forementioned circumstances created a conflict, the district court merely claimed (i) there was no evidence suggesting the interests of class members had been traded away and (ii) sequencing negotiations so that each type of damages claim was negotiated separately "served as a structural protection that ensured fair and adequate

representation for all class members," while citing *Fata* at 3 as its legal basis for such determination. Opinion p. 74.

Pursuant to *Amchem* at 627 (as quoted above), the uncompensated extinguishment of Older 3rd Party Claims indicates that those class members' interests have been traded away and that there are inadequate structural assurances of fair and adequate representation.

*Fata* is not applicable to this case because the subclasses here do not pursue the same types of claims and the negotiations of this Settlement were separated by type of claim rather than being separated so that each subclass was negotiated separately.

Here, the conflict of interest between the class members arising from the pursuit of third-party NIL damages claims of class members who participated with their respective programs before July 1, 2021 and failure to pursue Older 3rd Party Claims is fundamental because the validity and value of third-party NIL claims are "specific issues in controversy" in this class action.

Therefore, the district court abused its discretion via an erroneous view of the law when it approved this Settlement over objections regarding the fundamental conflicts between class members as it

concerns the failure to pursue Older 3rd Party Claims because (x) the failure to pursue Older 3rd Party Claims created a fundamental conflict of interest between class members, (y) *Fata* does not provide that separating settlement negotiations by type of claim provides structural assurances of fair and adequate representation that sufficiently overcomes such a fundamental conflict of interest, and (z) the uncompensated extinguishment of the Older 3rd Party Claims indicates the utilization of inadequate structural assurances to satisfy the due process requirement of adequate representation.

V. DID THE DISTRICT COURT ABUSE ITS DISCRETION VIA AN ERRONEOUS VIEW OF THE LAW BY APPROVING THE SETTLEMENT DESPITE THE SETTLEMENT'S FAILURE TO PURSUE CLAIMS DUE TO THE UNCERTAINTY CAUSED BY DEFENDANTS' WRONGDOING?

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion. *In re Hyundai* at 556.

A district court abuses its discretion "if it based its ruling on an erroneous view of the law." *Cooter* at 405.

"The most elementary conceptions of justice and public policy

62

**require** that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65 (1946) (internal citations and quotation marks omitted) (emphasis added); *see also*, *S.E.C. v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).

(a) EXCLUDED WALK ON BNIL CLAIMS

The Complaint alleged that the Excluded Walk Ons were harmed by the Defendants' scholarship restrictions and that such restrictions violated the Sherman Act. Complaint, p. 36-37.

Class Counsel did not seek in the negotiations of the Settlement, and the Settlement did not provide, any remedy for Excluded Walk Ons' BNIL claims solely due to the uncertainty (arising from the Excluded Walk Ons' lack of athletic scholarships) of whether Excluded Walk Ons would get BNIL compensation from their school. Opinion, p. 62.

Many Excluded Objectors objected, informing the district court that using scholarship status alone to determine if Excluded Walk Ons BNIL damages were worthy of pursuit was "inequitable" or otherwise

"unfair." *E.g.*, ECFs 612, 619, and 633. Excluded Objectors reminded the district court that the Excluded Walk Ons were affected by both the BNIL and scholarship restrictions and otherwise stated, "[t]he substantial revenue generated by broadcast media is driven by the presence and contributions of all athletes regardless of scholarship status. Excluding walk ons from the football and basketball settlement damages classes creates an inequity that undermines the fairness of the settlement, which seeks to remedy the injuries caused by the NCAA's conduct on all student-athletes." ECF 612, p. 14.

When approving this Settlement in the Opinion, the district court overruled the objections of the Excluded Objectors without providing any analysis considering the equity of using scholarship status as the sole basis for determining whether Excluded Walk Ons' BNIL damages were warranted and worthy of pursuit in a situation where the uncertainty arising from Excluded Walk Ons' lack of scholarship was caused by the Defendants' alleged wrongdoing. Opinion, p. 62.

By finding it fair and reasonable to use scholarship status as the sole basis for determining whether Excluded Objectors' BNIL damages were warranted and worthy of pursuit, the district court abused its

64

discretion when approving the Settlement due to its erroneous view of the law because the Excluded Walk Ons' lack of scholarship is an alleged injury in the Complaint and fundamental principles of equity and Supreme Court case law provide that it is inequitable to use uncertainty arising from an injury caused by alleged wrongdoing for the purpose of discounting claims against the alleged wrongdoer(s).

      (b) <u>OLDER 3ʳᵈ PARTY CLAIMS</u>

The Complaint alleged that all class members were harmed by the NCAA's third-party NIL restrictions. Complaint, p. 107.

The damages model used to determine third-party NIL damages claim liability excluded class members who did not receive third-party NIL compensation after July, 2021 under the basis that such lack of third-party NIL compensation indicates that such class members "might not have received third-party payments" for their NIL, regardless of the fact that enforcement of those restrictions was not suspended until July, 2021. ECF 387, p. 40.

Class members objected to the failure to seek Older 3ʳᵈ Party Claims, informing the district court:

> "[A]s an NCAA athlete before the NIL era, the
> unfairness to me and those like me is stark

> compared to those players who were lucky enough to receive third-party NIL payments while they were in school … The logic is circular. You can only get compensated for lost third-party NIL [claims] if you actually got third-party NIL [compensation]. This model is discriminatory against me and other athletes who simply had no access to third-party NIL but still incurred the [injuries]."

Transcript, p. 100-101.

The district court only responded to this objection at the fairness hearing by saying, "Okay. Well, again if the settlement is not approved, then it won't matter what the calculation was… because no one will get anything." Transcript Page 102.

The district court then approved the Settlement. *See* Opinion.

The use of the lack of third-party NIL compensation in the model to determine that class members who played before the imposition of the interim policy that suspended third-party NIL restriction enforcement is inequitable because the uncertainty caused by such class members' lack of third-party NIL compensation was caused by the restrictions that were enforced by the Defendants and alleged to be wrongful in the Complaint, meaning these older class members should not bear the risk of uncertainty.

Therefore, the district court erroneously viewed the law in thinking that the Settlement could be approved with this inequity present, so the district court abused its discretion when it approved this Settlement.

VI. DID THE DISTRICT COURT ABUSE ITS DISCRETION VIA AN ERRONEOUS VIEW OF THE LAW BY DETERMINING THAT PAY-FOR-PAY CLAIMS FAILED IN *ALSTON* AND USING SUCH CONCLUSION TO JUSTIFY A LOW-VALUE FOR CAS CLAIMS.

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion. *In re Hyundai* at 556.

A district court abuses its discretion "if it based its ruling on an erroneous view of the law." *Cooter* at 405.

The Complaint sought "compensation that class members would have received … absent Defendants' unlawful restraints on pay-for-play compensation." Complaint, p. 104.

However, the calculation of damages for CAS claims considers education-related benefits and other compensation that was already being paid to student athletes on scholarship as "compensation for

67

athletic services" for the purposes of discounting the Defendants' liability, but that calculation of the Defendant's liability fails to account for the generally acknowledged fact that the class members who were not on scholarship did not receive such CAS and that their claims extended to that educated-related, or otherwise previously provided, compensation included in the "Total Estimated Athlete Compensation Received" calculation, which was intended to estimate the amount that the class members would have received. Rascher Decl., p. 21 ("Exhibit 7").

Class members raised objections to this discount, alleging that "settlement class members who have pay-for-play claims will receive only a small fraction of what those claims are worth." Opinion, p. 59-60; *see also*, ECF 710, p. 6-7, concerning the reasons why the calculations of CAS were inequitable and objectively insufficient (including the denial of a remedy for claims of "compensation for athletic services due to the unlawful scholarship limitations" while discounting the estimated liability as if all class members received scholarships and all the benefits that came with them).

The district court overruled these objections when approving the

Settlement, finding that the low amount of damages for CAS, also known as "pay-for-play," claims "reflect the difficulties of challenging NCAA pay-for-play restrictions in light of prior actions that failed to succeed on that claim, such as *Alston*." Opinion, p. 60.

Contrary to the district court's assertion in its Opinion concerning this Settlement, some of the pay-for-play claims in *Alston* succeeded and none of the claims at-issue in *Alston* failed based on whether they were pay-for-play, or CAS, claims. In its findings of fact concerning that case, the court found that "[m]uch of this permissible compensation appears on its face to be akin to 'pay' under the plain meaning of the word. In some instances it is provided to student-athletes in exchange for their athletic performance, making it similar to what a reasonable person could consider to be 'pay for play.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1071 (N.D. Cal. 2019), aff'd, 958 F.3d 1239 (9th Cir. 2020), aff'd sub nom. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

In reality, the district court in *Alston* ruled in favor of those plaintiffs' pay-for-play claims that concerned education-related benefits because the court found that the "Defendants have not shown a

69

procompetitive effect for NCAA rules that restrict inherently limited, non-cash, education-related benefits provided on top of a grant-in-aid." *Alston* at 1104.

Therefore, the district court abused its discretion when approving the Settlement and overruling objections related to the Settlement's low valuation of education-related CAS claims by using *Alston* to conclude that "pay-for-pay" claims have always previously failed because that was an erroneous view of the law considering education-related pay-for-play claims succeeded in such case.

VII. DID THE DISTRICT COURT ABUSE ITS DISCRETION VIA AN ERRONEOUS VIEW OF THE LAW WHEN APPROVING THE SETTLEMENT BASED UPON ITS DETERMINATIONS THAT SCHOLARSHIP RESTRICTION CLAIMS HAVE PRACTICALLY NO VALUE DUE TO THE PREVIOUS CASES IT CITED IN THE OPINION WHILE FAILING TO CONSIDER THE RULING FROM ALSTON?

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion. *In re Hyundai* at 556.

A district court abuses its discretion "if it based its ruling on an

70

erroneous view of the law." *Cooter* at 405.

Due to the unique due process concerns of absent class members such as the Excluded Walk Ons in the pre-certification-settlement context, the district court must conduct a more probing inquiry than normal. *Roes* at 1049.

In connection with claims that are being released via a settlement, the district court "must also consider whether class members were required to release claims that were more meritorious than the theories Plaintiffs pursued in this litigation." *Campbell* at 1124.

The Complaint sought "compensation for any additional scholarships these class members would have received … absent Defendants' unlawful restraints on scholarships." Complaint, p. 104.

The Settlement provided for the release of claims arising from "NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions." Settlement, p. 10-11. Athletic scholarships are among those benefits, and the non-scholarship and partial scholarship class members are not provided any remedy connected with their scholarship restriction claims.

71

Class members objected to the uncompensated release of their scholarship restriction claims. Opinion, p. 60. Excluded Objectors requested the application of the objective athletic performance and third-party recruitment data, which is the common evidence used to measure the CAS damages, to measure the damages of their education-related CAS claims such as those arising from scholarship limitations. *E.g.*, ECFs 593, 601, 612, 619, and 633.

The district court overruled such objections because it claimed that the "Plaintiffs have shown that claims arising out of those injuries have little to no value given that prior cases that challenged scholarship caps did not get beyond the class certification stage and were, thus, not successful." Opinion, p. 60. To support this legal conclusion, the district court cited three cases that Class Counsel previously litigated without success: "*In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D. Wash. May 3, 2006) (challenging scholarship limits on behalf of walk-on football players in the Power 5); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) (challenging the NCAA's then-prohibition on multiyear scholarships and the cap on the number of scholarships per team); and *Rock v. National Collegiate*

*Athletic Association*, 2016 WL 1270087, at *15-16 (S.D. Ind. Mar. 31, 2016) (challenging the multiyear scholarship and one-year limits imposed at that time by the NCAA)." Opinion, p. 60 n.15.

However, the issues that caused such past litigation to fail have already been overcome in this lawsuit in regard to the CAS claims.

In *Agnew*, the 7ᵗʰ Circuit upheld the dismissal of the scholarship restriction claims because Class Counsel did not identify a relevant commercial market. *See Agnew* at 347 ("Unfortunately for plaintiffs, nothing resembling a discussion of a relevant market for student-athlete labor can be found in the amended complaint … Plaintiffs appear to have made the strategic decision to forgo identifying a specific relevant market … We therefore affirm the district court's dismissal of plaintiffs' claims.")

Here, the Complaint identifies the relevant labor market for the scholarship restriction claims and the other claims alleged therein. *See* Complaint, p. 34.

In the two other cases cited by the district court, the classes could not be certified because Class Counsel did not provide any common proof or objective guidelines to determine the antitrust impact of the

scholarship restrictions or to allocate the damages arising from scholarship restriction claims. *See Rock* at 14 ("[The plaintiff] cannot demonstrate that his theory of common antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."); *see also, In re NCAA I-A Walk-On Football Players Litigation* at 8-9 ("Plaintiffs' expert offers no explanation about how each class member's *actual* damages will be determined after a generalized calculation is made. It is these specific calculations … that present significant individual issues for each class member … as well as provide evidence of fundamental intra-class conflicts … the Court finds that 'no method at all' has been presented by Plaintiffs' expert to deal with the problem of intra-class antagonism at the damages calculation and distribution phase.")

Here, the Settlement uses objective third-party recruiting data and athletic participation and performance data as common evidence to prove the antitrust impact of CAS claims and measure the damages arising therefrom. *See* Opinion, p. 10 ("damages amounts will be calculated using a formula that includes a standardized minimum amount, and that makes individualized adjustments based on seniority,

recruiting star rating, and certain performance metrics. *See* Docket No. 450 at 22-23; Rascher Decl. ¶¶ 50-81.").

Therefore, a probing inquiry by the district court into the legal theories asserted by Class Counsel to support the uncompensated release of scholarship restriction claims should have informed the district court that Class Counsel's previous failures in connection with past scholarship restriction litigation were distinguishable from this lawsuit and could not have served as the basis for determining that class members' scholarship restriction claims had no value because here (x) a relevant market was identified in the Complaint and (y) common proof and objective guidelines that are applicable to scholarship restriction claims are already being used in this lawsuit to determine the scholarship players' CAS damages – Class Counsel merely chose to exclude those with scholarship restriction claims from having such claims calculated and allocated using such common proof and objective guidelines.

Additionally, the district court's reliance upon *Alston* as a fundamental basis for its review of this Settlement should have informed the district court that the scholarship restriction claims were

valuable because such claims concern education-related benefits. The district court acknowledged in the Opinion that the class in *Alston* "prevailed in its challenge to NCAA rules restricting education-related compensation." Opinion, p. 3. Scholarships are education-related compensation. Therefore, the district court should have analyzed the scholarship restriction claims for what they truly are – claims arising from restrictions upon education-related CAS – and considered the impact of such claims' prior success in *Alston* upon the value of the scholarship restriction claims at issue here.

The district court's view of the law was erroneous in regard to its valuation of the scholarship restriction claims because (1) the past litigation cited in the Opinion was substantially distinguishable from these circumstances (where a relevant market, set of common evidence, and objective measurement of damages is used for other claims and can be applied to these claims) and (2) the claims arising from NCAA restrictions upon education-related compensation (such as scholarships) were successful in *Alston*, so the district court abused its discretion by approving the Settlement.

76

## CONCLUSION

Ultimately, the district court committed a plain error by approving the Settlement without analyzing government participation in the Settlement and the conspiracy where public universities are alleged coconspirators and the terms of the Settlement permit public universities to continue restricting class members' freedoms of expression and association in violation of the First Amendment.

Additionally, the district court abused its discretion by overruling class members' objections and approving the Settlement via (i) erroneous views of the law regarding *Alston's* impact on the value of CAS claims, the inequitable uncompensated extinguishment of substantial claims by using class members' injury from the alleged conspiracy as the basis for devaluing claims, and fundamental conflicts of interests concerning the substantial discrepancies in the types of relief pursued and damages allocated between subgroups of class members with differing interests, (ii) a clearly erroneous assessment of evidence regarding Excluded Walk Ons' compensation and the competition for their services, and (iii) failures to apply the correct legal standards due when a settlement has been negotiated prior to formal

77

certification of its classes, evidenced by the district court's failure to conduct a probing inquiry, allow Excluded Objectors' attendance at the fairness hearing, and otherwise apply the heightened scrutiny, standards of fairness, and analysis.

This Settlement's infringement upon the class members' constitutional rights to due process and the freedoms of association and expression require judicial intervention in these circumstances, as supported by the case law set forth herein.

Such constitutional considerations are supplemented by the vast presence of substantive unfairness and impropriety throughout the Settlement, particularly as it relates to the uncompensated extinguishment of many subgroups' claims where similar types of claims are pursued and allocated damages for the benefit of subgroups with diverging interests in such claims.

Therefore, the severity and pervasiveness of the wrongs imbedded into this Settlement warrant the reversal of the district court's approval of the Settlement.

Accordingly, I hereby respectfully request that the 9th Circuit reverse the Final Judgement due to the errors of law identified above.

Additionally, I would like for the district court to be instructed to allow an opportunity for me to motion to intervene on behalf of the Excluded Walk Ons and the class members who completed their participation for their programs prior to July 1, 2021 so that class members similarly situated to me can be adequately represented in the negotiation of a new settlement.

October 29, 2025        Respectfully submitted,

/s/ Tyler Phillips

Tyler Phillips

| Objector Table |||
|---|---|---|
| "Excluded Objectors" |||
| ECF No. | Objector | Sport |
| 593 | Kwame Etwi | Football |
| 601 | David Kasemervisz | Football |
| 612 | Larry Wright | Football |
| 619 | D'Andre McKenzie | Football |
| 632 | John Christmann | Football |
| 633 | Jason Thompson | Football |
| 634 | Logan Berzins | Football |
| 636 | Dorsey Gibson | Football |
| 639 | Joseph Lucas | Football |
| 653 | Griffin Waiss | Football |
| 654 | Jason Amsler | Football |
| 659 | Adam Rourke | Football |
| 664 | Vincenzo Granatelli | Football |
| 668 | Trevor Glassman | Basketball |
| 672 | Kiersten Lee | Football |
| 673 | Charles Mirer | Football |
| 675 | Josh Harris | Football |
| 678, as amended by ECF 710 | Tyler Phillips | Football |
| 679 | Zachary Hoover | Football |
| 682 | John Nix | Football |
| 684 | Landry Estes | Football |
| 685 | Cody Markel | Football |
| 689 | Christopher Lutzel | Football |
| 692 | Byron Keaton | Football |
| 693 | Cameron Colbert | Football |

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-4190, 25-3722, 25-3835, 25-4137, 25-4150,25-4218

I am the attorney or self-represented party.

**This brief contains [ 13,721 ] words,** including `0` words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*: ☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties
☐
☐

81

a party or parties are filing a single brief in response to multiple briefs

a party or parties are filing a single brief in response to a

longer joint brief.

◯ ☐ complies with the length limit designated by court order

◯ dated                                                                                    . ☐ is a

**Signature**   **s/ Tyler Phillips**                    **Date**   | **10/29/2025** |

*(use "s/[typed name]" to sign electronically-filed documents)*



# House Appeal Addendum

### I.    United States Constitution

*First Amendment*

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

*Fifth Amendment*

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

*Fourteenth Amendment*

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV section 1.

II.    Federal Rules of Civil Procedure

*Rule 23 ("Class Actions")*

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

(1) *Certification Order.*

(A) *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

(2) *Notice.*

(A) *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2) , the court may direct appropriate notice to the class.

(B) *For (b)(3) Classes.* For any class certified under Rule 23(b)(3) —or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.The notice must clearly and concisely state in plain, easily understood language:

> (i) the nature of the action;
>
> (ii) the definition of the class certified;
>
> (iii) the class claims, issues, or defenses;
>
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
> (v) that the court will exclude from the class any member who requests exclusion;
>
> (vi) the time and manner for requesting exclusion; and
>
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3) .

(3) *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

> (A) for any class certified under Rule 23(b)(1) or (b)(2) , include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3) , include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) Conducting the Action.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16 .

(e) Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) *Notice to the Class* .

(A) *Information That Parties Must Provide to the Court* . The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) *Grounds for a Decision to Give Notice* . The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) *Approval of the Proposal* . If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

89

(C) the relief provided for the class is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal;
>
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) *Identifying Agreements*. The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to Be Excluded* . If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections.*

(A) *In General* . Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) *Court Approval Required for Payment in Connection with an Objection* . Unless approved by the court after a hearing,

no payment or other consideration may be provided in connection with:

    (i) forgoing or withdrawing an objection, or

    (ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) *Procedure for Approval After an Appeal* . If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

(f) Appeals. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) Class Counsel.

(1) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

    (i) the work counsel has done in identifying or investigating potential claims in the action;

    (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

91

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h) ; and

(E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

(h) Attorney's Fees and Nontaxable Costs. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2) , subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a) .

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D) .

III.  NCAA NIL Rules At Issue in the Complaint (the "Old NIL Rules")

*NCAA Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming a Student-Athlete")*

"After becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual: (a) Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or (b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service."

*NCAA  Bylaws 12.4.1-12.4.1.1 ("Criteria Governing Compensation to Student-Athletes" and "Athletics Reputation")*

"Compensation may be paid to a student-athlete:

93

a) Only for work actually performed; and (b) At a rate commensurate with the going rate in that locality for similar services.

Such compensation may not include any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following obtained because of athletics ability."

*NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales")*

"A student-athlete may not be employed to sell equipment related to the student-athlete's sport if the student-athlete's name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising or promotion, the student-athlete may be employed in a legitimate sales position, provided the student-athlete is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson."

*NCAA Bylaw 12.4.4 ("Self-Employment")*

"A student-athlete may establish a business, provided the student-athlete's name, photograph, appearance or athletics reputation is not used to promote the business."