**Nos.** 25-3722, **25-3835**, 25-4137, 25-4150, 25-4190

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

GRANT HOUSE, et al.,
*Plaintiffs-Appellees,*

v.

CHARLOTTE NORTH, et al.,
*Objectors-Appellants*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,
*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:20-cv-03919-CW
The Honorable Claudia Wilken

---

### APPELLANTS' OPENING BRIEF

---

Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants:* Charlotte North,
Mai Nirundorn, Katherine McCabe Ernst, Sarah Brooke Baker

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................iii

INTRODUCTION...........................................................................1

ISSUES PRESENTED ON APPEAL....................................................8

JURISDICTIONAL STATEMENT.......................................................9

STATUTORY AND REGULATORY AUTHORITY..................................10

STATEMENT OF THE CASE...........................................................10

    I.    Procedural History.............................................................10

    II.    Objectors–Appellants *North, et al*......................................17

SUMMARY OF THE ARGUMENT....................................................23

STANDARD OF REVIEW...............................................................24

ARGUMENT...............................................................................25

    I.    The District Court Abused its Discretion in Approving the Settlement.......................................................................25

        A.    The District Court Failed to Interpret, Apply, and Enforce Title IX...................................................................25

            1.    The District Court Failed to Determine Title IX's Applicability and Uphold Its Protections.....................27

            2.    The District Court Erroneously Concluded Athletic Conferences Will Make Payments and Are Not Subject to Title IX.................................................................29

            3.    The District Court Ignored Guidance from the *Alston* Decision Regarding Title IX.................................33

        B.    The District Court Relied on a Fundametally Flawed Damages Model that Ignores Title IX and Violates Federal Law............35

1.    The BNIL Formula is Fictitious and Lacks Any
      Economic Foundation……………………….............37

2.    The Damages Calculation Excludes Title IX and
      Violates Federal Law.......................................................38

3.    The Damages Calculation Ignores Market Realities by
      Excluding the Value of Women's Sports......................41

C.    The Injunctive Relief Harms the Female Sub-Class and
      Perpetuates Gender Inequities…………………….........43

II.   Class Counsel's Conflict of Interest with Female Sub-Class Violates
      Adequacy of Representation Requirement Under Rule 23……..........45

A.    Class Counsel Has a Conflict of Interest with Female Sub-Class
      and Failed to Adequately Represent Them..............................47

1.    Class Counsel Instructed Economic Experts to Exclude
      Title IX from Damages Calculation Resulting in
      Inequitable Remedies…...................................................49

2.    Class Counsel's Failure to Pursue Title IX Claims
      Demonstrates a Conflict of Interest and Inadequate
      Representation of Female Sub-Class.............................50

3.    Class Counsel's Fees are Four Times Greater than
      Female Sub-Class's Recovery–Demonstrates a Conflict
      of Interest and Inadequate Representation....................52

III.  The Settlement's Title IX Release Violates Rule 23 and
      Constitutionial Rights of Female Sub-Class...................................54

A.    Class Counsel Added Sweeping Title IX Release–Breaches
      Duty of Adequate Representation…………..………….........55

CONCLUSION..............................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) ................................................8, 25, 26

*Amaro v. Anaheim Arena Mgmt.*,
69 Cal. App. 5th 521 (2021) ...............................................................7

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).....................................................47, 48, 52, 54

*Barrs v. S. Conf.*,
734 F. Supp. 2d 1229 (N.D. Ala. 2010)...........................................51

*Biediger v. Quinnipiac Univ.*,
691 F.3d 85 (2d Cir. 2012)................................................................38

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) ...........................................8, 25, 26

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
475 F.3d 524 (3d Cir. 2007) ............................................................32

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001).........................................................................33

*Brown v. Ticor Title Ins. Co.*,
982 F.2d 386 (9th Cir. 1992) ...........................................................54

*Carter v. Nat'l Collegiate Athletic Ass'n*,
No. 3:23-cv-06325-SK (N.D. Cal. Dec. 7, 2023)..........................1, 12

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979).......................................................................8, 28

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992)..........................................................55

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
137 F. Supp. 2d 910 (W.D. Mich. 2001) ..........................................51

iii

*Cohen v. Brown Univ.*,
    101 F.3d 155 (1st Cir. 1996).........................................................38, 44

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022)..................................................................5, 6, 28

*Cureton v. Nat'l Collegiate Athletic Ass'n*,
    198 F.3d 107 (3d Cir. 1999) .................................................................32

*Devlin v. Scardellitti*,
    536 U.S. 1 (2002)...................................................................................46

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
    773 F.2d 1506 (9th Cir. 1985)..............................................................31

*Drazen v. Pinto*,
    106 F.4th 1302 (11th Cir. 2024)...........................................................53

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997).................................................................58

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998).........................................................................28, 29

*Grove City Coll. v. Bell*,
    465 U.S. 555 (1984).....................................................5, 30, 32, 51

*Haffer v. Temple Univ.*,
    688 F.2d 14 (3d Cir. 1982)...........................................26, 27, 29, 31, 32

*Hansberry v. Lee*,
    311 U.S. 32 (1940)................................................................................46

*Holmes v. Cont'l Can Co.*,
    706 F.2d 1144 (11th Cir. 1983).........................................3, 46, 50, 53

*Horner v. Ky. High Sch. Athletic Ass'n*,
    43 F.3d 265 (6th Cir. 1994)............................................................30, 51

*Horner v. Ky. High Sch. Athletic Ass'n*,
    206 F.3d 685 (6th Cir. 2000) ........................................................30, 32

*House v. Nat'l Collegiate Athletic Ass'n*,
    545 F. Supp. 3d 804 (N.D. Cal. 2021) ................................................11

*Hubbard v. Nat'l Collegiate Athletic Ass'n*,
   No. 4:23-cv-0593-SK (N.D. Cal. 2025)..............................................11

*In re Coll. Athlete NIL Litig.*,
   No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sept. 22, 2023)
   ........................................................................................................11

*Jones v. GN Netcom, Inc.*,
   654 F.3d 935 (9th Cir. 2011)......................................................3, 52, 54

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005)..........................................................................28

*Kim v. Allison*,
   87 F.4th 994 (9th Cir. 2023)..........................................................46, 47

*Koon v. United States*,
   518 U.S. 81 (1996)............................................................................36

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare*,
   939 F.3d 1145 (11th Cir. 2019)............................................................52

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
   863 F. Supp. 2d 928 (N.D. Cal. 2012)..................................................54

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011)............................................................26

*Named Plaintiffs & Settlement Class Members v. Feldman*,
   50 F.4th 769 (9th Cir. 2022) ..............................................8, 25–26, 27

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021)....................................................18–19, 33, 34, 42

*Nat'l Collegiate Athletic Ass'n v. Smith*,
   525 U.S. 459 (1999)......................................................31, 32, 33, 51

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ................................................36, 38, 45

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)..........................................................................46

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014)................................................................54

*Partl v. Volkswagen, AG*,
    895 F.3d 597 (9th Cir. 2018) ..................................................46, 47, 49

*Pavey v. Univ. of Alaska*,
    490 F. Supp. 1011 (D. Alaska 1980)......................................................5

*Payne v. Tenn.*,
    501 U.S. 808 (1991)..............................................................................35

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014)................................................................52

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000) .........................................................6, 40

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)..............................................................................54

*Radcliffe v. Experian Info. Sols.*,
    715 F.3d 1157 (9th Cir. 2013)..............................................................54

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002).........................................................7, 52

*Reyn's Pasta Bella, LLC v. Visa USA Inc.*,
    442 F.3d 741 (9th Cir. 2006)................................................................55

*Roes v. SFBSC Mgmt. LLC*,
    944 F.3d 1035 (9th Cir. 2019).......................................................23, 24

*United States v. City of Miami*,
    614 F.2d 1322 (5th Cir. 1980)..............................................................52

*United States Dep't of Transp. v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986)..............................................................................31

*United States v. Johnson*,
    256 F.3d 895 (9th Cir. 2001)................................................................35

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948)..............................................................................36

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)...............................................................57

*Williams v. Boeing Co.,*
    517 F.3d 1120 (9th Cir. 2008)..........................................55

*Williams v. Gaye,*
    885 F.3d 1150 (9th Cir. 2018)..................................25, 27

**Statutes**

20 U.S.C. § 1681 ..................1, 2, 3, 5, 6, 8, 24, 26, 27, 31, 36, 40, 41, 50, 56

20 U.S.C. § 1682 .........................................1, 5, 6, 8, 40, 50

20 U.S.C. § 1683 ............................................1, 5, 8, 40, 50

20 U.S.C. § 1684 ............................................1, 5, 8, 40, 50

20 U.S.C. § 1685 ............................................1, 5, 8, 40, 50

20 U.S.C. § 1686 ............................................1, 5, 8, 40, 50

20 U.S.C. § 1687 ......................................1, 5, 6, 8, 31, 40, 50

20 U.S.C. § 1688 ............................................1, 5, 8, 40, 50

20 U.S.C. § 1689 ............................................1, 5, 8, 40, 50

28 U.S.C. § 1291 ...........................................................9

28 U.S.C. § 1331 ...........................................................9

28 U.S.C. § 1332 ...........................................................9

28 U.S.C. § 1337 ...........................................................9

**Regulations**

34 C.F.R. § 106.2 (2024) .........................................31–32

34 C.F.R. § 106.37 (1980) ..............................................4

34 C.F.R. § 106.41 (1980) ..........................................4, 36

34 C.F.R. § 106.42 (1980).............................................43

41 C.F.R. § 101-4 (2000)................................................5

45 C.F.R. § 86.1 (1975).....................................................................5

**Rules**

Fed. R. Civ. P. 23 ...2, 3, 4, 5, 9, 12, 23, 24, 25, 36, 40, 45, 46, 47, 48, 50, 52, 53, 54, 58

**Other Authorities**

Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics,
44 Fed. Reg. 71413 (Dec. 11, 1979)................................................1, 38

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988).........................................................................................5

Rachel Bachman, *Women's Sports Drive Value of NCAA's New ESPN Deal*, Wall St. J. (Jan. 4, 2024, at 11:02 ET),
https://www.wsj.com/sports/basketball/women-sports-ncaa-tv-espn-deal-
758e2a97?gaa_at=eafs&gaa_n=AWEtsqc6iKtrGUOpvimBBxcAxyn2
nBjKZRZ-YmUOcRO02FNY7-TR-lWyS-
ktXNo9xJ4%3D&gaa_ts=690183b7&gaa_sig=pzvXpxxK1f793QJzC
Lg31bW-itkiNV_ccRG1ftYrZ0I8FY8L2oWYigIO31PBsqC1afX-
OLorfF2RKr1UkWx68g%3D%3D..................................................42

## **REQUEST FOR ORAL ARGUMENT**

Appellants Charlotte North, et. al., respectfully request oral argument.

# INTRODUCTION

For decades, the National Collegiate Athletic Association (NCAA), the Power Five Conferences, and their member institutions (universities) have profited from the athletic labor and Name, Image, and Likeness (NIL) rights of Division I student-athletes. 2-NorthER-428–33, 453–54. Through the enactment and enforcement of NCAA eligibility and compensation rules, these not-for-profit institutions generated billions of dollars in revenue while prohibiting student-athletes from monetizing their own NIL rights. 2-NorthER-411–15, 425–33, 438.

On June 6, 2025, the United States District Court for the Northern District of California (District Court) approved a $2.8 billion class action settlement in *In re Coll. Athlete NIL Litig* (*House* Settlement or Settlement), consolidating three antitrust lawsuits: *House v. NCAA*, *Hubbard v. NCAA*, and *Carter v. NCAA*.[1] 1-NorthER-2–4, 106, 117–21, 125–26. While the Settlement resolved claims under federal antitrust law, the District Court failed to properly interpret and apply federal antidiscrimination law, specifically Title IX of the Education Amendments of 1972 (Title IX), causing material harm to all past, current, and future female Division I student-athletes (Female Sub-Class). 1-NorthER-179–80; *see* 20 U.S.C. §§ 1681–1688 (1972); Policy Interpretation, 44 Fed. Reg. 71413 (Dec. 11, 1979).

---

[1] Total *House* Settlement $2.576 billion: $1.976 billion for NIL Claims and $600 million for Additional Compensation Claims. An additional $200 million from *Hubbard* brings combined total to $2.776 billion.

Although the NCAA's NIL restrictions are facially gender-neutral, they had a disparate impact on female student-athletes "because the NCAA promotes female sports less than it does male sports." 2-NorthER-343, 439–40. Rather than remedying this disparate treatment, the Settlement exacerbates it.

- Past Damages Settlement ($2.6 billion): Male student-athletes received $2.4 billion (96%), while female student-athletes received only $102 million (4%).[2] 1-NorthER-125–26, 2-NorthER-263, 280, 313, 325, 342, 471.

- Future Injunctive Relief Settlement ($1.6 billion/year) Effective immediately upon approval of the Settlement on June 6, 2025, universities may allocate up to $20.5 million annually in direct payments to student-athletes.[3] 1-NorthER-127. To date, over 90% of payments have gone to male student-athletes. 2-NorthER-197–99, 202–03.

This distribution not only fails to remedy existing disparities—it entrenches them. The Settlement's distribution plan perpetuates gender-based inequities in student-athlete compensation and violates both the fairness requirements of Rule 23 and the nondiscrimination mandate of Title IX. *See* Fed. R. Civ. P. 23(e)(2); § 1681(a).

The 2018 amendments to Rule 23(e) require courts to ensure that class action settlements treat all class members fairly. A settlement may be approved only if it is "fair, reasonable, and adequate," a standard that demands equitable treatment among class members. *See* Rule 23(e)(2)(D). Class actions carry inherent

---

[2] Plaintiffs' economic expert Daniel Rascher did not account for remaining $49 million (2%).
[3] Payments capped at 22% of the average athletically related revenues of Power Five schools.

risks of collusion and disproportionate allocations; therefore, courts have a fiduciary duty to safeguard the interests of absent class members. *See Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) (requiring "careful judicial scrutiny" of subclass allocations).

Where intra-class conflicts exist, the Ninth Circuit has made clear district courts must apply heightened scrutiny. *See Jones v. GN Netcom, Inc.*, 654 F.3d 935, 947 (9th Cir. 2011) (warning courts to be "particularly vigilant" for signs of collusion and inequity). Absent such vigilance, vulnerable subclasses are routinely disadvantaged—as occurred here. Despite glaring disparities adversely impacting the Female Sub-Class, the District Court failed to apply the heightened scrutiny required by Rule 23(e). This failure constitutes an abuse of discretion and warrants reversal.

In addition to violating Rule 23, the Settlement's inequitable distribution constitutes sex-based discrimination in violation of Title IX. Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or subjected to discrimination under any education program or activity receiving federal financial assistance.

§ 1681(a). The Female Sub-Class is approximately 47% of the total class but received only 4% of past damages and less than 10% of injunctive relief payments. 2-NorthER-197–99, 202–03, 263, 342, 358. Under Title IX, payments to student-athletes qualify as forms of "financial assistance" and "benefits." *See* § 1681. Title

3

IX requires financial assistance be provided on a proportional basis and benefits be equivalent for members of both sexes. *See* 34 C.F.R. § 106.37(c), .41(c) (1980). Accordingly, the Settlement's allocation of 96% to men and 4% to women should have more accurately reflected actual participation rates, which are approximately 53% male and 47% female. The injunctive relief distribution should likewise proportionally represent the Female Sub-Class.

Rather than applying federal law, the Settlement intentionally excluded Title IX from its damages calculations, resulting in a grossly inequitable distribution in which over 90% of compensation is allocated to male student-athletes. 2-NorthER-348–49; 3-NorthER-505–06. Class Counsel directed the economic experts to omit Title IX from their model, thereby violating Rule 23(e)'s adequacy of representation requirement and failing to protect the interests of Female Sub-Class. 2-NorthER-348–49.

Class Counsel maintains that Title IX's applicability is a matter of statutory interpretation and unnecessary for approval of the Settlement. 2-NorthER-306, 465–66. That assertion is incorrect. The Settlement calculates damages in a hypothetical "but for" world in which the NCAA's anticompetitive rules are removed. 2-NorthER-306. However, Title IX remains binding federal law and fully operative in any such scenario. Its deliberate exclusion from the damages model

4

was improper and constitutes a violation of Rule 23(e)'s adequacy of representation requirement. *See* § 1681(a); 2-NorthER-356–60, 465–67.

Title IX is mandatory. It is a federal civil rights statute and a condition of receiving federal funding. § 1681(a); 45 C.F.R. § 86.1 (1975); Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988); *Grove City Coll. v. Bell*, 465 U.S. 555, 574 (1984) (direct and indirect recipients must comply with Title IX). Universities must comply with Title IX regardless of NCAA rules or settlement terms. *See* § 1681(a); § 86.1; *Pavey v. Univ. of Alaska*, 490 F. Supp. 1011, 1015–16 (D. Alaska 1980) (finding a university must comply with Title IX notwithstanding conflicting NCAA rules). Federal regulations affirm that Title IX requirements cannot be preempted by other federal, state, or private requirements. 41 C.F.R. § 101-4.125 (2000). Accordingly, any damages model purporting to reflect a lawful "but for" world must incorporate Title IX. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219–20 (2022) ("Spending Clause legislation operates based on consent: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." (internal citation omitted)).

Because Title IX applies by operation of law to all federally funded educational institutions, Appellants are not required to cite precedent specifically holding that it governs an antitrust settlement. §§ 1681–89. Title IX's applicability does not depend on the nature of the legal claim; it depends on whether the

institution receives federal funding. This principle is inherent in Title IX's character as a federal civil rights statute and as a condition attached to the receipt of federal financial assistance. §§ 1681–82; *see Cummings,* 596 U.S. at 219. Title IX applies institution-wide to any education "program or activity," which includes intercollegiate athletics. § 1687 (defining "program or activity" to mean all of the operations of an entity). Accordingly, a "but for" world that disregards Title IX is not legally permissible and cannot serve as the basis for calculating damages. *See Pederson v. La. State Univ.*, 213 F.3d 858, 880–81 (5th Cir. 2000) (stating assumptions that discriminate based on gender violate Title IX); 2-NorthER-357–60 (stating Title IX makes the proposed "but for" world factually and legally impossible).

Rather than ensuring compliance with federal law, the Settlement shields the NCAA, athletic conferences, and universities from Title IX liability through a sweeping release that grants the institutions immunity. 1-NorthER-130–31; 2-NorthER-461–62. Although Class Counsel asserts that Title IX claims are preserved, 2-NorthER-304, the release extends to ***"any claims arising out of or relating to the distribution of the Gross Settlement Fund."*** 2-NorthER-217–21, 224–26, 306. Accordingly, the purported preservation of Title IX claims is illusory. 1-NorthER-130–31, 145–46; 2-NorthER-217–18.

No Title IX claims were litigated in the underlying antitrust lawsuits. 1-NorthER-179–80; 2-NorthER-299, 465–66. Yet the Settlement requires female student-athletes to release broader claims than their male counterparts, while allocating them a much smaller share of the damages. 2-NorthER-462. This disparity raises serious due process concerns. 1-NorthER-131. A release that extends beyond the scope of the claims actually litigated warrants heightened judicial scrutiny. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283–84 (7th Cir. 2002) (noting a release beyond the scope of the litigation may be invalid and requires heightened scrutiny); *see also Amaro v. Anaheim Arena Mgmt.,* 69 Cal. App. 5th 521, 537 (2021) (finding a class settlement release overbroad, covered claims beyond the scope of the complaint).

Including a Title IX release in the Settlement is improper and sets a dangerous precedent. It suggests civil rights protections can be waived through unrelated litigation, undermining the structural integrity of Title IX. Such a release opens the door for future settlements to circumvent legal mandates designed to remedy discrimination, eroding the very protections Congress enacted to ensure gender equity in education.

The decision before this Court confronts entrenched gender inequities in intercollegiate athletics. Approving and upholding a Settlement that allocates over 90% of payments to male student-athletes perpetuates historical discrimination—

7

signaling to the NCAA, conferences, and universities that gender inequities are permissible. Even more troubling, the Settlement threatens to unravel more than fifty years of progress under Title IX, undermining its core purpose: to ensure equal opportunity and remedy sex-based discrimination in education. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979); §§ 1681–89.

By approving a Settlement that excludes Title IX from the damages calculation and releases those claims for the Female Sub-Class, the District Court abused its discretion and warrants reversal. *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015); *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021); *Named Plaintiffs & Settlement Class Members v. Feldman,* 50 F.4th 769, 783 (9th Cir. 2022); 3-NorthER-487.

This Court must reject the Settlement to uphold equity, civil rights, and the rule of law. Anything less would sanction systemic discrimination and reverse decades of progress for women in education and athletics. Title IX is not a negotiating chip—it is binding federal law. §§ 1681–89. It cannot be waived in a Settlement agreement, and its protections must be preserved.

## ISSUES PRESENTED ON APPEAL

1.  Whether the District Court abused its discretion by approving a Settlement that failed to properly interpret, apply, or enforce Title IX.

8

2. Whether the District Court abused its discretion by approving a Settlement based on a fundamentally flawed model that disregards Title IX.

3. Whether a conflict of interest between Class Counsel and Female Sub-Class renders their representation inadequate under Rule 23(a)(4).

4. Whether an antitrust Settlement can lawfully include a Title IX release when Title IX issues have not been litigated.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation). Jurisdiction was also proper under 28 U.S.C. § 1332(d), as this is a class action in which the amount in controversy exceeds $5,000,000, and at least one class member is a citizen of a state different from the Defendants.

The final judgment approving the Settlement was entered on June 6, 2025. 1-NorthER-2–4, 100–06, 117–92. Objectors-Appellants *North et al*. filed a timely notice of appeal on June 12, 2025, in accordance with Federal Rule of Appellate Procedure 4(a). 3-NorthER-584–90. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which provides appellate jurisdiction over the final decision of the District Court.

## STATUTORY AND REGULATORY AUTHORITY

All relevant statutory and regulatory authorities are included in the Addendum to this brief.

## STATEMENT OF THE CASE

This matter comes before the Court to determine whether the District Court properly approved the Plaintiffs' Fourth Amended Stipulation and Settlement Agreement, which was entered into with Defendants: the National Collegiate Athletic Association (NCAA), Atlantic Coast Conference (ACC), The Big Ten Conference, Inc. (Big Ten), The Big 12 Conference, Inc. (Big 12), Pac-12 Conference (Pac-12) and Southeastern Conference (SEC) (collectively, the Defendants). 2-NorthER-211–57.

## I. Procedural History

This consolidated litigation originated from two separate antitrust actions filed in 2020: (1) *House v. National Collegiate Athletic Association*, 4:20-cv-03919 (*House*); and (2) *Oliver v. National Collegiate Athletic Association*, 4:20-cv-04527 (*Oliver*). 1-NorthER-120. The *House* action was brought by Grant House and Sedona Prince, both former Division I student-athletes in men's swimming and women's basketball, respectively. 1-NorthER-120. The *Oliver* action was brought by Tymir Oliver, also a former Division I football player. 1-NorthER-120. Plaintiffs alleged NCAA rules unlawfully restrict student-athletes from (1)

10

receiving compensation for the commercial use of their NIL, and (2) prohibit the NCAA, member conferences, and member schools from sharing third-party revenue derived from the commercial use of student-athletes' NIL with the student-athletes. 1-NorthER-117.

Defendants jointly moved to dismiss all claims in *House* and *Oliver*. However, on June 24, 2021, the District Court only granted the motion with respect to *Oliver*'s individual claims for injunctive relief. 3-NorthER-569–70; *see House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818 (N.D. Cal. 2021). On July 14, 2021, the District Court approved a stipulation consolidating the *House* and *Oliver* actions under the caption *In re Coll. Athlete NIL Litig.*, No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sep. 22, 2023); 3-NorthER-567–68. Plaintiffs filed a Consolidated Amended Complaint shortly thereafter. 3-NorthER-563–66.

On April 4, 2023, Chuba Hubbard filed suit in District Court alleging student-athletes who competed prior to *Alston* were unlawfully denied the opportunity to receive academic achievement awards up to $5,980. *Hubbard v. NCAA*, No. 4:23-cv-0593-SK (N.D. Cal. 2025). Pursuant to the Settlement, the *Hubbard* action was dismissed on the merits with prejudice. 3-NorthER-502–03.

On September 22, 2023, the District Court certified an Injunctive Relief Class and appointed Hagens Berman Sobol Shapiro LLP (Hagens Berman) and

11

Winston & Strawn LLP (Winston & Strawn) as Co-Lead Class Counsel (Class Counsel). 3-NorthER-500–01.

On November 3, 2023, the District Court certified three Damages Classes under Rule 23(b)(3): (1) Football and Men's Basketball, (2) Women's Basketball, and (3) Additional Sports; as well as one Injunctive Relief Class (collectively, Settlement Classes). 2-NorthER-479–80.

On December 7, 2023, a related class action, *Carter v. NCAA*, was filed, challenging NCAA rules prohibiting payments for athletic services ("pay-for-play") on antitrust grounds. No. 3:23-cv-06325-SK (N.D. Cal. Dec. 7, 2023) [hereinafter *Carter*]. The operative complaint, filed as the Third Consolidated Amended Complaint, consolidated the *Carter* with *House* and added DeWayne Carter and Nya Harrison as named Plaintiffs. 2-NorthER-410, 456.

Plaintiffs challenged four categories of NCAA-imposed restraints on DI student-athletes:

> 1. <u>Broadcast NIL (BNIL)</u>: Rules that prevent DI student-athletes from being paid by schools or conferences for NIL use in broadcasts.
>
> 2. <u>Third Party NIL - Videogame and Other (Lost NIL Opportunities)</u>: Rules that prohibit compensation from third parties for NIL use in video games and other merchandise.
>
> 3. <u>Athletic Services (Pay-for-Play)</u>: Rules that prohibit compensation for athletic performance beyond scholarships.

12

    4. <u>Scholarship Caps</u>: Rules that impose limits on the number or amount of scholarships per sport.

2-NorthER-416–27.

On July 26, 2024, Plaintiffs filed a motion for a preliminary approval of the Settlement Agreement. 2-NorthER-474–78. On September 5, 2024, the District Court held a hearing. 2-NorthER-457. Following revisions, the District Court granted preliminary approval and authorized notice to the Settlement Classes on October 7, 2024. 2-NorthER-398–402.

The deadline for filing claims, objections, and opt-outs was January 31, 2025. 1-NorthER-122. Objectors: Charlotte North, Mai Nirundorn, Katherine McCabe Ernst, and Sarah Brooke Baker (collectively, *North et al.)* each submitted separate objection letters to the District Court by the deadline. 2-NorthER-310–55.

On March 3, 2025, Plaintiffs filed a motion for final approval of the Settlement Agreement. 2-NorthER-300–01. The District Court held a final approval hearing on April 7, 2025; counsel for Settlement Classes, Defendants, and Objectors, including pro se objectors, appeared in person and via Zoom. 2-NorthER-264–67.

Attorney Leigh Ernst Friestedt, representing *North et al.*, appeared in person at the April 7, 2025 hearing and raised several objections to the proposed Settlement, including:

13

1. <u>Disparate Allocation of Funds</u>: $2.4 billion (96%) to male athletes versus $102 million (4%) to female athletes violates Title IX.

2. <u>Flawed Valuation Model</u>: "But For" world fails to account for Title IX and violates federal law.

3. <u>Improper Title IX Release</u>: Release of Title IX claims should not be included in an antitrust settlement.

4. <u>Overly Broad Title IX Release</u>: Covers the NCAA, conferences, and universities—barring claims for both past Damages Settlement and future Injunctive Relief.

5. <u>Conflict of Interest with Class Counsel</u>: Conflict exists between Class Counsel and Female Sub-Class, raising concerns about adequacy of representation.

6. <u>Inadequate Notice and Procedural Deficiencies</u>: Deficiencies in notice to class members, including inability to correct inaccurate information or obtain revised valuations.

2-NorthER-279–85.

On April 15, 2025, Ms. Friestedt filed a letter on behalf of *North et al.* in response to proposed revisions to the Third Amended Settlement Agreement. 2-NorthER-263. The letter reiterated concerns and identified five key issues:

1. <u>Title IX Violation</u>: Allocation of Settlement funds—$2.4 billion (96%) to male athletes and only $102 million (4%) to female athletes—constitutes a violation of Title IX.

2. <u>Title IX Valuation</u>: Economic model used to calculate damages relies on a "but for" world that fails to account for Title IX— payments would have been prohibited.

14

3. <u>NCAA and Athletic Conferences are Subject to Title IX</u>: As indirect recipients of federal funds, the NCAA and athletic conferences are subject to Title IX.

4. <u>Title IX Release</u>: Settlement does not carve out Title IX claims, releasing both past Damages Settlement and future Injunctive Relief payments; and

5. <u>Conflict of Interest and Adequacy of Counsel</u>: Class Counsel has a conflict of interest with Female Sub-Class, as evidenced by assertions that: (i) Settlement does not raise any Title IX issues, (ii) Title IX does not apply to the NCAA or conferences, and (iii) Title IX is carved out with a narrow release.

2-NorthER-263.

On May 7, 2025, parties filed the Fourth Amended Stipulation and Settlement Agreement, which serves as the operative version. 2-NorthER-211–57. On the same date, the parties renewed their request for final approval. 2-NorthER-232–34.

On June 6, 2025, the District Court granted final approval of the $2.6 billion class action Settlement. 1-NorthER-117–92. In reaching its decision, the District Court reviewed Plaintiffs' Motion for Final Settlement Approval and Omnibus Response to Objections, supplemental submissions, the Fourth Amended Stipulation and Settlement Agreement, objections and related briefing, and oral statements made at the April 7, 2025 hearing. 1-NorthER-101. On June 6, 2025, the District Court issued its Order of Final Approval and the Final Judgment and Dismissal with Prejudice. 1-NorthER-2–4, 100–06.

15

On June 16, 2025, *North et al.* filed a Notice of Appeal to the Ninth Circuit Court of Appeals. 3-NorthER-584–90. In total, six parties appealed the District Court's approval of the Settlement Agreement. On June 18, 2025, the Ninth Circuit assigned Case No. 25-3835 to the *North et al.* appeal. 3-NorthER-571–90.

On July 18, 2025, Appellees filed a Joint Motion to Consolidate Related Objectors Appeals, seeking a uniform briefing schedule, oral argument, and decision. Dkt. No. 22.1 at 12.

On July 28, 2025, *North et al.* filed a Reply in Opposition to Appellees' Joint Motion to Consolidate, citing a failure to meet and confer in good faith. Dkt. No. 24.1 at 14. On August 6, 2025, the Court granted the motion to modify the briefing schedule, setting September 29, 2025, as the deadline for Appellants' opening briefs. Dkt. No. 26.1.

The deadline for filing objections to the Injunctive Relief was September 22, 2025. 2-NorthER-209–10. Objector-Appellant: Katherine McCabe Ernst, a current student-athlete and member of the Injunctive Relief Class, submitted an objection letter to the District Court by the deadline. 2-NorthER-197–203.

On September 28, 2025, Appellant K. Braeden Anderson and Thomas Castellanos (Case No. 25-4218) filed a request for an extension of time to file their opening brief. Dkt. No. 29. On September 29, 2025, the Court granted the request, extending the deadline to October 29, 2025. Dkt. No. 31.

16

On October 14, 2025, Case No. 25-4218 was voluntarily dismissed. The consolidated appeals for remaining parties [25-3722, 25-3835, 25-4137, 25-4150, 25-4190] shall proceed under the existing briefing schedule, with opening briefs due on October 29, 2025. Dkt. No. 32.

## II.     Objectors-Appellants *North, et al.*

Objectors-Appellants **Charlotte North**, **Mai Nirundorn**, **Katherine McCabe Ernst**, and **Sarah Brooke Baker** are current and former Division I female student-athletes of Power Five Conference universities. They are members of the Additional Sports and Injunctive Relief Class. Collectively, *North et al.* have won four NCAA National Championships, five ACC Championships, and three SEC Championships—all while maintaining cumulative GPAs above 3.5.

| **Charlotte North**: Women's Lacrosse (Captain) Duke University (2017–19), Boston College (2020–22) | |
| --- | --- |
|  | NCAA National Champions (2021) ACC Champions (2022) |
| | Tewaaraton Award (Best College Lacrosse Player) First Team All-American ACC Athlete of the Year ACC Scholar-Athlete of the Year Eagle of the Year (Highest Honor for BC Athlete) ESPY Nominee (Best College Athlete) National Player of the Year |
| | USA Women's Lacrosse National Team Professional Women's Lacrosse League ESPN Broadcaster |

2-NorthER-340, 344–47, 352, 355.

**Charlotte North** is one of the best women's lacrosse players in the world. She currently plays for the U.S. Women's National Lacrosse Team, which has captured three World Championship titles, and serves as an Ambassador for the Professional Women's Lacrosse League. North began her collegiate career at Duke University, where she led the team in scoring both seasons before transferring to Boston College. 2-NorthER-340, 352.

At Boston College, North broke NCAA records, including most goals in a single season (102) and most career goals (397). In 2021, she captained Boston College to its first-ever NCAA Championship title, scoring six goals in the final and earning NCAA Tournament Most Outstanding Player honors. North is a two-time Tewaaraton Award winner—the highest honor in collegiate lacrosse—and was named ACC Female Athlete of the Year and IWLCA Player of the Year in both 2021 and 2022. 2-NorthER-340, 352.

North's NIL value reaches beyond her athletic achievements. She has been featured in ESPN broadcasts, countless interviews, and appeared in *Forbes,* as well as on the covers of *USA Lacrosse* and *Inside Lacrosse*. 2-NorthER-344.

Despite being recognized as the nation's top women's lacrosse player, the Settlement valued North's BNIL at **$0** and her Athletic Services at just **$287** for five years of elite NCAA DI competition—an amount that equates to **$0.11 per hour**. 2-NorthER-341, 346. Following the U.S. Supreme Court decision, *Nat'l*

18

*Collegiate Athletic Ass'n v. Alston,* 594 U.S. 69 (2021), North generated **$594,000** in third-party revenue, while the Settlement valued her Lost NIL Opportunities at only $2,019. Despite submitting detailed documentation to Class Counsel, the claims administrator never recalculated this figure. 2-NorthER-341, 355.

| **Mai Nirundorn**: Women's Tennis (Captain) University of Georgia (2021–25) | |
|---|---|
|  | NCAA National Champions (2025) SEC Champions (2023, 2024, 2025) Intercollegiate Tennis Association Indoor Champions (2025) |
| | Dole E. Monte Women's Tennis Scholarship J. Reid Parker Director of Athletics Honor Roll (2022–25) SEC Honor Roll Recipient (2021–25) ITA All-Academic Team |
| | Student-Athlete Advisory Committee (SAAC) |
| | UBS Financial Analyst (Current) |

2-NorthER-310, 315–18, 322.

**Mai Nirundorn** was the captain of the #1 ranked Women's Tennis team at University of Georgia, leading the team to two NCAA Championship titles in 2025. Prior to college, Nirundorn was ranked #20 in the world and #3 in Asia, competing in the junior Grand Slams at the Australian Open, Wimbledon, and US Open. As one of the world's premier junior players, she was endorsed by major brands—Nike, Fila, and Dunlop—before beginning her collegiate career.

Although Nirundorn captained the nation's top-ranked DI Women's Tennis team and led them to two NCAA Championships, the Settlement assigned a value of **$0** to her BNIL and only **$427** for her Athletic Services over four years

competing on the highest collegiate level—an amount that equates to **$0.21 per hour**. 2-NorthER-311–12, 317.

| **Katherine Ernst** – Women's Lacrosse<br>Vanderbilt University (2022–Present) | |
|---|---|
|  | IWLCA Academic Honor Roll (2024–25)<br>SEC Spring Honor Roll (2024, 2025)<br>AAC All-Academic (2023, 2024)<br><br>Draw Specialist<br><br>Current Student-Athlete |

2-NorthER-323, 327–28, 330, 334.

**Katherine Ernst** is a senior on the Women's Lacrosse Team at Vanderbilt University. As a draw specialist, her NIL appears prominently at the center of the field to start a game, the second half, and after a goal is scored. All of Vanderbilt's home games are broadcast live on ESPN+. 2-NorthER-323, 327.

The Settlement assigned Katherine a value of **$0** to her BNIL and just **$326** for her Athletic Services over three years, competing at a top university—an amount that equates to **$0.22 per hour**. 2-NorthER-324, 329–30, 334. Ernst and her teammates have been receiving full *Alston* payments of $5,980 annually since 2023. 2-NorthER-199, 330. Vanderbilt plans to discontinue these cash payments for all female student-athletes in the 2025–26 academic year. 2-NorthER-199.

20

| Sarah Brooke Baker: Women's Lacrosse University of North Carolina Chapel Hill (2020–23) Vanderbilt University (2023–Present) | |
|---|---|
|  | NCAA National Champions (2022) ACC Champions (2021, 2022) |
| | All-AAC First Team (2025) IWLCA Academic Honor Roll (2024, 2025) SEC Spring Honor Roll (2024, 2025) ACC Academic Honor Roll (2022, 2023) All-AAC Academic Team (2024, 2025) CSC Academic All-District Team (2024, 2025) Unanimous AAC Pre-Season All-Conference Team (2025) |
| | Student-Athlete Advisory Committee (SAAC) |
| | Current Student-Athlete |

2-NorthER-335, 339.

**Brooke Baker** is a member of the Women's Lacrosse Team at Vanderbilt University, where she is the leading midfielder on her team and in the conference. 2-NorthER-339. Prior to enrolling at Vanderbilt for her graduate studies, Baker was a member of the #1 ranked Women's Lacrosse team at the University of North Carolina, Chapel Hill, which won the NCAA Championships in 2021 and ACC Championships in 2021 and 2022. 2-NorthER-335, 339.

Although Baker played for the undefeated #1 Women's Lacrosse team in the country and won an NCAA Championship title in front of a sold-out crowd broadcast live on ESPN, as well as two ACC Championships, the Settlement assigned a value of **$0** to her Broadcast NIL rights and just **$630** for her Athletic Services over five years competing at the highest collegiate level—an amount that equates to **$0.25 per hour**. 2-NorthER-336.

21

Each Objector-Appellant of *North et al.* submitted an independent, detailed objection letter to the District Court, documenting how the Settlement discriminates against women and perpetuates systemic gender inequities in intercollegiate athletics. 2-NorthER-310–21, 323–33, 335–37, 340–51. Specifically, *North et al.* argues that the Settlement's failure to incorporate Title IX results in harm to the Female Sub-Class with respect to both the past damages allocation and the Injunctive Relief payments. 2-NorthER-197–203.

Due to concerns about a conflict of interest with Class Counsel—who negotiated a Settlement allocating 96% of past damages to male athletes and only 4% to female athletes, while requiring women to release Title IX claims related to these payments—*North et al.* retained independent counsel, Leigh Ernst Friestedt. 2-NorthER-321, 332–33, 336, 350.

*North et al.* objected to the Settlement and now appeals the District Court's approval of the Settlement on behalf of "millions of female student-athletes who deserve an equal opportunity to play sports in college and receive equal treatment and benefits under Title IX." 2-NorthER-311, 323, 335, 340. *North et al.* appeals the District Court's approval of the Settlement, including $2.6 billion in past damages and $20.5 million in injunctive relief payments, on grounds that the disparate allocation of funds, which awards over 90% of compensation to male student-athletes and less than 10% to female student-athletes, constitutes sex-based

22

discrimination in violation of Title IX. 2-NorthER-263, 279–85, 310–21, 323–33, 335–37, 340–51.

Accordingly, *North et al.* respectfully request this Court reverse the District Court's approval of the Settlement and remand the case for further proceedings consistent with the requirements of Title IX and the standards set forth in Rule 23, to ensure a resolution that is fair, reasonable, and adequate for all class members. To the extent the Court finds Class Counsel cannot adequately represent the Female Sub-Class due to a conflict of interest, *North et al.* request new counsel be appointed to represent the Female Sub-Class.

## SUMMARY OF THE ARGUMENT

Amended Rule 23 makes clear when a settlement allocation is facially inequitable, it creates an inference of unfairness. Rule 23(e). That presumption demands *heightened judicial scrutiny* and places a substantial burden on the allocation's proponents to prove its fairness. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019) (requiring more intensive scrutiny when analyzing the fairness of a settlement). Here, 96% of the Settlement damages were allocated to male student-athletes and only 4% to female student-athletes. 2-NorthER-263, 313, 325, 342, 471. On top of this disparity, the Settlement forced women to release Title IX damages claims tied to the distribution of funds. 1-NorthER-131, 2-NorthER-224–26, 405–09. This combination squarely triggers the presumption of

unfairness and violates both Rule 23(e) and Title IX's mandate for gender equity in federally funded education programs. § 1681. *See Roes*, 944 F.3d at 1049.

The District Court abused its discretion in approving this Settlement. First, the Court failed to properly interpret, apply, or enforce Title IX. Second, the damages model underlying the Settlement was fundamentally flawed because it disregarded Title IX. Third, Class Counsel had a conflict of interest and failed to adequately represent the Female Sub-Class, violating Rule 23(a)(4)'s adequacy requirement. Fourth, the Settlement includes a Title IX release even though no Title IX claims were litigated, violating Rule 23's fairness requirement and infringing on the Constitutional rights of Female Sub-Class.

The District Court failed to exercise the heightened scrutiny required under Rule 23(e) and instead approved a Settlement that entrenches, rather than remedies, gender inequities in college sports. This constitutes a clear abuse of discretion. The judgment should therefore be reversed, or at a minimum, remanded with instructions to apply Title IX's mandate for gender equity.

## STANDARD OF REVIEW

Each section of the Argument begins by stating the applicable standard of review for the issue presented, with citations to the relevant statute or controlling Ninth Circuit authority.

24

## ARGUMENT

## I. The District Court Abused Its Discretion in Approving the Settlement.

In the Ninth Circuit, appellate review of a class action settlement requires a showing that the district court abused its discretion. Reversal is warranted where a district court: (1) applied the incorrect **legal standard**, (2) relied on clearly **erroneous findings of fact**, or (3) misapplied the **law to the facts**. *Named Plaintiffs & Settlement Class Members,* 50 F.4th at 783 (vacating settlement approval for applying incorrect legal standard); *Briseño*, 998 F.3d at 1022–25 (holding Rule 23(e)(2)(C) imposes a duty on courts to apply heightened scrutiny when assessing whether post-settlement certification and division of funds between class members and counsel is fair and adequate); *Allen*, 787 F.3d at 1223–25 (reversing settlement approval due to the district court's failure to apply adequate scrutiny and protect absent class members in analyzing awarded attorney's fees).

### A. The District Court Failed to Interpret, Apply, and Enforce Title IX.

The District Court's approval of the Settlement violates all three prongs of the Ninth Circuit's abuse of discretion standard. A failure under any one prong warrants reversal. *Williams v. Gaye*, 885 F.3d 1150, 1167 (9th Cir. 2018) (internal citation omitted) (finding reversal warranted if the district court's finding is illogical, implausible, or unsupported by the record); *Named Plaintiffs &*

25

*Settlement Class Members,* 50 F.4th at 783; *Briseño*, 998 F.3d at 1025; *Allen*, 787 F.3d at 1223–24. Here, the District Court failed all three.

Incorrect Legal Standard: The District Court applied the incorrect legal standard by approving a Settlement that excluded Title IX from the damages calculation. 1-NorthER-179–80; *see Named Plaintiffs & Settlement Class Members*, 50 F.4th at 783.

Clearly Erroneous Findings of Fact: The District Court relied on flawed assumptions in constructing the "but for" world for damages: Title IX does not apply; athletic conferences (not universities) will make payments to student-athletes; female student-athletes do not generate revenue; and routing payments through a claims administrator avoids Title IX compliance. 1-NorthER-179–80; 2-NorthER-272–73, 280, 286–87, 442–49; *see Allen*, 787 F.3d at 1223–24.

Misapplied Law to Facts: The District Court erred by failing to recognize that Title IX applies in the "but for" world and must be incorporated into the damages calculation. Additionally, because the NCAA and athletic conferences are indirect recipients of federal financial assistance, they are subject to Title IX. 2-NorthER-263, 284, 331; 3-NorthER-556–57; *see* § 1681; *Briseño*, 998 F.3d at 1022 (citing *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)); *see also Haffer v. Temple Univ.*, 688 F.2d 14, 17 (3d Cir. 1982).

### 1. The District Court Failed to Determine Title IX's Applicability and Enforce Its Protections.

The District Court applied the incorrect legal standard by approving a Settlement that excluded Title IX from the damages calculation. 1-NorthER-179–80; *see* 2-NorthER-482–84; 3-NorthER-487. While the underlying litigation arises from antitrust violations, damages were calculated in a hypothetical "but for" world in which Title IX applies and student-athletes would have received payments from their universities. 1-NorthER-153, 175; 2-NorthER-272, 281, 285, 289–90, 297–99, 356–59. Because universities receive federal financial assistance, any payments to student-athletes are subject to Title IX. § 1681; *Haffer*, 688 F.2d at 17; 2-NorthER-348–49. The District Court's failure to apply Title IX was a legal error and constitutes an abuse of discretion. *See Williams*, 885 F.3d at 1167 (internal citation omitted); *Named Plaintiffs & Settlement Class Members,* 50 F.4th at 783.

During a hearing on September 21, 2023, the District Court considered whether to admit the expert testimony of Professor Barbara Osborne, a recognized Title IX scholar. In addressing this issue, the Court stated:

> But with respect to Professor Osborne, I do think that some of what she is being proffered for is telling me what the law is, and I think that's my job. And I have to get it briefed, and you all can brief it and tell me what Title IX means and what it doesn't mean and whether it applies or doesn't apply. But I think that's for you to brief me and for me to decide, and not for an expert to talk about.

27

3-NorthER-487. Judge Wilken emphasized it was the Court's responsibility to interpret the law and indicated she would request briefing from the parties to clarify the meaning and applicability of Title IX. However, no such briefing was ever submitted into the record. 3-NorthER-487. Professor Osborne's testimony was excluded, and the District Court approved a multi-billion Settlement without determining whether Title IX applied or ensuring that its protections were enforced. 1-NorthER-179–80; 2-NorthER-484; 3-NorthER-487.

By excluding expert testimony and failing to receive additional briefing, the District Court lacked the necessary legal foundation to determine whether Title IX applied. As a result, Title IX was excluded from the Settlement analysis, and the District Court applied the incorrect legal standard. The Supreme Court has made clear that institutions receiving federal financial assistance must ensure those funds are not used to support discrimination. *See Cannon*, 441 U.S. at 704. This obligation applies regardless of the underlying claims. *See Cummings*, 596 U.S. at 219. Accordingly, any distribution of funds by federally funded universities must comply with Title IX's requirements. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (stating Title IX applies broadly to discriminatory practices in federally funded education programs).

In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998), the Supreme Court held institutions receiving federal funds shall not be deliberately

28

indifferent to discrimination. Universities are responsible for distributing financial aid and scholarships; therefore, any directive or issuance of payments, such as those detailed in the Settlement, triggers Title IX compliance. *Id.* at 286–87 (noting the "contractual framework" between the institution receiving federal funds and the Government under Title IX); 3-NorthER-556–57; *see Haffer*, 688 F.2d at 17 (requiring Title IX compliance throughout a university if it receives federal funding).

The District Court's failure to assess Title IX's applicability to the Settlement was a misapplication of the law to facts and a failure to apply the correct legal standard. By approving a Settlement that excluded Title IX from the damages calculation, the District Court abused its discretion and undermined the civil rights protections guaranteed to women.

### 2. The District Court Erroneously Concluded Athletic Conferences Will Make Payments and Are Not Subject to Title IX.

The District Court incorrectly assumed athletic conferences, rather than universities, would make payments to student-athletes and, on that basis, concluded that Title IX did not apply. 2-NorthER-286–87; 3-NorthER-497, 556–57. At the September 21, 2023 hearing, the District Court stated "schools aren't paying the money, the conferences are paying the money. And Title IX covers schools not conferences." 3-NorthER-497. This statement is both factually and legally incorrect. Courts have long recognized that athletic associations may be

29

subject to Title IX as indirect recipients of federal financial assistance. *Horner v. Ky. High Sch. Athletics Ass'n*, 206 F.3d 685, 692–93 (6th Cir. 2000) [hereinafter *Horner II*]; *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) (referencing *Grove City Coll.*, 465 U.S. at 564–70) (ruling a state high school athletic association could qualify as an indirect recipient); 3-NorthER-556–57.

At that same hearing (September 21, 2023), Defense Counsel refuted the District Court's assumption stating, "the schools are controlling every aspect of the payments that would be actually made," and there is no real-world example of a school permitting a conference to make such payments. 3-NorthER-492, 497. Under the "but for" framework used to calculate Settlement damages, this admission confirms that universities—not the athletic conferences—are responsible for compensating student-athletes. 2-NorthER-357–60; 3-NorthER-513–15, 539–40, 556–57.

However, at the April 7, 2025 hearing, Defense Counsel reversed course, advancing a new position: that athletic conferences would contribute money into a fund, and a claims administrator—not the universities—would distribute payments to the student-athletes. 2-NorthER-286. This revised position was not incidental. It mirrors the Settlement's terms, which deliberately funnel payments through a claims administrator pursuant to a distribution plan. 2-NorthER-229, 286. By

30

design, this structure attempts to insulate universities from direct involvement in the payments and thereby creates a loophole to avoid Title IX compliance.

Title IX cannot be evaded by outsourcing payments. Even if an athletic conference or claims administrator distributes the funds, Title IX still applies because the universities direct the money. 34 C.F.R. § 106.2(h) (2024) (defining "recipient" to include any entity receiving direct federal financial assistance or through another recipient which receives or benefits from such assistance); *see Haffer*, 688 F.2d at 17; 1-NorthER-179–80; 3-NorthER-497 (referencing *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc*., 773 F.2d 1506, 1510–11 (9th Cir. 1985)). Title IX's protections attach to the universities' role in directing funds, regardless of the intermediary used to distribute them. § 1687(4) (extending "program or activity" to any entity which is established by two or more covered entities); *United States Dep't of Transp. v. Paralyzed Veterans of Am.,* 477 U.S. 597, 607 (1986) (stating entities that receive federal assistance directly or through an intermediary are recipients under Title IX); *Nat'l Collegiate. Athletic Ass'n v. Smith,* 525 U.S. 459, 468 (1999); *Haffer*, 688 F.2d at 17.

Title IX applies to both direct and indirect recipients of federal financial assistance and prohibits sex discrimination in "any education program or activity receiving federal financial assistance." §§ 1681(a), 1687(2)(A)(a) (expanding "program or activity" to all operations of a college or university); *see* § 106.2(h);

31

*Haffer*, 688 F.2d at 17; *Grove City Coll.*, 465 U.S. at 564 (ruling Title IX "encompasses all forms of federal aid to education direct or indirect."); *Smith*, 525 U.S. at 467–68. Courts have consistently held that athletic associations are indirect recipients and subject to antidiscrimination laws when they exercise controlling authority over a federally funded program. *See, e.g., Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 545 (3d Cir. 2007); *Horner II*, 206 F.3d at 692–93; *Cureton v. Nat'l Collegiate Athletic Ass'n*, 198 F.3d 107, 116 (3d Cir. 1999); *Haffer*, 688 F.2d at 17.

In *Smith*, the Supreme Court addressed the narrow question of whether dues paid by member schools constitute receipt of federal financial assistance. *Smith*, 525 U.S. at 462. The Court held that dues, by themselves, do not render the NCAA a Title IX recipient. *Id.* at 468. However, Justice Ginsburg's opinion explicitly left open the possibility that the NCAA could be subject to Title IX in the future. "We do not address whether under other circumstances, an entity that does not itself receive federal funding may nevertheless be subject to Title IX." *Id.* at 468.

Since *Smith*, the NCAA, athletic conferences, and universities have developed a highly integrated and profitable system built on the unpaid athletic services and NIL rights of student-athletes. 2-NorthER-428–33, 453–54. This symbiotic relationship has evolved into a multi-billion-dollar business model that facilitates the flow of money and control between these not-for-profit educational

institutions. 2-NorthER-263, 428–33, 453–54. Courts have described such a relationship as "pervasive entwinement." *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298–99 (2001) (finding state action where a private athletic association was intertwined with public institutions and exercised controlling authority). This integrated financial and operational relationship with federally funded institutions subjects the NCAA and athletic conferences to Title IX compliance. *See id.* at 298–99; *Smith*, 525 U.S. at 467–68.

By failing to conduct the necessary legal analysis of Title IX's applicability to the NCAA and athletic conferences, the District Court erroneously concluded universities are not responsible for payments and conferences are not subject to Title IX. Both conclusions are factually and legally incorrect and constitute an abuse of discretion, providing clear grounds for reversal of the Settlement's approval.

### 3. The District Court Ignored Guidance from the *Alston* Decision Regarding Title IX.

The District Court failed to consider critical guidance from the U.S. Supreme Court's decision in *NCAA v. Alston*, which recognized the evolving legal and economic landscape of college sports and signaled future implications for Title IX in a system where student-athletes receive compensation. *See Alston*, 594 U.S. at 108–10 (2021) (Kavanaugh, J., concurring). Although the Court's majority opinion in *Alston* focused on NCAA rules limiting education-related benefits,

33

Justice Kavanaugh's concurring opinion anticipated broader legal challenges tied to the NCAA's compensation framework. S*ee id.*; s*ee generally Alston*, 594 U.S. at 78–87 (Gorsuch, J., majority).

Justice Kavanaugh emphasized "the NCAA's remaining compensation rules also raise serious questions under antitrust laws," and observed "the NCAA's business model of using unpaid student athletes to generate billions of dollars in revenue for colleges raises serious questions under the antitrust laws." *Alston,* 594 U.S. at 108, 110 (Kavanaugh, J., concurring). This case presents that issue: whether the NCAA's compensation rules violate federal antitrust law.

Justice Kavanaugh previewed the legal and policy complexities that would emerge from a compensation-based model, including how such a system would interact with federal antidiscrimination mandates under Title IX:

> If it turns out that some or all of the NCAA's remaining compensation rules violate the antitrust laws... How would paying greater compensation to student athletes affect non-revenue generating sports? Could student-athletes in some sports but not others receive compensation? *How would any compensation regime comply with Title IX?*

*Id*. at 111 (emphasis added). The questions posed by Justice Kavanaugh are directly relevant to the Settlement, which involves the distribution of billions of dollars in compensation to student-athletes. However, the District Court failed to address these critical questions.

34

The District Court's refusal to consider the broader implications identified in *Alston*, particularly the intersection of federal antitrust law and federal antidiscrimination law, constitutes legal error. Although concurring opinions are not binding, they are persuasive authority, especially when they predict unresolved legal questions that bear directly on the case at hand. *See Payne v. Tenn.*, 501 U.S. 808, 827–28 (1991) (concurring opinions may guide future legal reasoning). *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (concurring opinions can be persuasive when they offer compelling reasoning on unsettled issues).

By disregarding the Title IX concerns raised by *North et al.* and the guidance articulated in *Alston*, the District Court approved a Settlement without ensuring compliance with federal civil rights laws. This omission undermines the integrity of the Settlement process and sets a dangerous precedent for future litigation involving student-athlete compensation. The District Court's failure to analyze the legal requirements of Title IX in this evolving framework reflects an abuse of discretion and warrants reversal of the Settlement's approval.

## B. The District Court Relied on a Fundamentally Flawed Damages Model that Excludes Title IX and Violates Federal Law.

Plaintiffs' economic experts, Dr. Daniel Rascher and Edwin Desser, constructed a hypothetical "but for" model to estimate what the market would have looked like absent NCAA restrictions on student-athlete compensation. 1-NorthER-153, 175; 2-NorthER-289, 297. The damages model is fundamentally

35

flawed in three ways: (1) the BNIL formula was invented and lacked any economic foundation; (2) the model disregarded Title IX, violating federal law; and (3) it ignored market realities by excluding the value of women's sports. 2-NorthER-391–93, 439–40, 444–45; 3-NorthER-513–15, 553–55, 558–62.

As the foundation for Settlement damages, Plaintiffs' experts introduced a fabricated concept—Broadcast NIL (BNIL). The BNIL formula allocated 75% of value to men's football, 15% to men's basketball, and only 5% each to women's basketball and all other Division I athletes. 2-NorthER-470. This allocation resulted in over 90% of Settlement payments being directed to male student-athletes. 2-NorthER-470–71; 3-NorthER-511, 543–44. This inequitable distribution violates the fairness requirement of Rule 23(e)(2)(D), which mandates that a settlement must "treat class members equitably relative to each other." It also violates Title IX's requirement that financial assistance be proportional to participation and benefits be equivalent. § 1681; § 106.41(c); *see Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 854 (9th Cir. 2014).

Approving a damages model that is legally and economically flawed constitutes an abuse of discretion. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Koon v. United States*, 518 U.S. 81, 100 (1996) (abuse of discretion occurs when a decision is based on an erroneous view of the law). Reversal or remand is necessary to correct this error and to ensure any antitrust

36

resolution complies with Title IX by incorporating its requirements into the damages calculation.

### 1. The BNIL Formula Is Fictitious and Lacks Any Economic Foundation.

BNIL is not a recognized economic measure; it is a litigation construct invented by Plaintiffs' economic experts. Its credibility has been challenged—even by the NCAA and athletic conferences—because it rests on speculative assumptions rather than established economic principles. 2-NorthER-439–40; 3-NorthER-553–54. Economist Andrew Zimbalist explained the term "BNIL" was invented by the experts and has "little basis in economic reality." 2-NorthER-359; 3-NorthER-556–58. Defense Counsel likewise conceded the model's "serious flaws," criticizing its methodology and describing Desser's analysis as speculative, "just kind of making up a market and saying what the numbers are." 3-NorthER-489–90.

The BNIL model relied on a series of unsupported and unrealistic assumptions, including:

1. In a "but for" world, it was permissible for men to receive 96% of payments and women only 4%;

2. Conferences would make direct payments to student-athletes, despite no evidence of conferences ever doing so;

3. Universities would allow conferences to make payments to student-athletes; and

37

4. 10% of broadcast contract value is attributable to NIL, a figure Desser admitted has no evidentiary support.

3-NorthER-508–15.

Despite these fundamental flaws, the District Court adopted the BNIL model, a construct without any economic foundation. 1-NorthER-148, 177, 186. By approving a Settlement based on this fictitious formula that excluded Title IX from the damages calculation, the District Court abused its discretion. Reversal or remand is required to correct this legal error, ensure compliance with federal law, and mandate proper application of Title IX in the damages analysis.

### 2. The Damages Calculation Excludes Title IX and Violates Federal Law.

The BNIL formula—allocating over 90% of Settlement funds to men—replicates decades of systemic underinvestment in women's sports and disregards the statutory protections guaranteed under Title IX. Courts have consistently held that Title IX applies to athletic programs and requires equitable treatment and benefits. *See, e.g., Ollier*, 768 F.3d at 854; *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 108 (2d Cir. 2012) (affirming Title IX prohibits practices that result in unequal benefits based on sex); *Cohen v. Brown Univ.,* 101 F.3d 155, 164–65 (1st Cir. 1996); 44 Fed. Reg. at 71415.

Class Counsel argues "the Settlement is a resolution of antitrust claims that must, as a matter of law, be based on market realities 'but for' the challenged

38

compensation." 2-NorthER-306. But the Settlement ignores one of the most fundamental market realities—the existence and applicability of federal antidiscrimination laws, including Title IX. 1-NorthER-179–80; 2-NorthER-429–40, 3-NorthER-558–59.

Economist Andrew Zimbalist explained that, absent the NCAA's unlawful restrictions, any compensation to student-athletes would have been distributed only through an equitable allocation required by Title IX. 2-NorthER-357–59. Title IX prohibits distributing benefits based on the commercial value of a sport. The BNIL formula does exactly that—it allocates damages according to the estimated broadcast revenue. By tying student-athlete compensation to market value, the formula contravenes the statute and legislative history. Congress repeatedly rejected attempts to exempt revenue-generating sports from Title IX's coverage. 3-NorthER-513–28. Under Title IX, men and women must receive equal treatment and benefits, regardless of the revenue their sports generate. 2-NorthER-357–59.

Class Counsel's own pleading confirms the discriminatory impact of NIL restrictions on female student-athletes. In the Third Amended Consolidated Complaint (September 26, 2024), Class Counsel stated:

- "Female athletes have been especially adversely impacted by NIL restrictions and will Profit in the New NIL Era."

- "NIL rules have adversely impacted female athletes more than their male counterparts because… the NCAA

promotes female sports less than it does male sports and thus many female athletes are not as well known."

- "There was unanswered demand for the use of NIL of female athletes before the interim NIL rules."

- "A study conducted by the website AthleticDirectorU and the marketing firm Navigate Research found that 13 of the 25 college athletes with the greatest annual endorsement potential between $46,000 and $630,000 were female athletes."

- "The impact of the restraints on female athletes is further exacerbated by the NCAA's unequal treatment of female athletes."

2-NorthER-439–40. These admissions underscore that the BNIL formula rests on a discriminatory foundation and fails to account for Title IX. *Compare* § 1681 *with* 2-NorthER-439–40; *see also Pederson*, 213 F.3d at 880–81 (stating assumptions that discriminate based on gender violate Title IX). A Settlement that ignores Title IX cannot be deemed to be "fair, reasonable, or adequate" under Rule 23(e) and must be rejected.

By excluding Title IX from the damages analysis, the District Court disregarded federal law and effectively endorsed a discriminatory allocation of compensation. §§1681–89; *see* 1-NorthER-179–80. Its approval of the Settlement entrenches the very inequities that Title IX was enacted to eliminate and constitutes an abuse of discretion. Reversal, or at a minimum remand, is necessary

40

to restore compliance with federal civil rights law and ensure that any future resolution incorporates Title IX protections and principles of equity.

### 3. The Damages Calculation Ignores Market Realities by Excluding the Value of Women's Sports.

The District Court approved a Settlement premised on the false assumption that women's sports lack economic value—an assumption that contradicts market realities. *See* 2-NorthER-443–47. The BNIL formula disregarded the growing commercial viability of women's sports, relying instead on the outdated narrative that women's sports cannot generate revenue—a narrative long used to justify discriminatory treatment. 2-NorthER-274–78, 355.

The BNIL formula relies on broadcast agreements—an inherently biased metric that reflects decades of institutional underpromotion and underfunding of women's sports by the NCAA, conferences, and universities. 2-NorthER-343, 444–45. By equating the value of student-athletes under this flawed model and failing to apply Title IX corrective adjustments, the Settlement perpetuates gender disparities rather than remedying them. *See* § 1681; 2-NorthER-343, 444–45.

The BNIL formula also excludes the value of women's sports embedded in bundled media rights agreements. 2-NorthER-391–93, 439–40, 444–45. Broadcasters pay billions for college sports media packages that include student-athletes' NIL rights and their athletic services. 2-NorthER-385, 389, 394, 431. In 2024, ESPN extended its NCAA contract to cover 40 Championships (21 women's

41

and 19 men's) at $115 million per year, triple the prior deal, with women's sports driving much of the increased value.[4] However, the BNIL formula ignores this bundled structure, focusing narrowly on regular-season football and men's basketball, while excluding the women's contributions. 2-NorthER-391–94, 439–40, 444–45, 472–73.

By relying on regular-season broadcast estimates, the BNIL formula systematically undervalues female student-athletes. It disregards the structure of postseason media contracts and corporate sponsorships, which bundle rights for men's and women's sports together. 2-NorthER-376–77, 385–87, 465, 471. Because aggregate contracts do not break down value by sport or athlete, the BNIL formula distorts the actual economic contribution of women's sports—skewing the allocation of $2.6 billion in past damages and $20.5 million in annual injunctive relief payments. 2-NorthER-380, 385–87.

By endorsing a valuation model that excludes Title IX and ignores market realities, the District Court entrenches a discriminatory allocation that is unlawful. *See Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("The NCAA's business model would be flatly illegal in almost any other industry in America"). Title IX

---

[4] Rachel Bachman, *Women's Sports Drive Value of NCAA's New ESPN Deal*, Wall St. J. (Jan. 4, 2024, at 11:02 ET), https://www.wsj.com/sports/basketball/women-sports-ncaa-tv-espn-deal-758e2a97?gaa_at=eafs&gaa_n=AWEtsqc6iKtrGUOpvimBBxcAxyn2nBjKZRZ-YmUOcRO02FNY7-TR-lWyS-ktXNo9xJ4%3D&gaa_ts=690183b7&gaa_sig=pzvXpxxK1f793QJzCLg31bW-itkiNV_ccRG1ftYrZ0I8FY8L2oWYigIO31PBsqC1afX-OLorfF2RKr1UkWx68g%3D%3D.

governs all aspects of intercollegiate athletics, including the compensation of student-athletes. 34 C.F.R. § 106.42 (1980).

The District Court's failure to require compliance with Title IX in evaluating the fairness and legality of the Settlement entrenches the very inequities Congress sought to eliminate. This constitutes an abuse of discretion. Reversal, or at a minimum remand, is necessary to restore compliance with federal law and ensure that any resolution of antitrust claims reflects both market realities and Title IX.

## C. The Injunctive Relief Harms the Female Sub-Class and Perpetuates Gender Inequities.

The Injunctive Relief took effect on June 6, 2025, when the District Court granted final approval of the Settlement without giving student-athletes an opportunity to opt-out. 1-NorthER-130. For Division I institutions that elect to participate, the plan authorizes universities to distribute up to $20.5 million in annual payments directly to student-athletes. 1-NorthER-160.

The Settlement promises to deliver "ground-breaking changes" by allowing universities to share athletic revenues directly with student-athletes–estimated to be $1.6 billion in new compensation and benefits per year. 1-NorthER-117–18. However, just as 94% of the $2.6 billion in past damages was allocated to male student-athletes, preliminary disclosures from the few universities that have released a gender breakdown show that more than 90% of new payments are being directed to male student-athletes. 2-NorthER-197–99, 202–03.

43

What is advertised as a transformative remedy for "all student-athletes" instead locks in gender inequities for the next decade. The revenue-sharing framework is based on the same fundamentally flawed BNIL formula that produced the inequitable past damages allocation. 2-ER-199–200. By adopting a distribution scheme that disregards Title IX, the Settlement does not remedy discrimination—it codifies it. 2-ER-195–96, 199–200. Title IX was enacted to correct these disparities not to entrench them. *Cohen*, 101 F.3d at 179 (stating Title IX was enacted to remedy discrimination). Congress repeatedly considered and rejected proposals to exempt revenue-producing sports like football and men's basketball from the scope of Title IX, which is precisely what the Settlement achieves for both past and future injunctive relief. 3-NorthER-526–29, 541.

The injunctive relief has already had a disparate impact on the Female Sub-Class. 2-NorthER-197–203. *Alston* payments and incremental athletic scholarships are deducted from the overall benefits pool, creating a financial incentive for universities to reduce or eliminate these forms of support and redirect those funds to for "revenue-producing" men's sports. 1-NorthER-24, 28–29, 65–69. 2-NorthER-199–200. For female student-athletes, many of whom do not receive a full scholarship, *Alston* payments were a critical supplement, functioning as scholarship support to offset partial awards. 2-NorthER-199.

44

The distribution plan also attempts to circumvent Title IX by narrowly defining the revenues included in the benefits pool by excluding those categories that could trigger compliance obligations. 1-NorthER-24, 28–29. Student fees, government funding, and institutional support, all sources that would tie the pool to federal financial assistance, are deliberately omitted. In doing so, the injunctive relief framework further entrenches gender inequities in intercollegiate athletics. 1-NorthER-65–69.

The Ninth Circuit has emphasized the strong public interest in remedying gender discrimination and ensuring compliance with Title IX. *See Ollier*, 768 F.3d at 868. Yet the Settlement adopts a distribution plan that rewards historical inequities rather than remedying them, perpetuating sex-based discrimination under the guise of forward-looking relief. Because the Injunctive Relief fails to meet Rule 23's fairness requirement and violates Title IX's mandate for gender equity, the District Court abused its discretion in approving it. That abuse of discretion warrants reversal of the Settlement, or at a minimum, remand with instructions to bring the distribution plan into compliance with Title IX.

## II. Class Counsel's Conflict of Interest with Female Sub-Class Violates Adequacy of Representation Requirement Under Rule 23.

Rule 23(e) mandates that any class action settlement be "fair, reasonable, and adequate" to protect the interests of absent class members. The Supreme Court has repeatedly emphasized that absent class members are entitled to meaningful

45

protection. In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852–53 (1999), the Court criticized the incentive for class counsel to prioritize reaching a settlement that could survive a Rule 23(e) fairness hearing over securing the best possible recovery for the class as a whole. In *Devlin v. Scardellitti*, 536 U.S. 1, 14 (2002), the Court affirmed that unnamed class members retain the right to appeal a settlement, recognizing they must be able to safeguard their own interests when class counsel fails to do so. And in *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940), the Court held that absent class members may only be bound by a judgment if they are adequately represented, as required by due process.

The Ninth Circuit has emphasized that conflicts of interest within a class— particularly those involving divergent interests in settlement allocations or divisions *among* subgroups—can undermine adequate representation and violate due process. *Partl v. Volkswagen, AG,* 895 F.3d 597, 607–08 (9th Cir. 2018). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This obligation includes:

- **Avoiding conflicts** that go to the heart of the litigation;
- **Pursuing all viable claims** on behalf of the entire class; and
- **Ensuring equitable treatment** across subgroups within the class.

Rule 23; *Kim v. Allison*, 87 F.4th 994, 1000, 1003 (9th Cir. 2023); *Partl*, 895 F.3d at 607–08; *Holmes*, 706 F.2d at 1148.

46

In *Partl,* the court highlighted that conflicts of interest within a class can arise in various forms, such as differing allocations of settlement funds or structural conflicts between subgroups of class members. 895 F.3d at 607–08. The court explained that serious conflicts impair adequate representation and violate due process, emphasizing the need for heightened scrutiny of class settlements to ensure fairness and prevent collusion. *Id.* Similarly, in *Kim*, the Ninth Circuit reaffirmed that Rule 23(a)(4) requires the absence of conflicts of interest between named plaintiffs, class counsel, and absent class members. 87 F.4th at 1003.

### A. Class Counsel Has a Conflict of Interest with Female Sub-Class and Failed to Adequately Represent Them.

The Ninth Circuit has consistently applied rigorous scrutiny to class action settlements to ensure that conflicts of interest do not compromise the adequacy of representation and that class counsel fulfills its fiduciary duties to absent class members. *See Partl*, 895 F.3d at 607–08; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–29 (1997). Here, Class Counsel had a clear conflict of interest and failed to protect the interests of the Female Sub-Class fairly and adequately:

> 1. <u>Inequitable Allocation of Remedies</u>: Class Counsel instructed economic experts to exclude Title IX from the calculation of damages, resulting in unequal allocations. 2-NorthER-348–49. The Settlement directs over 90% of funds to male student-athletes for past damages and injunctive relief payments under the distribution plan. 2-NorthER-197–99, 202–03.

47

2. <u>Failure to Pursue All Viable Claims</u>: Class Counsel declined to pursue Title IX claims on behalf of the Female Sub-Class, asserting there are no Title IX issues and that the NCAA and Athletic Conferences are not subject to Title IX. 2-NorthER-296–99, 305–07.

3. <u>Failure to Ensure Equitable Treatment Across Subgroups</u>: The Female Sub-Class was allocated only 4% of past damages and less than 10% of injunctive relief payments under the distribution plan, demonstrating inequitable treatment between male and female student-athletes. 2-NorthER-197–99, 202–03, 470–73.

In addition to Class Counsel's failure to adequately protect the interests of the Female Sub-Class, numerous other class members have also challenged the adequacy of representation. Even the named plaintiffs—Grant House, Sedona Prince, and Nya Harrison—raised concerns in a December 12, 2024, letter to the District Court regarding Class Counsel's ability to safeguard the interests of student-athletes. 2-NorthER-396–97. More recently, multiple objectors to the Injunctive Relief identified serious deficiencies in Class Counsel's representation, including a failure to provide meaningful assistance in advancing their legal rights. 2-NorthER-194–201, 204–08. These objections underscore the inadequacy of representation and reflect a broader pattern of inadequate representation in violation of Rule 23(a)(4). Class Counsel's failures undermine the fairness of the Settlement and provide an independent basis for reversal of the Settlement's approval. *See Amchem Prods., Inc.*, 521 U.S. at 625–29.

### 1. Class Counsel Instructed Economic Experts to Exclude Title IX from Damages Calculation Resulting in Inequitable Remedies.

Class Counsel instructed the economic experts to exclude Title IX from their calculation of Settlement damages. 3-NorthER-506. This directive explains the stark disparity in the allocation of funds between male and female student-athletes. As confirmed in deposition testimony by the Plaintiffs' economic experts Rascher and Desser:

> Rascher Testimony:
> Q: Have you tried to account for Title IX in any of your damage's models in this case?
> A: No
> 2-NorthER-348, 380.
>
> Desser Testimony:
> Q: Have you given any consideration to the Title [IX] in your preparation of this report?
> A: That's not within the scope of what I was assigned to work on.
> Q: So, the answer is: 'No' you have not given any consideration to it, because you weren't asked to do that?
> A: No, I have not.
> 2-NorthER-349; 3-NorthER-506.

This directive represents a fundamental conflict of interest and a failure to adequately represent the Female Sub-Class. *See Partl,* 895 F.3d at 607–08. By instructing experts to disregard Title IX, Class Counsel sidelined the rights of female student-athletes and compromised the integrity of the Settlement process. The District Court erred in accepting and approving a damages model explicitly constructed to exclude Title IX. In doing so, the court failed to ensure adequate

49

representation of the Female Sub-Class under Rule 23(a)(4) and did not satisfy the fairness requirement under Rule 23(e)(2)(A).

Had the experts incorporated Title IX into their analysis, the resulting allocation—awarding over 90% of the Settlement fund to male student-athletes—would have been impermissible. 2-NorthER-289–90, 358; *see* § 1681–89. The proper allocation should have been closer to 53% for men and 47% for women. When an allocation "explicitly provides for preferential treatment" of some class members over others, such a "disparity in benefits" may demonstrate "either substantive unfairness or inadequate representation." *Holmes*, 706 F.2d at 1148. The District Court's failure to exercise careful judicial scrutiny of this inequitable allocation warrants a reversal.

**2. Class Counsel's Failure to Pursue Title IX Claims Demonstrates a Conflict of Interest and Inadequate Representation of Female Sub-Class.**

Class Counsel failed to satisfy the adequacy standard required under Rule 23(a)(4). In their Motion for Final Settlement Approval, Class Counsel included a section titled, "There Are No Title IX Issues Raised by the Settlement." 2-NorthER-305–07. During the April 7, 2025 hearing, Mr. Kessler reaffirmed this position, admitting his refusal to litigate the Title IX claims, stating: "Cause I don't think it exists cause I would have brought it. I tried to. We researched it." 2-NorthER-273, 283–84. However, there is no record that Class Counsel ever raised

50

any Title IX issues or submitted any substantive research findings to the District Court. 2-NorthER-348–49, 380; 3-NorthER-506.

Instead, Class Counsel improperly asserted that *Smith* was the only case addressing whether an athletic association is subject to Title IX and concluded incorrectly, "that Title IX doesn't apply to the NCAA or conferences." 2-NorthER-306. This position is legally inaccurate and directly undermines the interests of Female Sub-Class. Courts have repeatedly recognized athletic associations exercising controlling authority over federally funded programs may be subject to Title IX as indirect recipients. *See Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235–36 (N.D. Ala. 2010) (finding athletic conference's control over intercollegiate athletics, delegated by its member schools, are subject to Title IX as funding recipient); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n.*, 137 F. Supp. 2d 910, 913 (W.D. Mich. 2001) (entity exercising controlling authority over a federally funded program is subject to Title IX despite lack of direct funding); *Horner I*, 43 F.3d at 272 (referencing *Grove City Coll.*, 465 U.S. at 564–70) (noting state high school athletic association could qualify as indirect recipients of federal funding).

By failing to pursue viable Title IX claims, Class Counsel breached its fiduciary duty to adequately represent the Female Sub-Class. The District Court's

approval of a Settlement negotiated under this conflict of interest constitutes an abuse of discretion and warrants reversal.

### 3. Class Counsel's Fees are Four Times Greater than Female Sub-Class's Recovery—Demonstrates a Conflict of Interest and Inadequate Representation.

Courts have long cautioned that class counsel's financial interests can distort settlements, requiring "careful scrutiny…to guard against settlements that may benefit…attorneys at the expense of absent class members." *Managed Care Advisory Grp., LLC v. CIGNA Healthcare*, 939 F.3d 1145, 1162 (11th Cir. 2019) (quoting *United States v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980)); *see also Reynolds,* 288 F.3d at 279 (recognizing the problem of "lawyers for the class who may…place their pecuniary self-interest ahead of that of the class"). Rule 23(a)(4) demands adequate representation, and the Supreme Court has recognized that structural or financial conflicts can defeat adequacy. *See Amchem Prods., Inc.*, 521 U.S. at 627.

This concern is particularly significant in cases involving substantial attorney's fees. In *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014), the court warned that "the incentive of class counsel to settle claims for too low a value in exchange for a high fee award" can distort the settlement process. Similarly, in *Jones*, 654 F.3d at 947, the Ninth Circuit held that courts must be vigilant for signs of collusion, including disproportionate attorney's fees and a lack

52

of meaningful relief to the class. And in *Drazen v. Pinto*, 106 F.4th 1302, 1352 (11th Cir. 2024), the Eleventh Circuit reversed approval of a settlement where attorney's fees were disproportionately high compared to the relief provided to class members. The court emphasized that Rule 23(e) requires a proportionality review—even when fees are paid from a separate fund—to ensure that compensation to counsel aligns with the actual benefit conferred on the class. *Drazen*, 106 F.4th at 1328.

The Settlement here exhibits the same flaws identified in *Drazen*. *Compare Id*. at 1352 *with* 1-NorthER-134. The District Court approved Class Counsel's fees in the amount of $455.2 million for past damages—more than four times the $102 million awarded to female student-athletes. 2-NorthER-263. While the fee may appear reasonable against the $2.8 billion Settlement, it is indefensible when measured against the Female Sub-Class's recovery. This disparity violates the proportionality requirement under Rule 23(e)(2)(C)(iii), which mandates scrutiny of whether the fee award is reasonable considering the actual benefit to the class.

Accordingly, the Settlement should be reversed and remanded for reconsideration of both the attorney's fee structure and the equitable distribution of relief to the Female Sub-Class. 2-NorthER-289–90, 358. Where fee driven incentives dominate the interests of the class—particularly those of historically marginalized classes—the integrity of the settlement process is compromised. *See*

*Holmes*, 706 F.2d at 1148. Judicial intervention is not only warranted; it is necessary to restore fairness and uphold the fiduciary obligations owed to all class members.

## III. THE SETTLEMENT'S TITLE IX RELEASE VIOLATES RULE 23 AND CONSTITUTIONAL RIGHTS OF FEMALE SUB-CLASS

Release provisions in class action settlements are subject to heightened scrutiny because they implicate the constitutional due process rights of absent class members. *Jones*, 654 F.3d at 946; *see also Radcliffe v. Experian Info. Sols*., 715 F.3d 1157, 1168 (9th Cir. 2013) (concluding the district court abused its discretion in approving a settlement where the class representatives and class counsel did not adequately represent the interests of the class). Courts consistently require that such provisions be narrowly tailored to the claims actually litigated, that they provide clear notice to fairly appraise class members of their rights, and that they provide meaningful opportunities to object or opt out. *See Brown v. Ticor Title Ins. Co.,* 982 F.2d 386, 392 (9th Cir. 1992) (stating the court must provide "minimal due process" to bind an absent class member)*; Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 821 (1985) (noting that due process requires adequate representation, notice, and opt-out rights in class actions); *see also Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) (referencing *Amchem Prods., Inc.*, 521 U.S. at 614) (stating the purpose of Rule 23(b)(2) is to protect civil rights).

54

A release that extends beyond the factual predicate of the litigation or compels the waiver of unrelated statutory rights is unenforceable. *See McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 949 (N.D. Cal. 2012) (referencing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) holding a settlement release may not release claims if they do not arise from an "identical factual predicate" as the claims asserted in the litigation). The Ninth Circuit has repeatedly invalidated overbroad releases that purport to extinguish claims outside the scope of the operative complaint. *See Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992).

## A. Class Counsel Added Sweeping Title IX Release—Breaches Duty of Adequate Representation.

At the hearing on September 12, 2024, the District Court directly raised concerns about whether the Settlement adequately preserved Title IX rights. 2-NorthER-458. In response, Class Counsel, Mr. Kessler, assured the Court "Title IX is completely preserved." 2-NorthER-460. That assurance was misleading. Defense Counsel, Mr. Kilaru, immediately clarified, "I'm not sure I agree with it precisely as Mr. Kessler put it… as relates to *future Title IX liability, that's not something we are releasing through the settlement."* 2-NorthER-460–61.

The District Court urged counsel "get together and see if you can work out something that will make the objectors comfortable that each of you can agree

55

with." 2-NorthER-461. Class Counsel and Defense Counsel responded by inserting a sweeping Title IX release into the Settlement Agreement. 2-NorthER-405–09. This amendment fundamentally altered the definition of "**Unreleased Claims**" for the Female Sub-Class:

> Claims under Title IX of the Education, Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, ***other than any claims arising out of or relating to the distribution of the Gross Settlement Fund.***

1-NorthER-131 (emphasis added); 2-NorthER-224–26, 405–09.

The "Gross Settlement Fund" is defined to include both the NIL Claims Amount ($1.976 billion) and the Additional Compensation Settlement Amount ($600 million), combined total of $2.576 billion in past damages. 1-NorthER-145–46; 2-NorthER-218. Instead of protecting female student-athletes, the amendment forecloses the Female Sub-Class from challenging the inequitable allocation of the Settlement.

In their Motion for Final Settlement Approval dated March 3, 2025, Class Counsel represented "there is only a very narrow release of Title IX claims '*arising from the distribution of the gross settlement agreement.*'" 2-NorthER-306 (emphasis added). They further assert that the Settlement "has a release that applies only to certain NCAA rules, and does not apply to employment law or Title IX." 2-NorthER-304. However, the accompanying footnote to this statement concedes,

56

*"the settlement's release does not extend to claims that the settlement distribution plan violates Title IX."* 2-NorthER-304 n. 30.

The Settlement Agreement defines "<u>Distribution Plan</u>" as "the *plan* or *formula* of allocation of the Gross Settlement Fund for *future distribution* of Authorized Recipients." 2-NorthER-217 (emphasis added). In practice, this means the Title IX release is tied to the BNIL formula governing future revenue-sharing payments–a formula built on a damages model that excluded Title IX.

This carve out is illusory. By conditioning the release on the Distribution of the Gross Settlement Fund—the Settlement extinguishes the Female Sub-Class's ability to challenge the BNIL formula and future distribution plan for injunctive relief payments. 2-NorthER-224. In other words, the Settlement forces female student-athletes to relinquish their statutory rights under Title IX in exchange for no consideration and simultaneously provides immunity to the NCAA, athletic conferences, and universities. 2-NorthER-224.

This is not a permissible release. It is a denial of due process. The Female Sub-Class was never adequately represented on Title IX issues and was not even given an opportunity to opt out of the injunctive relief that pays male student-athletes over 90% of the billions of dollars distributed each year. 2-NorthER-197–203. *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 363 (2011) (emphasizing that Rule 23(b)(2) does not require notice or opt-out rights; however, combining

individualized monetary claims with (b)(2) certification could raise due process concerns); *see also Eubanks v. Billington*, 110 F.3d 87, 95 (D.C. Cir. 1997) (stating "where both injunctive and monetary relief are sought, the need to protect the rights of individual class members may necessitate procedural protections beyond those ordinarily provided under [Rule 23(b)(1), (2)]").

Title IX claims were never litigated or certified as part of the class. The inclusion of a Title IX release in an antitrust settlement serves no purpose other than to shield the NCAA, athletic conferences, and member institutions from liability for ongoing gender inequities in intercollegiate athletics. Accordingly, the Ninth Circuit should vacate the Settlement and remand the case to the District Court for proper consideration of the Title IX issues raised on appeal, and mandate that any future antitrust resolution include Title IX.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, or at a minimum, remanded with clear instructions to apply Title IX's mandate of gender equity. Any future resolution must incorporate Title IX's protections. If a conflict of interest prevents Class Counsel from adequately representing the Female Sub-Class, new counsel must be appointed to ensure women's rights are fully and fairly protected.

Date: October 29, 2025

/s/ Leigh Ernst Friestedt

Leigh Ernst Friestedt

EQUITY IX, LLC

40 Mercer St., Suite 15

New York, NY 10013

(917) 513-5541

leigh@equityix.com

/s/ Jeffrey E. Faucette

Jeffrey E. Faucette

SKAGGS FAUCETTE LLP

505 Montgomery St., 11th Floor

San Francisco, CA 94111

(415) 874-3181

jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants:* Charlotte North, Mai Nirundorn, Katherine McCabe Ernst, Sarah Brooke Baker

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-3722, 25-3835, 25-4137, 25-1450, 25-4190

I am the attorney or self-represented party.

**This brief contains 12,567 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Leigh Ernst Friestedt  **Date** October 29, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

**9th Cir. Case Number(s)** 25-3722, 25-3835, 25-4137, 25-4150, 25-4190

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[x] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Tyler Phillips, tylerphillips@causavalori.com

**Description of Document(s)** *(required for all documents)***:**

> Opening Brief: Charlotte North, et al., Objectors–Appellants
> Excerpts of Record – Index Volume, Volumes I–III

**Signature**  s/ Leigh Ernst Friestedt   **Date** October 29, 2025

# ADDENDUM

**Page**

20 U.S.C § 1681 ................................................................... 002

20 U.S.C § 1682 ................................................................... 004

20 U.S.C § 1683 ................................................................... 005

20 U.S.C § 1684 ................................................................... 005

20 U.S.C § 1685 ................................................................... 005

20 U.S.C § 1686 ................................................................... 005

20 U.S.C § 1687 ................................................................... 006

20 U.S.C § 1688 ................................................................... 007

20 U.S.C § 1689 ................................................................... 007

Title 34 Code of Federal Regulations Part 106................................... 009

1979 Policy Interpretation ...................................................... 023

Civil Rights Restoration Act of 1987 .......................................... 031

FRCP Rule 23 ................................................................... 033

## § 1653. Omitted

**Editorial Notes**

CODIFICATION

Section, Pub. L. 92–318, title VIII, §803, June 23, 1972, 86 Stat. 372, provided that the effectiveness of orders of district courts requiring transfer or transportation of students for purposes of achieving a balance among students with respect to race, sex, religion, or socioeconomic status, be postponed until all appeals in connection with such orders have been exhausted or until expiration of the time for such appeals, expired at midnight on Jan. 1, 1974.

## § 1654. Intervention authorization in implementation of court orders

A parent or guardian of a child, or parents or guardians of children similarly situated, transported to a public school in accordance with a court order, may seek to reopen or intervene in the further implementation of such court order, currently in effect, if the time or distance of travel is so great as to risk the health of the student or significantly impinge on his or her educational process.

(Pub. L. 92–318, title VIII, §804, June 23, 1972, 86 Stat. 372.)

## § 1655. Uniform rules of evidence of racial discrimination

The rules of evidence required to prove that State or local authorities are practicing racial discrimination in assigning students to public schools shall be uniform throughout the United States.

(Pub. L. 92–318, title VIII, §805, June 23, 1972, 86 Stat. 372.)

## § 1656. Prohibition against official or court orders to achieve racial balance or insure compliance with constitutional standards applicable to entire United States

The proviso of section 407(a) of the Civil Rights Act of 1964 [42 U.S.C. 2000c–6(a)] providing in substance that no court or official of the United States shall be empowered to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards shall apply to all public school pupils and to every public school system, public school and public school board, as defined by title IV [42 U.S.C. 2000c et seq.], under all circumstances and conditions and at all times in every State, district, territory, Commonwealth, or possession of the United States regardless of whether the residence of such public school pupils or the principal offices of such public school system, public school or public school board is situated in the northern, eastern, western, or southern part of the United States.

(Pub. L. 92–318, title VIII, §806, June 23, 1972, 86 Stat. 373.)

**Editorial Notes**

REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in text, is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Title IV of the Civil Rights Act of 1964 is classified generally to subchapter IV (§2000c et seq.) of chapter 21 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of Title 42 and Tables.

## CHAPTER 38—DISCRIMINATION BASED ON SEX OR BLINDNESS

Sec.
1681.　Sex.
1682.　Federal administrative enforcement; report to Congressional committees.
1683.　Judicial review.
1684.　Blindness or visual impairment; prohibition against discrimination.
1685.　Authority under other laws unaffected.
1686.　Interpretation with respect to living facilities.
1687.　Interpretation of "program or activity".
1688.　Neutrality with respect to abortion.
1689.　Task Force on Sexual Violence in Education.

## § 1681. Sex

### (a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

### (1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

### (2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

### (3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of

this subsection would not be consistent with the religious tenets of such organization;

**(4) Educational institutions training individuals for military services or merchant marine**

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

**(5) Public educational institutions with traditional and continuing admissions policy**

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices—

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

**(7) Boy or Girl conferences**

this section shall not apply to—

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for—

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

**(8) Father-son or mother-daughter activities at educational institutions**

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

**(9) Institution of higher education scholarship awards in "beauty" pageants**

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has

received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

**(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance**

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided*, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

**(c) "Educational institution" defined**

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

(Pub. L. 92–318, title IX, § 901, June 23, 1972, 86 Stat. 373; Pub. L. 93–568, § 3(a), Dec. 31, 1974, 88 Stat. 1862; Pub. L. 94–482, title IV, § 412(a), Oct. 12, 1976, 90 Stat. 2234; Pub. L. 96–88, title III, § 301(a)(1), title V, § 507, Oct. 17, 1979, 93 Stat. 677, 692; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in subsecs. (b) and (c), was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note below and Tables.

#### AMENDMENTS

1986—Subsec. (a)(6)(A). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

1976—Subsec. (a)(6) to (9). Pub. L. 94–482 substituted "this" for "This" in par. (6) and added pars. (7) to (9).

1974—Subsec. (a)(6). Pub. L. 93–568 added par. (6).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–482, title IV, §412(b), Oct. 12, 1976, 90 Stat. 2234, provided that: ''The amendment made by subsection (a) [amending this section] shall take effect upon the date of enactment of this Act [Oct. 12, 1976].''

EFFECTIVE DATE OF 1974 AMENDMENT

Pub. L. 93–568, §3(b), Dec. 31, 1974, 88 Stat. 1862, provided that: ''The provisions of the amendment made by subsection (a) [amending this section] shall be effective on, and retroactive to, July 1, 1972.''

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–259, §1, Mar. 22, 1988, 102 Stat. 28, provided that: ''This Act [enacting sections 1687 and 1688 of this title and section 2000d–4a of Title 42, The Public Health and Welfare, amending sections 706 and 794 of Title 29, Labor, and section 6107 of Title 42, and enacting provisions set out as notes under sections 1687 and 1688 of this title] may be cited as the 'Civil Rights Restoration Act of 1987'.''

SHORT TITLE

Pub. L. 107–255, Oct. 29, 2002, 116 Stat. 1734, provided ''That title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.; Public Law 92–318) [title IX of Pub. L. 92–318, enacting this chapter and amending sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare] may be cited as the 'Patsy Takemoto Mink Equal Opportunity in Education Act'.''

TRANSFER OF FUNCTIONS

''Secretary'' substituted for ''Commissioner'' in subsec. (a)(2) pursuant to sections 301(a)(1) and 507 of Pub. L. 96–88, which are classified to sections 3441(a)(1) and 3507 of this title and which transferred functions of Commissioner of Education to Secretary of Education.

REGULATIONS; NATURE OF PARTICULAR SPORTS: INTERCOLLEGIATE ATHLETIC ACTIVITIES

Pub. L. 93–380, title VIII, §844, Aug. 21, 1974, 88 Stat. 612, directed Secretary to prepare and publish, not more than 30 days after Aug. 21, 1974, proposed regulations implementing the provisions of this chapter regarding prohibition of sex discrimination in federally assisted programs, including reasonable regulations for intercollegiate athletic activities considering the nature of the particular sports.

**Executive Documents**

COORDINATION OF IMPLEMENTATION AND ENFORCEMENT OF PROVISIONS

For provisions relating to the coordination of implementation and enforcement of the provisions of this chapter by the Attorney General, see section 1–201(b) of Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out under section 2000d–1 of Title 42, The Public Health and Welfare.

EX. ORD. NO. 14021. GUARANTEEING AN EDUCATIONAL ENVIRONMENT FREE FROM DISCRIMINATION ON THE BASIS OF SEX, INCLUDING SEXUAL ORIENTATION OR GENDER IDENTITY

Ex. Ord. No. 14021, Mar. 8, 2021, 86 F.R. 13803, provided:
By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Policy.* It is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity. For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq., which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance.

SEC. 2. *Review of Agency Actions.* (a) Within 100 days of the date of this order [Mar. 8, 2021], the Secretary of Education, in consultation with the Attorney General, shall review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that are or may be inconsistent with the policy set forth in section 1 of this order, and provide the findings of this review to the Director of the Office of Management and Budget.

(i) As part of the review required under subsection (a) of this section, the Secretary of Education shall review the rule entitled ''Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,'' 85 FR 30026 (May 19, 2020), and any other agency actions taken pursuant to that rule, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.

(ii) As soon as practicable, and as appropriate and consistent with applicable law, the Secretary of Education shall review existing guidance and issue new guidance as needed on the implementation of the rule described in subsection (a)(i) of this section, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.

(iii) The Secretary of Education shall consider suspending, revising, or rescinding—or publishing for notice and comment proposed rules suspending, revising, or rescinding—those agency actions that are inconsistent with the policy set forth in section 1 of this order as soon as practicable and as appropriate and consistent with applicable law, and may issue such requests for information as would facilitate doing so.

(b) The Secretary of Education shall consider taking additional enforcement actions, as appropriate and consistent with applicable law, to enforce the policy set forth in section 1 of this order as well as legal prohibitions on sex discrimination in the form of sexual harassment, which encompasses sexual violence, to the fullest extent permissible under law; to account for intersecting forms of prohibited discrimination that can affect the availability of resources and support for students who have experienced sex discrimination, including discrimination on the basis of race, disability, and national origin; to account for the significant rates at which students who identify as lesbian, gay, bisexual, transgender, and queer (LGBTQ+) are subject to sexual harassment, which encompasses sexual violence; to ensure that educational institutions are providing appropriate support for students who have experienced sex discrimination; and to ensure that their school procedures are fair and equitable for all.

SEC. 3. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assist-

ance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

(Pub. L. 92–318, title IX, § 902, June 23, 1972, 86 Stat. 374.)

#### Executive Documents

DELEGATION OF FUNCTIONS

Functions of President relating to approval of rules, regulations, and orders of general applicability under this section, delegated to Attorney General, see section 1–102 of Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out under section 2000d–1 of Title 42, The Public Health and Welfare.

### § 1683. Judicial review

Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5, and such action

shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

(Pub. L. 92–318, title IX, § 903, June 23, 1972, 86 Stat. 374.)

#### Editorial Notes

CODIFICATION

"Section 1682 of this title", where first appearing, substituted in text for "section 1002" as conforming to intent of Congress as Pub. L. 92–318 was enacted without any section 1002 and subsequent text refers to "section 902", which is classified to section 1682 of this title.

### § 1684. Blindness or visual impairment; prohibition against discrimination

No person in the United States shall, on the ground of blindness or severely impaired vision, be denied admission in any course of study by a recipient of Federal financial assistance for any education program or activity, but nothing herein shall be construed to require any such institution to provide any special services to such person because of his blindness or visual impairment.

(Pub. L. 92–318, title IX, § 904, June 23, 1972, 86 Stat. 375.)

### § 1685. Authority under other laws unaffected

Nothing in this chapter shall add to or detract from any existing authority with respect to any program or activity under which Federal financial assistance is extended by way of a contract of insurance or guaranty.

(Pub. L. 92–318, title IX, § 905, June 23, 1972, 86 Stat. 375.)

#### Editorial Notes

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

### § 1686. Interpretation with respect to living facilities

Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

(Pub. L. 92–318, title IX, § 907, June 23, 1972, 86 Stat. 375.)

#### Editorial Notes

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare.

For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

This Act, referred to in text, is Pub. L. 92–318, June 23, 1972, 86 Stat. 235, known as the Education Amendments of 1972. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

## § 1687. Interpretation of "program or activity"

For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section section[1] 7801 of this title), system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.

(Pub. L. 92–318, title IX, §908, as added Pub. L. 100–259, §3(a), Mar. 22, 1988, 102 Stat. 28; amended Pub. L. 103–382, title III, §391(g), Oct. 20, 1994, 108 Stat. 4023; Pub. L. 107–110, title X, §1076(j), Jan. 8, 2002, 115 Stat. 2091; Pub. L. 114–95, title IX, §9215(bb), Dec. 10, 2015, 129 Stat. 2173.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see

---

[1] So in original.

Short Title note set out under section 1681 of this title and Tables.

#### AMENDMENTS

2015—Par. (2)(B). Pub. L. 114–95 substituted "section 7801 of this title), system of vocational education, or other school system;" for "7801 of this title), system of vocational education, or other school system;".

2002—Par. (2)(B). Pub. L. 107–110 substituted "7801" for "8801".

1994—Par. (2)(B). Pub. L. 103–382 substituted "section 8801" for "section 2854(a)(10)".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–95 effective Dec. 10, 2015, except with respect to certain noncompetitive programs and competitive programs, see section 5 of Pub. L. 114–95, set out as a note under section 6301 of this title.

#### EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–110 effective Jan. 8, 2002, except with respect to certain noncompetitive programs and competitive programs, see section 5 of Pub. L. 107–110, set out as an Effective Date note under section 6301 of this title.

#### FINDINGS OF CONGRESS

Pub. L. 100–259, §2, Mar. 22, 1988, 102 Stat. 28, provided that: "The Congress finds that—

"(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], and title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.]; and

"(2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."

#### CONSTRUCTION

Pub. L. 100–259, §7, Mar. 22, 1988, 102 Stat. 31, provided that: "Nothing in the amendments made by this Act [see Short Title of 1988 Amendment note under section 1681 of this title] shall be construed to extend the application of the Acts so amended [Education Amendments of 1972, Pub. L. 92–318, see Short Title of 1972 Amendment, set out as a note under section 1001 of this title, Rehabilitation Act of 1973, 29 U.S.C. 701 et seq., Age Discrimination Act of 1975, 42 U.S.C. 6101 et seq., and Civil Rights Act of 1964, 42 U.S.C. 2000a et seq.] to ultimate beneficiaries of Federal financial assistance excluded from coverage before the enactment of this Act [Mar. 22, 1988]."

#### ABORTION NEUTRALITY

This section not to be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal funds to perform or pay for an abortion, see section 8 of Pub. L. 100–259, set out as a note under section 1688 of this title.

## § 1688. Neutrality with respect to abortion

Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion.

(Pub. L. 92–318, title IX, § 909, as added Pub. L. 100–259, § 3(b), Mar. 22, 1988, 102 Stat. 29.)

### Editorial Notes
#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

#### Statutory Notes and Related Subsidiaries
#### CONSTRUCTION

This section not to be construed to extend application of Education Amendments of 1972, Pub. L. 92–318, to ultimate beneficiaries of Federal financial assistance excluded from coverage before Mar. 22, 1988, see section 7 of Pub. L. 100–259, set out as a note under section 1687 of this title.

#### ABORTION NEUTRALITY

Pub. L. 100–259, § 8, Mar. 22, 1988, 102 Stat. 31, provided that: "No provision of this Act or any amendment made by this Act [see Short Title of 1988 Amendment note under section 1681 of this title] shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal Funds [sic] to perform or pay for an abortion."

### § 1689. Task Force on Sexual Violence in Education

#### (a) Task Force on Sexual Violence in Education

Not later than September 1, 2022, the Secretary of Education, the Secretary of Health and Human Services, and the Attorney General shall establish a joint interagency task force to be known as the "Task Force on Sexual Violence in Education" that shall—

(1) provide pertinent information to the Secretary of Education, the Attorney General, Congress, and the public with respect to campus sexual violence prevention, investigations, and responses, including the creation of consistent, public complaint processes for violations of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) and section 1092(f) of this title;

(2) provide recommendations to educational institutions for establishing sexual assault prevention and response teams;

(3) develop recommendations for educational institutions on providing survivor resources, including health care, sexual assault kits, sexual assault nurse examiners, culturally responsive and inclusive standards of care, trauma-informed services, and access to confidential advocacy and support services;

(4) develop recommendations in conjunction with student groups for best practices for responses to and prevention of sexual violence and dating violence for educational institutions, taking into consideration an institution's size and resources;

(5) develop recommendations for educational institutions on sex education, as appropriate, training for school staff, and various equitable discipline models;

(6) develop recommendations on culturally responsive and inclusive approaches to supporting survivors, which include consideration of race, ethnicity, national origin, religion, immigrant status, lesbian, gay, bisexual, or transgender (commonly referred to as "LGBT") status, ability, disability, socio-economic status, exposure to trauma, and other compounding factors;

(7) solicit periodic input from a diverse group of survivors, trauma specialists, advocates from national, State, and local anti-sexual violence advocacy organizations, institutions of higher education, and other public stakeholders;

(8) assess the Department of Education's ability under section 902 of the Education Amendments of 1972 (20 U.S.C. 1682) to levy intermediate fines for noncompliance with title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) and the advisability of additional remedies for such noncompliance, in addition to the remedies already available under Federal law; and

(9) create a plan described in subsection (c).

#### (b) Personnel details
#### (1) Authority to detail

Notwithstanding any other provision of law, the head of a component of any Federal agency for which appropriations are authorized under the Violence Against Women Act of 1994 (34 U.S.C. 13925 et seq.), or any amendments made by that Act, may detail an officer or employee of such component to the Task Force on Sexual Violence in Education or to the Secretary of Education to assist the Task Force with the duties described in subsection (a), as jointly agreed to by the head of such component and the Task Force.

#### (2) Terms of detail

A personnel detail made under paragraph (1) may be made—

(A) for a period of not more than 3 years; and

(B) on a reimbursable or nonreimbursable basis.

#### (c) Additional plan

Not later than 90 days after the date on which the Task Force on Sexual Violence in Education is established under subsection (a), the Task Force shall submit to Congress recommendations for recruiting, retaining, and training a highly-qualified workforce employed by the Department of Education to carry out investigation of complaints alleging a violation of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) or section 1092(f) of this title, and enforcement of such title IX (20 U.S.C. 1681 et seq.) or such section 1092(f) of this title, with respect to sexual violence in education, which shall include—

(1) an assessment to identify gaps or challenges in carrying out such investigation and enforcement, which may include surveying the current investigative workforce to solicit feedback on areas in need of improvement;

(2) an examination of issues of recruiting, retention, and the professional development of the current investigative workforce, including the possibility of providing retention bonuses or other forms of compensation for the pur-

pose of ensuring the Department of Education has the capacity, in both personnel and skills, needed to properly perform its mission and provide adequate oversight of educational institutions;

(3) an assessment of the benefits of outreach and training with both law enforcement agencies and educational institutions with respect to such workforce;

(4) an examination of best practices for making educational institutions aware of the most effective campus sexual violence prevention, investigation, and response practices and identifying areas where more research should be conducted; and

(5) strategies for addressing such other matters as the Secretary of Education considers necessary to sexual violence prevention, investigation, and responses.

**(d) Annual reporting**

The Task Force on Sexual Violence in Education shall submit to Congress, and make publicly available, an annual report of its activities and any update of the plan required under subsection (c), including—

(1) the number of complaints received regarding sexual violence at educational institutions;

(2) the number of open investigations of sexual violence at educational institutions;

(3) the number of such complaints that continued to resolution;

(4) the number of such complaints resolved using informal resolution;

(5) the average time to complete such an investigation;

(6) the number of such investigations initiated based on complaints; and

(7) the number of such investigations initiated by the Department of Education.

**(e) Definitions**

In this section:

**(1) Educational institution**

The term ''educational institution'' includes an institution of higher education, an elementary school, or a secondary school.

**(2) Elementary school; secondary school**

The terms ''elementary school'' and ''secondary school'' have the meanings given the terms in section 7801 of this title.

**(3) Institution of higher education**

The term ''institution of higher education'' has the meaning given the term in section 1002 of this title.

(Pub. L. 117–103, div. W, title XIII, § 1314, Mar. 15, 2022, 136 Stat. 936.)

**Editorial Notes**

REFERENCES IN TEXT

The Education Amendments of 1972, referred to in subsecs. (a)(1), (8) and (c), is Pub. L. 92–318, June 23, 1972, 86 Stat. 235. Title IX of the Act, known as the Patsy Takemoto Mink Equal Opportunity in Education Act, is classified principally to this chapter. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

The Violence Against Women Act of 1994, referred to in subsec. (b)(1), is title IV of Pub. L. 103–322, Sept. 13, 1994, 108 Stat. 1902. For complete classification of this Act to the Code, see section 40001 of Pub. L. 103–322, set out as a Short Title of 1994 Act note under section 10101 of Title 34, Crime Control and Law Enforcement, and Tables.

Section 7801 of this title, referred to in subsec. (e)(3), was in the original ''section 9101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801)'', and was translated as if it had been a reference to section 8101 of the Elementary and Secondary Education Act of 1965 to reflect the probable intent of Congress and the renumbering of section 9101 of the Act as 8101 by Pub. L. 114–95, § 8001(a)(1).

CODIFICATION

Section was enacted as part of the Violence Against Women Act Reauthorization Act of 2022, and also as part of the Consolidated Appropriations Act, 2022, and not as part of title IX of Pub. L. 92–318 which is classified principally to this chapter.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section not effective until Oct. 1 of the first fiscal year beginning after Mar. 15, 2022, see section 4(a) of div. W of Pub. L. 117–103, set out as a note under section 6851 of Title 15, Commerce and Trade.

DEFINITIONS

For definitions of terms used in this section, see section 12291 of Title 34, Crime Control and Law Enforcement, as made applicable by section 2(b) of div. W of Pub. L. 117–103, which is set out as a note under section 12291 of Title 34.

## CHAPTER 39—EQUAL EDUCATIONAL OPPORTUNITIES AND TRANSPORTATION OF STUDENTS

SUBCHAPTER I—EQUAL EDUCATIONAL OPPORTUNITIES

PART 1—POLICY AND PURPOSE

Sec.
1701. Congressional declaration of policy.
1702. Congressional findings.

PART 2—UNLAWFUL PRACTICES

1703. Denial of equal educational opportunity prohibited.
1704. Balance not required.
1705. Assignment on neighborhood basis not a denial of equal educational opportunity.

PART 3—ENFORCEMENT

1706. Civil actions by individuals denied equal educational opportunities or by Attorney General.
1707. Population changes without effect, per se, on school population changes.
1708. Jurisdiction of district courts.
1709. Intervention by Attorney General.
1710. Civil actions by Attorney General; notice of violations; certification respecting undertaking appropriate remedial action.

PART 4—REMEDIES

1712. Formulating remedies; applicability.
1713. Priority of remedies.
1714. Transportation of students.
1715. District lines.
1716. Voluntary adoption of remedies.
1717. Reopening proceedings.
1718. Limitation on court orders; termination of orders conditioned upon compliance with fifth and fourteenth amendments; statement of basis for termination orders; stay of termination orders.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 80 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR Part 106 (Aug. 3, 2023)

This content is from the eCFR and is authoritative but unofficial.

# Title 34 —Education
## Subtitle B —Regulations of the Offices of the Department of Education
## Chapter I —Office for Civil Rights, Department of Education

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 81 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR Part 106 (Aug. 3, 2023)

**Part 106** Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**Subpart A** Introduction

**§ 106.1** Purpose and effective date.

**§ 106.2** Definitions.

**§ 106.3** Remedial and affirmative action and self-evaluation.

**§ 106.4** Assurance required.

**§ 106.5** Transfers of property.

**§ 106.6** Effect of other requirements and preservation of rights.

**§ 106.7** Effect of employment opportunities.

**§ 106.8** Designation of coordinator, dissemination of policy, and adoption of grievance procedures.

**§ 106.9** Severability.

**Subpart B** Coverage

**§ 106.11** Application.

**§ 106.12** Educational institutions controlled by religious organizations.

**§ 106.13** Military and merchant marine educational institutions.

**§ 106.14** Membership practices of certain organizations.

**§ 106.15** Admissions.

**§ 106.16** Educational institutions eligible to submit transition plans.

**§ 106.17** Transition plans.

**§ 106.18** Severability.

**Subpart C** Discrimination on the Basis of Sex in Admission and Recruitment Prohibited

**§ 106.21** Admission.

**§ 106.22** Preference in admission.

**§ 106.23** Recruitment.

**§ 106.24** Severability.

**Subpart D** Discrimination on the Basis of Sex in Education Programs or Activities

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 82 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR Part 106 (Aug. 3, 2023)

Prohibited

**§ 106.30** Definitions.

**§ 106.31** Education programs or activities.

**§ 106.32** Housing.

**§ 106.33** Comparable facilities.

**§ 106.34** Access to classes and schools.

**§ 106.35** Access to institutions of vocational education.

**§ 106.36** Counseling and use of appraisal and counseling materials.

**§ 106.37** Financial assistance.

**§ 106.38** Employment assistance to students.

**§ 106.39** Health and insurance benefits and services.

**§ 106.40** Marital or parental status.

**§ 106.41** Athletics.

**§ 106.42** Textbooks and curricular material.

**§ 106.43** Standards for measuring skill or progress in physical education classes.

**§ 106.44** Recipient's response to sexual harassment.

**§ 106.45** Grievance process for formal complaints of sexual harassment.

**§ 106.46** Severability.

**Subpart E** Discrimination on the Basis of Sex in Employment in Education Programs or Activities Prohibited

**§ 106.51** Employment.

**§ 106.52** Employment criteria.

**§ 106.53** Recruitment.

**§ 106.54** Compensation.

**§ 106.55** Job classification and structure.

**§ 106.56** Fringe benefits.

**§ 106.57** Marital or parental status.

**§ 106.58** Effect of State or local law or other requirements.

**§ 106.59** Advertising.

**§ 106.60** Pre-employment inquiries.

**§ 106.61** Sex as a bona-fide occupational qualification.

**§ 106.62** Severability.

**Subpart F—Retaliation**

**§ 106.71** Retaliation.
**§ 106.72** Severability.
**Subpart G** Procedures
**§ 106.81** Procedures.
**§ 106.82** Severability.
**Appendix A to Part 106**
Guidelines for Eliminating Discrimination and Denial of Services
on the Basis of Race, Color, National Origin, Sex, and Handicap in
Vocational Education Programs

# PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

**Authority:** 20 U.S.C. 1681 *et seq.,* unless otherwise noted.

**Source:** 45 FR 30955, May 9, 1980, unless otherwise noted.

## Subpart A—Introduction

### § 106.1 Purpose and effective date.

The purpose of this part is to effectuate title IX of the Education Amendments of 1972, as amended by Pub. L. 93−568, 88 Stat. 1855 (except sections 904 and 906 of those Amendments) which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part. This part is also intended to effectuate section 844 of the Education Amendments of 1974, Pub. L. 93−380, 88 Stat. 484. The effective date of this part shall be July 21, 1975.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

### § 106.2 Definitions.

As used in this part, the term:

(a) *Title IX* means title IX of the Education Amendments of 1972, Pub. L. 92−318, as amended by section 3 of Pub. L. 93−568, 88 Stat. 1855, except sections 904 and 906 thereof; 20 U.S.C. 1681, 1682, 1683, 1685, 1686.

(b) *Department* means the Department of Education.

(c) *Secretary* means the Secretary of Education.

(d) *Assistant Secretary* means the Assistant Secretary for Civil Rights of the Department.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 84 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.2(e)

(e) *Reviewing Authority* means that component of the Department delegated authority by the Secretary to appoint, and to review the decisions of, administrative law judges in cases arising under this part.

(f) *Administrative law judge* means a person appointed by the reviewing authority to preside over a hearing held under this part.

(g) *Federal financial assistance* means any of the following, when authorized or extended under a law administered by the Department:

  (1) A grant or loan of Federal financial assistance, including funds made available for:

    (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

    (ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

  (2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

  (3) Provision of the services of Federal personnel.

  (4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

  (5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

(h) *Program or activity* and *program* means all of the operations of—

  (1)

    (i) A department, agency, special purpose district, or other instrumentality of a State or local government; or

    (ii) The entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

  (2)

    (i) A college, university, or other postsecondary institution, or a public system of higher education; or

    (ii) A local educational agency (as defined in 20 U.S.C. 8801), system of vocational education, or other school system;

  (3)

    (i) An entire corporation, partnership, other private organization, or an entire sole proprietorship—

      (A) If assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 85 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.2(h)(3)(i)(B)

(B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(ii) The entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) Any other entity that is established by two or more of the entities described in paragraph (h)(1), (2), or (3) of this section; any part of which is extended Federal financial assistance.

(Authority: 20 U.S.C. 1687)

(i) *Recipient* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

(j) *Applicant* means one who submits an application, request, or plan required to be approved by a Department official, or by a recipient, as a condition to becoming a recipient.

(k) *Educational institution* means a local educational agency (LEA) as defined by section 1001(f) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 3381), a preschool, a private elementary or secondary school, or an applicant or recipient of the type defined by paragraph (l), (m), (n), or (o) of this section.

(l) *Institution of graduate higher education* means an institution which:

(1) Offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certificate of any higher degree in the liberal arts and sciences; or

(2) Awards any degree in a professional field beyond the first professional degree (regardless of whether the first professional degree in such field is awarded by an institution of undergraduate higher education or professional education); or

(3) Awards no degree and offers no further academic study, but operates ordinarily for the purpose of facilitating research by persons who have received the highest graduate degree in any field of study.

(m) *Institution of undergraduate higher education* means:

(1) An institution offering at least two but less than four years of college level study beyond the high school level, leading to a diploma or an associate degree, or wholly or principally creditable toward a baccalaureate degree; or

(2) An institution offering academic study leading to a baccalaureate degree; or

(3) An agency or body which certifies credentials or offers degrees, but which may or may not offer academic study.

(n) *Institution of professional education* means an institution (except any institution of undergraduate higher education) which offers a program of academic study that leads to a first professional degree in a field for which there is a national specialized accrediting agency recognized by the Secretary.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 86 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.2(o)

(o) *Institution of vocational education* means a school or institution (except an institution of professional or graduate or undergraduate higher education) which has as its primary purpose preparation of students to pursue a technical, skilled, or semiskilled occupation or trade, or to pursue study in a technical field, whether or not the school or institution offers certificates, diplomas, or degrees and whether or not it offers fulltime study.

(p) *Administratively separate unit* means a school, department or college of an educational institution (other than a local educational agency) admission to which is independent of admission to any other component of such institution.

(q) *Admission* means selection for part-time, full-time, special, associate, transfer, exchange, or any other enrollment, membership, or matriculation in or at an education program or activity operated by a recipient.

(r) *Student* means a person who has gained admission.

(s) *Transition plan* means a plan subject to the approval of the Secretary pursuant to section 901(a)(2) of the Education Amendments of 1972, under which an educational institution operates in making the transition from being an educational institution which admits only students of one sex to being one which admits students of both sexes without discrimination.

*[45 FR 30955, May 9, 1980; 45 FR 37426, June 3, 1980, as amended at 65 FR 68056, Nov. 13, 2000; 85 FR 30579, May 19, 2020]*

## § 106.3 Remedial and affirmative action and self-evaluation.

(a) *Remedial action.* If the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part, such recipient must take such remedial action as the Assistant Secretary deems necessary to remedy the violation, consistent with 20 U.S.C. 1682.

(b) *Affirmative action.* In the absence of a finding of discrimination on the basis of sex in an education program or activity, a recipient may take affirmative action to overcome the effects of conditions which resulted in limited participation therein by persons of a particular sex. Nothing herein shall be interpreted to alter any affirmative action obligations which a recipient may have under Executive Order 11246.

(c) *Self-evaluation.* Each recipient education institution shall, within one year of the effective date of this part:

(1) Evaluate, in terms of the requirements of this part, its current policies and practices and the effects thereof concerning admission of students, treatment of students, and employment of both academic and non-academic personnel working in connection with the recipient's education program or activity;

(2) Modify any of these policies and practices which do not or may not meet the requirements of this part; and

(3) Take appropriate remedial steps to eliminate the effects of any discrimination which resulted or may have resulted from adherence to these policies and practices.

(d) *Availability of self-evaluation and related materials.* Recipients shall maintain on file for at least three years following completion of the evaluation required under paragraph (c) of this section, and shall provide to the Assistant Secretary upon request, a description of any modifications made pursuant to paragraph (c)(ii) of this section and of any remedial steps taken pursuant to paragraph (c)(iii) of this section.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30572, 30579, May 19, 2020]*

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 87 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.4

## § 106.4 Assurance required.

(a) *General.* Every application for Federal financial assistance shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that the education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part. An assurance of compliance with this part shall not be satisfactory to the Assistant Secretary if the applicant or recipient to whom such assurance applies fails to commit itself to take whatever remedial action is necessary in accordance with § 106.3(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Assistant Secretary of such assurance.

(b) *Duration of obligation.*

(1) In the case of Federal financial assistance extended to provide real property or structures thereon, such assurance shall obligate the recipient or, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used to provide an education program or activity.

(2) In the case of Federal financial assistance extended to provide personal property, such assurance shall obligate the recipient for the period during which it retains ownership or possession of the property.

(3) In all other cases such assurance shall obligate the recipient for the period during which Federal financial assistance is extended.

(c) *Form.* The Director will specify the form of the assurances required by paragraph (a) of this section and the extent to which such assurances will be required of the applicant's or recipient's subgrantees, contractors, subcontractors, transferees, or successors in interest.

*[45 FR 30955, May 9, 1980, as amended at 45 FR 86298, Dec. 30, 1980; 65 FR 68056, Nov. 13, 2000; 85 FR 30579, May 19, 2020]*

## § 106.5 Transfers of property.

If a recipient sells or otherwise transfers property financed in whole or in part with Federal financial assistance to a transferee which operates any education program or activity, and the Federal share of the fair market value of the property is not upon such sale or transfer properly accounted for to the Federal Government both the transferor and the transferee shall be deemed to be recipients, subject to the provisions of subpart B of this part.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

## § 106.6 Effect of other requirements and preservation of rights.

(a) *Effect of other Federal provisions.* The obligations imposed by this part are independent of, and do not alter, obligations not to discriminate on the basis of sex imposed by Executive Order 11246, as amended; sections 704 and 855 of the Public Health Service Act (42 U.S.C. 292d and 298b−2); Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*); the Equal Pay Act (29 U.S.C. 206 and 206(d)); and any other Act of Congress or Federal regulation.

(Authority: Secs. 901, 902, 905, Education Amendments of 1972, 86 Stat. 373, 374, 375; 20 U.S.C. 1681, 1682, 1685)

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 88 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.30(b)

of all parties or the recipient's educational environment, or deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures. The recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the recipient to provide the supportive measures. The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

(b) As used in §§ 106.44 and 106.45:

*Elementary and secondary school* means a local educational agency (LEA), as defined in the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act, a preschool, or a private elementary or secondary school.

*Postsecondary institution* means an institution of graduate higher education as defined in § 106.2(l), an institution of undergraduate higher education as defined in § 106.2(m), an institution of professional education as defined in § 106.2(n), or an institution of vocational education as defined in § 106.2(o).

*[85 FR 30574, May 19, 2020]*

## § 106.31 Education programs or activities.

(a) *General.* Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance. This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of

(1) a recipient to which subpart C does not apply, or

(2) an entity, not a recipient, to which subpart C would not apply if the entity were a recipient.

(b) *Specific prohibitions.* Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 89 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.31(b)(7)

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

(c) *Assistance administered by a recipient educational institution to study at a foreign institution.* A recipient educational institution may administer or assist in the administration of scholarships, fellowships, or other awards established by foreign or domestic wills, trusts, or similar legal instruments, or by acts of foreign governments and restricted to members of one sex, which are designed to provide opportunities to study abroad, and which are awarded to students who are already matriculating at or who are graduates of the recipient institution; *Provided,* a recipient educational institution which administers or assists in the administration of such scholarships, fellowships, or other awards which are restricted to members of one sex provides, or otherwise makes available reasonable opportunities for similar studies for members of the other sex. Such opportunities may be derived from either domestic or foreign sources.

(d) *Aid, benefits or services not provided by recipient.*

(1) This paragraph applies to any recipient which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational consortia and cooperative employment and student-teaching assignments.

(2) Such recipient:

(i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and

(ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

*[45 FR 30955, May 9, 1980, as amended at 47 FR 32527, July 28, 1982; 65 FR 68056, Nov. 13, 2000; 85 FR 30579, May 19, 2020]*

# § 106.32 Housing.

(a) *Generally.* A recipient shall not, on the basis of sex, apply different rules or regulations, impose different fees or requirements, or offer different services or benefits related to housing, except as provided in this section (including housing provided only to married students).

(b) *Housing provided by recipient.*

(1) A recipient may provide separate housing on the basis of sex.

(2) Housing provided by a recipient to students of one sex, when compared to that provided to students of the other sex, shall be as a whole:

(i) Proportionate in quantity to the number of students of that sex applying for such housing; and

(ii) Comparable in quality and cost to the student.

(c) *Other housing.*

(1) A recipient shall not, on the basis of sex, administer different policies or practices concerning occupancy by its students of housing other than provided by such recipient.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 90 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.34(c)(3)

(3) *Substantially equal factors.* Factors the Department will consider, either individually or in the aggregate as appropriate, in determining whether schools are substantially equal include, but are not limited to, the following: The policies and criteria of admission, the educational benefits provided, including the quality, range, and content of curriculum and other services and the quality and availability of books, instructional materials, and technology, the quality and range of extracurricular offerings, the qualifications of faculty and staff, geographic accessibility, the quality, accessibility, and availability of facilities and resources, and intangible features, such as reputation of faculty.

(4) *Definition.* For the purposes of paragraph (c)(1) through (3) of this section, the term "school" includes a "school within a school," which means an administratively separate school located within another school.

*[71 FR 62542, Oct. 25, 2006, as amended at 85 FR 30579 May 19, 2020]*

## § 106.35 Access to institutions of vocational education.

A recipient shall not, on the basis of sex, exclude any person from admission to any institution of vocational education operated by that recipient.

*[71 FR 62543, Oct. 25, 2006, as amended at 85 FR 30579, May 19, 2020]*

## § 106.36 Counseling and use of appraisal and counseling materials.

(a) *Counseling.* A recipient shall not discriminate against any person on the basis of sex in the counseling or guidance of students or applicants for admission.

(b) *Use of appraisal and counseling materials.* A recipient which uses testing or other materials for appraising or counseling students shall not use different materials for students on the basis of their sex or use materials which permit or require different treatment of students on such basis unless such different materials cover the same occupations and interest areas and the use of such different materials is shown to be essential to eliminate sex bias. Recipients shall develop and use internal procedures for ensuring that such materials do not discriminate on the basis of sex. Where the use of a counseling test or other instrument results in a substantially disproportionate number of members of one sex in any particular course of study or classification, the recipient shall take such action as is necessary to assure itself that such disproportion is not the result of discrimination in the instrument or its application.

(c) *Disproportion in classes.* Where a recipient finds that a particular class contains a substantially disproportionate number of individuals of one sex, the recipient shall take such action as is necessary to assure itself that such disproportion is not the result of discrimination on the basis of sex in counseling or appraisal materials or by counselors.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

## § 106.37 Financial assistance.

(a) *General.* Except as provided in paragraphs (b) and (c) of this section, in providing financial assistance to any of its students, a recipient shall not:

(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 91 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.37(a)(2)

(2) Through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or

(3) Apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

(b) *Financial aid established by certain legal instruments.*

(1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein; *Provided,* That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex.

(2) To ensure nondiscriminatory awards of assistance as required in paragraph (b)(1) of this section, recipients shall develop and use procedures under which:

(i) Students are selected for award of financial assistance on the basis of nondiscriminatory criteria and not on the basis of availability of funds restricted to members of a particular sex;

(ii) An appropriate sex-restricted scholarship, fellowship, or other form of financial assistance is allocated to each student selected under paragraph (b)(2)(i) of this section; and

(iii) No student is denied the award for which he or she was selected under paragraph (b)(2)(i) of this section because of the absence of a scholarship, fellowship, or other form of financial assistance designated for a member of that student's sex.

(c) *Athletic scholarships.*

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

## § 106.38 Employment assistance to students.

(a) *Assistance by recipient in making available outside employment.* A recipient which assists any agency, organization or person in making employment available to any of its students:

(1) Shall assure itself that such employment is made available without discrimination on the basis of sex; and

(2) Shall not render such services to any agency, organization, or person which discriminates on the basis of sex in its employment practices.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 92 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.38(b)

(b) *Employment of students by recipients.* A recipient which employs any of its students shall not do so in a manner which violates subpart E of this part.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

## § 106.39 Health and insurance benefits and services.

In providing a medical, hospital, accident, or life insurance benefit, service, policy, or plan to any of its students, a recipient shall not discriminate on the basis of sex, or provide such benefit, service, policy, or plan in a manner which would violate Subpart E of this part if it were provided to employees of the recipient. This section shall not prohibit a recipient from providing any benefit or service which may be used by a different proportion of students of one sex than of the other, including family planning services. However, any recipient which provides full coverage health service shall provide gynecological care.

*[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]*

## § 106.40 Marital or parental status.

(a) *Status generally.* A recipient shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex.

(b) *Pregnancy and related conditions.*

(1) A recipient shall not discriminate against any student, or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.

(2) A recipient may require such a student to obtain the certification of a physician that the student is physically and emotionally able to continue participation so long as such a certification is required of all students for other physical or emotional conditions requiring the attention of a physician.

(3) A recipient which operates a portion of its education program or activity separately for pregnant students, admittance to which is completely voluntary on the part of the student as provided in paragraph (b)(1) of this section shall ensure that the separate portion is comparable to that offered to non-pregnant students.

(4) A recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom in the same manner and under the same policies as any other temporary disability with respect to any medical or hospital benefit, service, plan or policy which such recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's educational program or activity.

(5) In the case of a recipient which does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy, a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom as a justification for a leave of absence for so long a period of time as is deemed medically necessary by the student's physician, at the conclusion of which the student shall be reinstated to the status which she held when the leave began.

Case: 25-4190, 10/29/2025, DktEntry: 36.1, Page 93 of 109

34 CFR Part 106 (up to date as of 8/03/2023)
Nondiscrimination on the Basis of Sex in Education Programs or...

34 CFR 106.41

[45 FR 30955, May 9, 1980, as amended at 65 FR 68056, Nov. 13, 2000; 85 FR 30579, May 19, 2020]

## § 106.41 Athletics.

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) *Equal opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

  (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

  (2) The provision of equipment and supplies;

  (3) Scheduling of games and practice time;

  (4) Travel and per diem allowance;

  (5) Opportunity to receive coaching and academic tutoring;

  (6) Assignment and compensation of coaches and tutors;

  (7) Provision of locker rooms, practice and competitive facilities;

  (8) Provision of medical and training facilities and services;

  (9) Provision of housing and dining facilities and services;

  (10) Publicity.

  Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

(d) *Adjustment period.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the elementary school level shall comply fully with this section as expeditiously as possible but in no event later than one year from the effective date of this regulation. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the secondary or post-secondary school level shall comply fully with this section as expeditiously as possible but in no event later than three years from the effective date of this regulation.

Skip to main content    About Us (/about/)    Contact Us (/about/contacts/gen/)    FAQs (https://answers.ed.gov/)    Language Assistance



(http://www.ed.gov/)

## U.S. Department of Education

Search...

**ABOUT ED (/ABOUT/LANDING.JHTML?SRC=LN)  /  OFFICES**


Office for Civil Rights

| | |
|---|---|
| Home (/about/offices/list/ocr/index.html) | About OCR (/about/offices/list/ocr/aboutocr.html) |
| Programs/Initiatives (/policy/rights/reg/ocr/index.html) (/about/offices/list/ocr/frontpage/faq/readingroom.html) | Reading Room (/about/offices/list/ocr/frontpage/faq/readingroom.html) |
| Office Contacts (http://wdcrobcolp1.ed.gov/CFAPPS/OCR/contactus.cfm) | Frequently Asked Questions (/about/offices/list/ocr/faqs.html) |
| Reports & Resources (/about/offices/list/ocr/reports-resources.html) | Careers/Internships (/about/offices/list/ocr/frontpage/careers/careers-index.html) |
| News (/about/offices/list/ocr/newsroom.html) | |

## A Policy Interpretation: Title IX and Intercollegiate Athletics

Federal Register, Vol.44, No. 239 - Tuesday, Dec. 11, 1979

Intercollegiate athletics policy interpretation; provides more specific factors to be reviewed by OCR under program factors listed at Section 106.41 Of the Title IX regulation; explains OCR's approach to determining compliance in inter-collegiate athletics; adds two program factors, recruitment and support services to be reviewed; clarifies requirement for athletic scholarships - 34 C.F.R. Section 106.37(C). The contains dated references, and footnote 6 is out of date; however, the policy is still current.

**Federal Register** / Vol. 44, No. 239 / Tuesday, December 11, 1979 / Rules and Regulations

**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**

**Office for Civil Rights**

**Office of the Secretary**

**45 CFR Part 26**

**Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics**

**AGENCY:** Office for Civil Rights, Office of the Secretary, HEW.

**ACTION:** Policy interpretation.

**SUMMARY:** The following Policy Interpretation represents the Department of Health, Education, and Welfare's interpretation of the intercollegiate athletic provisions of Title IX of the Education Amendments of 1972 and its implementing regulation. Title IX prohibits educational programs and institutions funded or otherwise supported by the Department from discriminating on the basis of sex. The Department published a proposed Policy Interpretation for public comment on December 11, 1978. Over 700 comments reflecting a broad range of opinion were received. In addition, HEW staff visited eight universities during June and July, 1979, to see how the proposed policy and other suggested alternatives would apply in actual practice at individual campuses. The final Policy Interpretation reflects the many comments HEW received and the results of the individual campus visits

**EFFECTIVE DATE:** December 11, 1979

**FOR FURTHER INFORMATION CONTACT:** Colleen O'Connor, 330 Independence Avenue, Washington, D.C. (202) 245-6671

**SUPPLEMENTARY INFORMATION:**

**1. Legal Background**

**A. The Statute**

### How Do I Find...

- Student loans, forgiveness (/fund/grants-college.html?src=rn)
- College accreditation (http://www.ed.gov/accreditation?src=rn)
- No Child Left Behind (/nclb/landing.jhtml?src=rn)
- FERPA (/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (http://fafsa.ed.gov/)
- 2015 Budget Proposal (http://www.ed.gov/budget15?src=rn)
  More > (/about/top-tasks.html?src=rn)

### Information About...

- Transforming Teaching (http://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (http://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (http://www.ed.gov/early-learning?src=rn)
- K-12 Reforms (http://www.ed.gov/k-12reforms?src=rn)
  More > (http://www.ed.gov/priorities?src=rn)

### Related Topics

How to File a Complaint (/about/offices/list/ocr/docs/howto.html?src=rt)

Topics A-Z (/about/offices/list/ocr/topics.html?src=rt)

Civil Rights Data Collection (CRDC) (/about/offices/list/ocr/data.html?src=rt)

Other Civil Rights Agencies (/about/offices/list/ocr/related.html?src=rt)

Recursos de la Oficina Para Derechos en Español (http://www.ed.gov/about/offices/list/ocr/sp.html)

Resources Available in Other Languages (http://www.ed.gov/about/offices/list/ocr/index.html)

Section 901(a) of Title IX of the Education Amendments of 1972 provides:

- No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Section 844 of the Education Amendments of 1974 further provides:

- The Secretary of [of HEW] shall prepare and publish ! ! ! proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

Congress passed Section 844 after the Conference Committee deleted a Senate floor amendment that would have exempted revenue-producing athletics from the jurisdiction of Title IX.

**B. The Regulation**

The regulation implementing Title IX is set forth, in pertinent part, in the Policy Interpretation below. It was signed by President Ford on May 27, 1975, and submitted to the Congress for review pursuant to Section 431(d)(1) of the General Education Provisions Act (GEPA).

During this review, the House Subcommittee on Postsecondary Education held hearings on a resolution disapproving the regulation. The Congress did not disapprove the regulation within the 45 days allowed under GEPA, and it therefore became effective on July 21, 1975.

Subsequent hearings were held in the Senate Subcommittee on Education on a bill to exclude revenues produced by sports to the extent they are used to pay the costs of those sports. The Committee, however, took no action on this bill.

The regulation established a three year transition period to give institutions time to comply with its equal athletic opportunity requirements. That transition period expired on July 21, 1978.

**II. Purpose of Policy Interpretation**

By the end of July 1978, the Department had received nearly 100 complaints alleging discrimination in athletics against more than 50 institutions of higher education. In attempting to investigate these complaints, and to answer questions from the university community, the Department determined that it should provide further guidance on what constitutes compliance with the law. Accordingly, this Policy Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved, and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.

**III. Scope of Application**

This Policy Interpretation is designed specifically for intercollegiate athletics. However, its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by regulation. Accordingly, the Policy Interpretation may be used for guidance by the administrators of such programs when appropriate.

This policy interpretation applies to any public or private institution, person or other entity that operates an educational program or activity which receives or benefits from financial assistance authorized or extended under a law administered by the Department. This includes educational institutions whose students participate in HEW funded or guaranteed student loan or assistance programs. For further information see definition of "recipient" in Section 86.2 of the Title IX regulation.

**IV. Summary of Final Policy Interpretation**

The final Policy Interpretation clarifies the meaning of "equal opportunity" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory. The Policy Interpretation is divided into three sections:

- Compliance in Financial Assistance (Scholarships) Based on Athletic Ability: Pursuant to the regulation, the governing principle in this area is that all such assistance should be available on a substantially proportional basis to the number of male and female participants in the institution's athletic program.
- Compliance in Other Program Areas (Equipment and supplies; games and practice times; travel and per diem, coaching and academic tutoring; assignment and compensation of coaches and tutors; locker rooms, and practice and competitive facilities; medical and training facilities; housing and dining facilities; publicity; recruitment; and support services): Pursuant to the regulation, the governing principle is that male and female athletes should receive equivalent treatment, benefits, and opportunities.
- Compliance in Meeting the Interests and Abilities of Male and Female Students: Pursuant to the regulation, the governing principle in this area is that the athletic interests and abilities of male and female students must be equally effectively accommodated.

**V. Major Changes to Proposed Policy Interpretation**

The final Policy Interpretation has been revised from the one published in proposed form on December 11, 1978. The proposed Policy Interpretation was based on a two-part approach. Part I addressed equal opportunity for participants in athletic programs. It required the elimination of discrimination in financial support and other benefits and opportunities in an institution's existing athletic program. Institutions could establish a presumption of compliance if they could demonstrate that:

- "Average per capita" expenditures for male and female athletes were substantially equal in the area of "readily financially

measurable" benefits and opportunities or, if not, that any disparities were the result of nondiscriminatory factors, and

- Benefits and opportunities for male and female athletes, in areas which are not financially measurable, "were comparable."

Part II of the proposed Policy Interpretation addressed an institution's obligation to accommodate effectively the athletic interests and abilities of women as well as men on a continuing basis. It required an institution either

- To follow a policy of development of its women's athletic program to provide the participation and competition opportunities needed to accommodate the growing interests and abilities of women, or
- To demonstrate that it was effectively (and equally) accommodating the athletic interests and abilities of students, particularly as the interests and abilities of women students developed.

While the basic considerations of equal opportunity remain, the final Policy Interpretation sets forth the factors that will be examined to determine an institution's actual, as opposed to presumed, compliance with Title IX in the area of intercollegiate athletics.

The final Policy Interpretation does not contain a separate section on institutions' future responsibilities. However, institutions remain obligated by the Title IX regulation to accommodate effectively the interests and abilities of male and female students with regard to the selection of sports and levels of competition available. In most cases, this will entail development of athletic programs that substantially expand opportunities for women to participate and compete at all levels.

The major reasons for the change in approach are as follows:

(1) Institutions and representatives of athletic program participants expressed a need for more definitive guidance on what constituted compliance than the discussion of a presumption of compliance provided. Consequently the final Policy Interpretation explains the meaning of "equal athletic opportunity" in such a way as to facilitate an assessment of compliance.

(2) Many comments reflected a serious misunderstanding of the presumption of compliance. Most institutions based objections to the proposed Policy Interpretation in part on the assumption that failure to provide compelling justifications for disparities in per capita expenditures would have automatically resulted in a finding of noncompliance. In fact, such a failure would only have deprived an institution of the benefit of the presumption that it was in compliance with the law. The Department would still have had the burden of demonstrating that the institution was actually engaged in unlawful discrimination. Since the purpose of issuing a policy interpretation was to clarify the regulation, the Department has determined that the approach of stating actual compliance factors would be more useful to all concerned.

(3) The Department has concluded that purely financial measures such as the per capita test do not in themselves offer conclusive documentation of discrimination, except where the benefit or opportunity under review, like a scholarship, is itself financial in nature. Consequently, in the final Policy Interpretation, the Department has detailed the factors to be considered in assessing actual compliance. While per capita breakdowns and other devices to examine expenditure patterns will be used as tools of analysis in the Department's investigative process, it is achievement of "equal opportunity" for which recipients are responsible and to which the final Policy Interpretation is addressed.

A description of the comments received, and other information obtained through the comment/consultation process, with a description of Departmental action in response to the major points raised, is set forth at Appendix "B" to this document.

- **VI. Historic Patterns of Intercollegiate Athletics Program Development and Operations**

In its proposed Policy Interpretation of December 11, 1978, the Department published a summary of historic patterns affecting the relative status of men's and women's athletic programs. The Department has modified that summary to reflect additional information obtained during the comment and consultation process. The summary is set forth at Appendix A to this document.

**VII. The Policy Interpretation**

This Policy Interpretation clarifies the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at 45 CFR 88.37(c) and 88.4a(c).

**A. Athletic Financial Assistance (Scholarships)**

1. The Regulation. Section 86.37(c) of the regulation provides:

- [Institutions] must provide reasonable opportunities for such award (of financial assistance) for member of each sex in proportion to the number of students of each sex participating in ! ! ! inter-collegiate athletics.

2. The Policy - The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or femaLe participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors. Two such factors are:

a. At public institutions, the higher costs of tuition for students from out-of state may in some years be unevenly' distributed between men's and women's programs. These differences will be considered nondiscriminatory if they are not the result of policies or practices which disproportionately limit the availability of out-of-state scholarships to either men or women.

b. An institution may make reasonable professional decisions concerning the awards most appropriate for program development. For example, team development initially may require spreading scholarships over as much as a full generation [four years] of student athletes. This may result in the award of fewer scholarships in the first few years than would be necessary to create proportionality between male and female athletes.

3. Application of the Policy - a. This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates.

b. When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX.

4. Definition - For purposes of examining compliance with this Section, the participants will be defined as those athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season: and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

B. Equivalence in Other Athletic Benefits and Opportunities

1. The Regulation C The Regulation requires that recipients that operate or sponsor interscholastic, intercollegiate, club or intramural athletics. "provide equal athletic opportunities for members of both sexes." In determining whether an institution is providing equal opportunity in intercollegiate athletics the regulation requires the Department to consider, among others, the following factors:

(1)

(2) Provision and maintenance of equipment and supplies;

(3) Scheduling of games and practice times;

(4) Travel and per diem expenses;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training services and facilities;

(9) Provision of housing and dining services and facilities; and

(10) Publicity

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this Section also addresses recruitment of student athletes and provision of support services.

This list is not exhaustive. Under the regulation, it may be expanded as necessary at the discretion of the Director of the Office for Civil Rights.

2. The Policy - The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effects of any differences is negligible.

If comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors. Some of the factors that may justify these differences are as follows:

a. Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities. This type of distinction was called for by the "Javits' Amendment" to Title IX which instructed HEW to make "reasonable (regulatory) provisions considering the nature of particular sports" in intercollegiate athletics.

Generally, these differences will be the result of factors that are inherent to the basic operation of specific sports. Such factors may include rules of play, nature/replacement of equipment, rates of injury resulting from participation, nature of facilities required for competition, and the maintenance/ upkeep requirements of those facilities. For the most part, differences involving such factors will occur in programs offering football, and consequently these differences will favor men. If sport-specific needs are met equivalently in both men's and women's programs, however, differences in particular program components will be found to be justifiable.

b. Some aspects of athletic programs may not be equivalent for men and women because of legitimately sex-neutral factors related to special circumstances of a temporary nature. For example, large disparities in recruitment activity for any particular year may be the result of annual fluctuations in team needs for first-year athletes. Such differences are justifiable to the extent that they do not reduce overall equality of opportunity.

c. The activities directly associated with the operation of a competitive event in a single-sex sport may, under some circumstances, create unique demands or imbalances in particular program components. Provided any special demands associated with the activities of sports involving participants of the other sex are met to an equivalent degree, the resulting differences may be found nondiscriminatory. At many schools, for example, certain sportsCnotably football and men's basketballCtraditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event

management to men's and women's programs may differ in degree and kind. These differences would not violate Title IX if the recipient does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of event management support available to both programs are based on sex-neutral criteria (e.g.. facilities used, projected attendance, and staffing needs).

d. Some aspects of athletic programs may not be equivalent for men and women because institutions are undertaking voluntary affirmative actions to overcome effects of historical conditions that have limited participation in athletics by the members of one sex. This is authorized at ' 86.3(b) of the regulation.

3. Application of the Policy - General Athletic Program Components C

a. Equipment and Supplies (' 86.41(c)(2)). Equipment and supplies include but are not limited to uniforms, other apparel, sport-specific equipment and supplies, general equipment and supplies, instructional devices, and conditioning and weight training equipment.

Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The quality of equipment and supplies:

(2) The amount of equipment and supplies;

(3) The suitability of equipment and supplies:

(4) The maintenance and replacement of the equipment and supplies; and

(5) The availability of equipment and supplies.

b. Scheduling of Games and Practice Times (' 86.41(c)(3)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The number of competitive events per sport;

(2) The number and length of practice opportunities;

(3) The time of day competitive events are scheduled;

(4) The time of day practice opportunities are scheduled; and

(5) The opportunities to engage in available pre-season and post-season competition.

c. Travel and Per Diem Allowances (' 86.41(c)(4)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Modes of transportation;

(2) Housing furnished during travel:

(3) Length of stay before and after competitive events:

(4) Per diem allowances: and

(5) Dining arrangements.

d. Opportunity to Receive Coaching and Academic Tutoring (' 86.41(c)(5)). (1) CoachingCCompliance will be assessed by examining, among other factors:

(a) Relative availability of full-time coaches:

(b) Relative availability of part-time and assistant coaches; and

(c) Relative availability of graduate assistants.

(2) Academic tutoring-Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(a) The availability of tutoring; and

(b) Procedures and criteria for obtaining tutorial assistance.

e. Assignment and Compensation of Coaches and Tutors (' 86.41(c)(6)). In general, a violation of Section 86.41(c)(6) will be found only where compensation or assignment policies or practices deny male and female athletes coaching of equivalent quality, nature, or availability.

Nondiscriminatory factors can affect the compensation of coaches. In determining whether differences are caused by permissible factors, the range and nature of duties, the experience of individual coaches, the number of participants for particular sports, the number of assistant coaches supervised, and the level of competition will be considered.

Where these or similar factors represent valid differences in skill, effort, responsibility or working conditions they may, in specific circumstances, justify differences in compensation. Similarly, there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary.

(1) Assignment of Coaches - Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Training, experience, and other professional qualifications;

(b) Professional standing.

(2) Assignment of Tutors-Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

(a) Tutor qualifications;

(b) Training, experience, and other qualifications.

(3) Compensation of Coaches - Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Rate of compensation (per sport, per season);

(b) Duration of contracts;

(c) Conditions relating to contract renewal;

(d) Experience;

(e) Nature of coaching duties performed;

(f) Working conditions; and

(g) Other terms and conditions of employment.

(4) Compensation of Tutors - Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

(a) Hourly rate of payment by nature subjects tutored;

(b) Pupil loads per tutoring season;

(c) Tutor qualifications;

(d) Experience;

(e) Other terms and conditions of employment.

f. Provision of Locker Rooms, Practice and Competitive Facilities (' 86.41(c)(7)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Quality and availability of the facilities provided for practice and competitive events;

(2) Exclusivity of use of facilities provided for practice and competitive events;

(3) Availability of locker rooms;

(4) Quality of locker rooms;

(5) Maintenance of practice and competitive facilities; and

(6) Preparation of facilities for practice and competitive events.

g. Provision of Medical and Training Facilities and Services (' 86.41(c)(8)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability of medical personnel and assistance;

(2) Health, accident and injury insurance coverage;

(3) Availability and quality of weight and training facilities;

(4) Availability and quality of conditioning facilities; and

(5) Availability and qualifications of athletic trainers.

h. Provision of Housing and Dining Facilities and Services (' 86.41(c)(9). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Housing provided;

(2) Special services as part of housing arrangements (e.g., laundry facilities, parking space, maid service).

i. Publicity (' 86.41(c)(10)). Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability and quality of sports information personnel;

(2) Access to other publicity resources for men's and women's programs; and

(3) Quantity and quality of publications and other promotional devices featuring men's and women's programs.

4. Application of the Policy-Other Factors (' 86.41(c)). a. Recruitment of Student Athletes. The athletic recruitment practices of institutions often affect the overall provision of opportunity to male and female athletes. Accordingly, where equal athletic opportunities are not present for male and female students, compliance will be assessed by examining the recruitment practices of the athletic programs for both sexes to determine whether the provision of equal opportunity will require modification of those practices.

Such examinations will review the following factors:

(1) Whether coaches or other professional athletic personnel in the programs serving male and female athletes are provided with substantially equal opportunities to recruit;

(2) Whether the financial and other resources made available for recruitment in male and female athletic programs are equivalently adequate to meet the needs of each program; and

(3) Whether the differences in benefits, opportunities, and treatment afforded prospective student athletes of each sex have a disproportionately limiting effect upon the recruitment of students of either sex.

b. Provision of Support Services. The administrative and clerical support provided to an athletic program can affect the overall provision of opportunity to male and female athletes, particularly to the extent that the provided services enable coaches to perform better their coaching functions.

In the provision of support services, compliance will be assessed by examining, among other factors, the equivalence of:

(1) The amount of administrative assistance provided to men's and women's programs;

(2) The amount of secretarial and clerical assistance provided to men's and women's programs.

5. Overall Determination of Compliance. The Department will base its compliance determination under ' 86.41(c) of the regulation upon an examination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole; or

c. Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.

C. Effective Accommodation of Student Interests and Abilities.

1. The Regulation. The regulation requires institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes.

Specifically, the regulation, at ' 86.41(c)(1), requires the Director to consider, when determining whether equal opportunities are availableC

Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this section also addresses competitive opportunities in terms of the competitive team schedules available to athletes of both sexes.

2. The Policy. The Department will assess compliance with the interests and abilities section of the regulation by examining the following factors:

a. The determination of athletic interests and abilities of students;

b. The selection of sports offered; and

c. The levels of competition available including the opportunity for team competition.

3. Application of the Policy C Determination of Athletic Interests and Abilities.

Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

a. The processes take into account the nationally increasing levels of women's interests and abilities;

b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;

c. The methods of determining ability take into account team performance records; and

d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

4. Application of the Policy - Selection of Sports.

In the selection of sports, the regulation does not require institutions to integrate their teams nor to provide exactly the same choice of sports to men and women. However, where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex.

a. Contact Sports - Effective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited; and

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.

b. Non-Contact Sports - Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited;

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and

(3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected.

5. Application of the Policy - Levels of Competition.

In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

b. Compliance with this provision of the regulation will also be assessed by examining the following:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

c. Institutions are not required to upgrade teams to intercollegiate status or otherwise develop intercollegiate sports absent a reasonable expectation that intercollegiate competition in that sport will be available within the institution's normal competitive regions. Institutions may be required by the Title IX regulation to actively encourage the development of such competition, however, when overall athletic opportunities within that region have been historically limited for the members of one sex.

6. Overall Determination of Compliance.

The Department will base its compliance determination under ' 86.41(c) of the regulation upon a determination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

VIII. The Enforcement Process

The process of Title IX enforcement is set forth in ' 88.71 of the Title IX regulation, which incorporates by reference the enforcement procedures applicable to Title VI of the Civil Rights

Act of 1964. The enforcement process prescribed by the regulation is supplemented by an order of the Federal District Court, District of Columbia, which establishes time frames for each of the enforcement steps.

According to the regulation, there are two ways in which enforcement is initiated:

- Compliance Reviews - Periodically the Department must select a number of recipients (in this case, colleges and universities which operate intercollegiate athletic programs) and conduct investigations to determine whether recipients are complying with Title IX (45 CFR 80.7(a))
- Complaints - The Department must investigate all valid (written and timely) complaints alleging discrimination on the basis of sex in a recipient's programs. (45 CFR 80.7(b))

The Department must inform the recipient (and the complainant, if applicable) of the results of its investigation. If the investigation indicates that a recipient is in compliance, the Department states this, and the case is closed. If the investigation indicates noncompliance, the Department outlines the violations found.

The Department has 90 days to conduct an investigation and inform the recipient of its findings, and an additional 90 days to resolve violations by obtaining a voluntary compliance agreement from the recipient. This is done through negotiations between the Department and the recipient, the goal of which is agreement on steps the recipient will take to achieve compliance. Sometimes the violation is relatively minor and can be corrected immediately. At other times, however, the negotiations result in a plan that will correct the violations within a specified period of time. To be acceptable, a plan must describe the manner in which institutional resources will be used to correct the violation. It also must state acceptable time tables for reaching interim goals and full compliance. When agreement is reached, the Department notifies the institution that its plan is acceptable. The Department then is obligated to review periodically the implementation of the plan.

G:\COMP\CIVILRTS\CIVIL RIGHTS RESTORATION ACT OF 1987.XML

# CIVIL RIGHTS RESTORATION ACT OF 1987

[Public Law 100–259; 102 Stat. 28]

[As Amended Through P.L. 100-259, Enacted March 22, 1988]

〚Currency: This publication is a compilation of Public Law 100-259. It was last amended by the public law listed in the As Amended Through note above and below at the bottom of each page of the pdf version and reflects current law through the date of the enactment of the public law listed at https://www.govinfo.gov/app/collection/comps/〛

〚Note: While this publication does not represent an official version of any Federal statute, substantial efforts have been made to ensure the accuracy of its contents. The official version of Federal law is found in the United States Statutes at Large and in the United States Code. The legal effect to be given to the Statutes at Large and the United States Code is established by statute (1 U.S.C. 112, 204).〛

An Act to restore the broad scope of coverage and to clarify the application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SHORT TITLE

SECTION 1. This Act may be cited as the "Civil Rights Restoration Act of 1987".

〚20 U.S.C. 1681 note〛

FINDINGS OF CONGRESS

SEC. 2. The Congress finds that—

(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964; and

(2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

〚20 U.S.C. 1687 note〛

EDUCATION AMENDMENTS AMENDMENT

SEC. 3. (a) 〚Amends title IX of the Education Amendments of 1972 by adding at the end the new sections 908 and 909.〛

1

G:\COMP\CIVILRTS\CIVIL RIGHTS RESTORATION ACT OF 1987.XML

### REHABILITATION ACT AMENDMENT

SEC. 4. 〖Amends section 504 of the Rehabilitation Act of 1973.〗

### AGE DISCRIMINATION ACT AMENDMENT

SEC. 5. 〖Amends section 309 of the Age Discrimination Act of 1975.〗

### CIVIL RIGHTS ACT AMENDMENT

SEC. 6. 〖Amends title VI of the Civil Rights Act of 1964.〗

### RULE OF CONSTRUCTION

SEC. 7. Nothing in the amendments made by this Act shall be construed to extend the application of the Acts so amended to ultimate beneficiaries of Federal financial assistance excluded from coverage before the enactment of this Act.

〖20 U.S.C. 1687 note〗

### ABORTION NEUTRALITY

SEC. 8. No provision of this Act or any amendment made by this Act shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal Funds to perform or pay for an abortion.

〖20 U.S.C. 1688 note〗

### CLARIFICATION OF INDIVIDUALS WITH HANDICAPS IN THE EMPLOYMENT CONTEXT

SEC. 9. 〖Amends section 7(8) of the Rehabilitation Act of 1973.〗

(3) *Extent of Relief.* Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded. The court may grant judgment to one or more plaintiffs according to their rights, and against one or more defendants according to their liabilities.

(b) PROTECTIVE MEASURES. The court may issue orders—including an order for separate trials—to protect a party against embarrassment, delay, expense, or other prejudice that arises from including a person against whom the party asserts no claim and who asserts no claim against the party.

(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 21. Misjoinder and Nonjoinder of Parties

Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.

(As amended Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 22. Interpleader

(a) GROUNDS.

(1) *By a Plaintiff.* Persons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead. Joinder for interpleader is proper even though:

(A) the claims of the several claimants, or the titles on which their claims depend, lack a common origin or are adverse and independent rather than identical; or

(B) the plaintiff denies liability in whole or in part to any or all of the claimants.

(2) *By a Defendant.* A defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim.

(b) RELATION TO OTHER RULES AND STATUTES. This rule supplements—and does not limit—the joinder of parties allowed by Rule 20. The remedy this rule provides is in addition to—and does not supersede or limit—the remedy provided by 28 U.S.C. §§ 1335, 1397, and 2361. An action under those statutes must be conducted under these rules.

(As amended Dec. 29, 1948, eff. Oct. 20, 1949; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 23. Class Actions

(a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

    (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

    (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D) the likely difficulties in managing a class action.

(c) CERTIFICATION ORDER; NOTICE TO CLASS MEMBERS; JUDGMENT; ISSUES CLASSES; SUBCLASSES.

(1) *Certification Order.*

    (A) *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

    (B) *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

    (C) *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

(2) *Notice.*

    (A) *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

    (B) *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States

mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:

>   (i) the nature of the action;

>   (ii) the definition of the class certified;

>   (iii) the class claims, issues, or defenses;

>   (iv) that a class member may enter an appearance through an attorney if the member so desires;

>   (v) that the court will exclude from the class any member who requests exclusion;

>   (vi) the time and manner for requesting exclusion; and

>   (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

>   (A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

>   (B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) CONDUCTING THE ACTION.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

>   (A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

>   (B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

>>   (i) any step in the action;

>>   (ii) the proposed extent of the judgment; or

>>   (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

>   (C) impose conditions on the representative parties or on intervenors;

>   (D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

>   (E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval.

33 FEDERAL RULES OF CIVIL PROCEDURE **Rule 23**

The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) *Notice to the Class.*

(A) *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to Be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections.*

(A) *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) *Procedure for Approval After an Appeal.* If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

(f) APPEALS. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) CLASS COUNSEL.

(1) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

(h) ATTORNEY'S FEES AND NONTAXABLE COSTS. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a

35          FEDERAL RULES OF CIVIL PROCEDURE          **Rule 23.2**

time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 24, 1998, eff. Dec. 1, 1998; Mar. 27, 2003, eff. Dec. 1, 2003; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 26, 2018, eff. Dec. 1, 2018.)

## Rule 23.1. Derivative Actions

(a) PREREQUISITES. This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

(b) PLEADING REQUIREMENTS. The complaint must be verified and must:

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

(c) SETTLEMENT, DISMISSAL, AND COMPROMISE. A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders.

(As added Feb. 28, 1966, eff. July 1, 1966; amended Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 23.2. Actions Relating to Unincorporated Associations

This rule applies to an action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties. The action may be maintained